# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

**James Michael Kenney-Prentiss**

Plaintiff

v.

**Stephanie Renee Hoffer**

Defendant

Case No. 1:25-cv-2018-MPB-TAB

**Complaint**
1. Defamation
2. Invasion of Privacy
3. Malicious Prosecution
4. Abuse of Process
5. Crime Victims Relief Act Claims
6. Tort of Conversion
7. Intentional Infliction of Emotional Distress
8. Tortious Interference with Parenting Rights
9. Civil Conspiracy

**Demand for a Jury Trial**

FILED
10/02/2025
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

"You should have lost that case."
- Stephanie Hoffer

*(Ms. Hoffer's immediate response to Mr. Kenney-Prentiss after he said he would have committed suicide if he lost the protection order case she filed against him.)*

**COMES NOW** James Michael Kenney-Prentiss, an individual ("Mr. Kenney-Prentiss"), against Stephanie Renee Hoffer ("Ms. Hoffer").

## 1. Summary of Action

Mr. Kenney-Prentiss brings forth this action to redress a multi-year course of intimate partner abuse, non-privileged defamation, and manipulation of legal process by Ms. Hoffer, his former law professor and mother of their child-in-common. After their relationship ended, Ms. Hoffer embarked on a campaign to (i) exclude Mr. Kenney-Prentiss from their young son's life, including a continuous 190-day denial of parenting time in 2024; (ii) weaponize court process, initiating an *ex parte* protection order proceeding without probable cause that was dismissed after

hearing; (iii) spread false statements about Mr. Kenney-Prentiss to third parties impugning his character and parental fitness; and (iv) exert unauthorized control over his property while destroying or withholding evidence to mask these acts. Ms. Hoffer's conduct was not an isolated lapse but a sustained course of coercive control—punishing Mr. Kenney-Prentiss for leaving the shared home in September 2023, falsely accusing him of rape, and causing severe emotional distress, including suicidal ideation.

This case is about truth and consequences. Mr. Kenney-Prentiss did the right thing — maintained a loving relationship with his son, pursued parenting time through the courts, and co-parented in good faith. Meanwhile, Ms. Hoffer did what the law forbids — false statements, concealment, and using legal process as punishment. For her misconduct, the law supplies the remedy.

## 2. Venue and Jurisdiction

Venue is proper because Ms. Hoffer is a citizen of Indiana and a substantial part of the events giving rise to the claims occurred in this District. The Court has jurisdiction over Mr. Kenney-Prentiss' claims through its diversity jurisdiction under 28 U.S. Code § 1332. Mr. Kenney-Prentiss is a citizen of Ohio. Ms. Hoffer is a citizen of Indiana. The amount in controversy well exceeds $75,000.

## 3. The Parties

Mr. Kenney-Prentiss is a citizen of Ohio. From 2020 to 2023, Mr. Kenney-Prentiss lived with Ms. Hoffer in Zionsville, Indiana.

Defendant Ms. Hoffer is a resident of Zionsville, Indiana and is currently the Lawrence A. Jegen III Chair in Tax Law at the Indiana University McKinney School of Law.

Mr. Kenney-Prentiss and Ms. Hoffer have one minor child-in-common ("Child"), born in 2017.

# 4. Factual Background

## 4.1. Timeline of Key Events

1. In 2016, Mr. Kenney-Prentiss became one of Ms. Hoffer's law students for her Tax Policy class at The Ohio State University's Moritz College of Law. Ms. Hoffer was a tenured law professor.

2. Shortly thereafter, Ms. Hoffer became pregnant.

3. Their child-in-common ("Child") was born in 2017.

4. At that time, Ms. Hoffer was living in Columbus with Mr. Perry and their two children-in-common ("Half-Brother 1" and "Half-Brother 2"). Mr. Perry moved out of Ms. Hoffer's residence in the Fall of 2018.

5. Mr. Kenney-Prentiss graduated from law school in 2016. At the time, he was in the Selected Marine Corps Reserves. In 2017, Mr. Kenney-Prentiss went on active duty and was stationed aboard Camp Lejeune, North Carolina.

6. In 2018, Ms. Hoffer became a Fulbright Scholar. Ms. Hoffer and Mr. Kenney-Prentiss lived in Vienna, Austria with Child. Ms. Hoffer taught at a local university for the Spring semester. Ms. Hoffer kicked Mr. Kenney-Prentiss out of their residence in May 2018. She returned with Child over the summer.

7. After returning home, Mr. Kenney-Prentiss got deployed. Mr. Kenney-Prentiss served overseas from 2018 to 2019.

8. Mr. Kenney-Prentiss is from Cleveland, Ohio. He has a large extended family in the area. However, after returning home from deployment in 2019, he moved to Columbus, Ohio to be close to Child. Child stayed with him for three nights every week.

9. In 2019, Ms. Hoffer received an offer to become a chaired law professor at Indiana University, McKinney School of Law.

10. In July 2020, Mr. Kenney-Prentiss and Ms. Hoffer moved to Zionsville, Indiana together, along with the three children.

11. Mr. Perry eventually moved to Indianapolis. However, Mr. Perry was prohibited from visiting Mr. Kenney-Prentiss and Ms. Hoffer's residence.

12. In moving in together, Mr. Kenney-Prentiss and Ms. Hoffer entered an exclusive, committed relationship. It did not go well.

13. In September 2023, Mr. Kenney-Prentiss moved out of the residence and returned to Cleveland, Ohio. Mr. Kenney-Prentiss moved in with his elderly grandmother to become her primary caretaker because she needed someone at her residence 24/7.

14. Before Mr. Kenney-Prentiss left her, Ms. Hoffer strenuously attempted to get Mr. Kenney-Prentiss to stay.

15. After Mr. Kenney-Prentiss left her, Ms. Hoffer refused to co-parent and began denying parenting time between Mr. Kenney-Prentiss and Child.

16. In February 2024, Ms. Hoffer filed for an *ex parte* order of protection against Mr. Kenney-Prentiss in Boone Superior Court I. Cause No. 06D01-2402-PO-000332. After several continuances, Ms. Hoffer's petition was dismissed by the trial court on December 18, 2024. Ms. Hoffer's petition contained more than one hundred false and misleading allegations made under oath.

17. Starting in April 2024, Ms. Hoffer began preventing all parenting time between Mr. Kenney-Prentiss and Child, despite her *ex parte* protection order applying only to her.

18. Due to Ms. Hoffer's actions, Mr. Kenney-Prentiss filed a custody suit to be able to see his son again.

19. Mr. Kenney-Prentiss did not see Child until October 2024, and did not have a set schedule with Child until November 2024. Her habit of denying parenting time continues to the present day.

20. As a result of Ms. Hoffer's actions, Mr. Kenney-Prentiss emptied all his savings to pay for legal bills, had to leave the Marine Corps, and became suicidally depressed. And despite his resume, Mr. Kenney-Prentiss' lifetime earning capacity has been severely degraded by Ms. Hoffer's abuse.

21. Ms. Hoffer presents herself as a victim, but she is almost always the aggressor.

22. Throughout all of this, Ms. Hoffer has demonstrated a complete lack of empathy.

23. Ms. Hoffer's misconduct has demonstrated a consistent pattern of anger, aggression, and domination. By contrast, Ms. Hoffer outwardly presents a high degree of helplessness and an entirely external locus of control. She puts the responsibility on her hardships, the failed relationship with Mr. Kenney-Prentiss, and their inability to co-parent largely on Mr. Kenney-Prentiss. By contrast, Ms. Hoffer does not make mistakes.

24. In her interactions with Mr. Kenney-Prentiss, Ms. Hoffer would be overly envious and critical of others, consistently attributed hostile motives to Mr. Kenney-Prentiss and others, regularly reacted to perceived slights with rage.

25. Ms. Hoffer's dishonesty appears almost pathological. Ms. Hoffer has systematically given false information to medical personnel, mental health professionals, school employees, friends, collogues, and family. Ms. Hoffer has also withheld, generated, and fabricated evidence for future use in court.

26. Mr. Kenney-Prentiss tried for years to build a healthy relationship co-parent relationship. For instance, after moving in together, the parties wrote to one another what they needed in their relationship. Before he moved out, Mr. Kenney-Prentiss remarked that Ms. Hoffer did not appear to attempt to do what he asked, and yet, by contrast, he wrote "I ended up doing 95% of what you asked. The result? I seemingly get yelled at, scolded, and put down more than ever. "

27. In filing this Complaint, Mr. Kenney-Prentiss' fear of Ms. Hoffer has significantly increased — whenever Mr. Kenney-Prentiss attempted to predict Ms. Hoffer's actions, Ms. Hoffer has regularly acted in a far more destructive and malicious manner. At this point, it would not be surprising for Ms. Hoffer to again withhold Child for months on end, to abuse the legal process against Mr. Kenney-Prentiss, or commit some other unknown horror in order to further control and harm Mr. Kenney-Prentiss.

### 4.2. Mr. Perry's Problematic Behavior

28. Mr. Perry did not react well to Ms. Hoffer's pregnancy with Mr. Kenney-Prentiss. Ms. Hoffer told Mr. Kenney-Prentiss about Mr. Perry's terrifying and abusive behavior.

29. Per Ms. Hoffer, Mr. Perry went through Ms. Hoffer's email account, her cell phone, and her computer all without her knowledge or consent. And he would monitor her phone logs.

30. Per Ms. Hoffer, Mr. Perry yelled at her, had "meltdowns", and generally terrified her.

31. Per Ms. Hoffer, Mr. Perry had a habit of threatening behavior. On one night when Ms. Hoffer was away, Mr. Perry sent Ms. Hoffer a selfie with him driving drunk with their two children. Mr. Perry had a wine stain on his shirt. Ms. Hoffer stated that Mr. Perry was an alcoholic. She took this as a threat.

32. Mr. Perry would threaten Ms. Hoffer with suicide, with litigation, and with refusing to ever move out of her house.

33. Unbeknownst to Ms. Hoffer, Mr. Perry stopped going to work, lost his job, and pretended to go to work every day. This went on for about eight months.

34. A month before Child was born, Mr. Perry stole Ms. Hoffer's late-mother's prescription pills and needed to be hospitalized. Ms. Hoffer has given different versions of events – Mr. Perry took too many and accidently fell down the stairs, or he attempted suicide, requiring emergency personnel to remove him from a locked bathroom. The children were present in all her versions.

35. Mr. Kenney-Prentiss witnessed several troubling events as well. On one occasion, Mr. Perry had shown up to a family holiday hosted by Mr. Kenney-Prentiss' grandmother. Mr. Perry invited himself in and disrupted the evening. Mr. Kenney-Prentiss also observed Mr. Perry talking disparagingly about Ms. Hoffer, wherein he called her sexless, damaged goods, that Ms. Hoffer could not handle things without her, and that Mr. Kenney-Prentiss' family would not accept her.

36. Due to these reasons, Mr. Perry was prohibited from ever being alone with Child and from visiting their Zionsville home.

### 4.3. Mr. Kenney-Prentiss' Life Before Ms. Hoffer

37. When Mr. Kenney-Prentiss met Ms. Hoffer, he had high potential given his health, education, and professional endeavors.

38. Mr. Kenney-Prentiss attended The Ohio State's Moritz College of Law for one semester as part of a visiting student program from Columbia Law School. He graduated from Columbia Law School in 2016.

39. Mr. Kenney-Prentiss attended West Virginia University where he majored in philosophy and minored in English, economics, political science, and political theory. He took three years of French, two years of Chinese, and studied abroad in China for a summer. Mr. Kenney-Prentiss was a member of the news department of the university's radio station, where he produced and sometimes hosted his own show. He was a member on the college's ethics bowl debate team, which went to nationals in his final year. He graduated in 2011.

40. In 2012, Mr. Kenney-Prentiss went to Officer Candidate School, commissioned, and became a United States Marine.

41. Meanwhile, Mr. Kenney-Prentiss was a U.S. Senate intern, became a member of Mensa, and served as a reserve Marine at the same time he was going to law school in New York City.

42. When Mr. Kenney-Prentiss met Ms. Hoffer, his goal at the time was to serve on active duty, find someone to start a family, and launch a new business/non-profit venture.

43. Mr. Kenney-Prentiss served on active duty in 2017. He later deployed to Kuwait from 2018 to 2019. After that, Mr. Kenney-Prentiss continued to serve in the Marine Corps Reserves.

44. In an affidavit, one of Mr. Kenney-Prentiss' friends since middle school described him as "a modern-day Renaissance man, given that he lives by a code of values. He is a philosopher by training, a lawyer, a solider, an advocate for the downtrodden."

45. Mr. Kenney-Prentiss was taken in by Ms. Hoffer's stories of prior abuse and victimization. Colleagues had plagiarized her. Secretaries made her job harder. Other men would constantly scare and pursue her. Mr. Kenney-Prentiss would be different.

### 4.4. Ms. Hoffer's Feelings about Mr. Kenney-Prentiss

46. From 2016 to 2025, Ms. Hoffer has long maintained that Mr. Kenney-Prentiss has many positive qualities.

47. Ms. Hoffer has long called him "wonderful in every way," "sweet," "kind," "smart," "fun," "full of enthusiasm for life," "bighearted," "thoughtful and full of life," "hard-working," "special," "curious about so many things," and "everyone sees [that you are] full of amazing qualities."

48. Ms. Hoffer has long maintained that Mr. Kenney-Prentiss had "a brain that is super-powered and full of all kinds of ideas," and "a healthy body," is "not afraid to be a real man," "the most interesting person I know," and is "destined to be great."

49. Ms. Hoffer regularly praised Mr. Kenney-Prentiss as a father to Child, saying that Child "loves you so much," "[y]ou bonded with him right out of the gate," "I'm glad that you're such a good dad," and "you're a good dad and we love you."

50. Ms. Hoffer wanted to be with Mr. Kenney-Prentiss, saying "we are different," "what a wonderful life we would have," "I feel so lucky to have met you," "I know that we can be amazing and have an amazing and wonderful life. You've brought so much life and fun into the house already," "I'm excited about maybe having a future together with you. I want things to work," "I have this vision of us being super happy together, "and "[l]et me put it a bit differently. We are extraordinary. You know it."

51. But if Mr. Kenney-Prentiss did not want Ms. Hoffer:

> "I don't want to see you fail in your career. I usually want to do nothing but love you. But you refusing to love me? You loving someone else? It's a whole-body blinding rage. I want to kill you. I want you to know that it was me and that it is because you can't be honest or good or protect me or love me. […] I have so much pent up anger at you for not recognizing that I'm different and that we are different. […] I know that you know that you're hurting me. And I want to kill you. There is no enjoyment in it for me. Just raw pain. Just raw violence. It's just a clean, pure urge to kill you so that you will stop. Stop ruining us. Stop hurting me."

### 4.5. Jealousy and Rage

52. Ms. Hoffer and Mr. Kenney-Prentiss had interpersonal issues from the very beginning. Despite living with Mr. Perry, Ms. Hoffer told Mr. Kenney-Prentiss that if he should date anyone else, she would want to know and would end their involvement together. However, in 2016, Mr. Kenney-Prentiss did not inform Ms. Hoffer of someone of whom he met and became involved with. This caused great anguish to Ms. Hoffer, especially because, according to her, no one had ever chased someone else while being involved with her.

53. Mr. Kenney-Prentiss and Ms. Hoffer did not enter a committed and exclusive relationship until July 2020. However, prior to that, Mr. Kenney-Prentiss and Ms. Hoffer were still occasionally intimately involved with one another. Oftentimes, Ms. Hoffer would approach Mr. Kenney-Prentiss despite his statements that he did not want to be with her.

54. Ms. Hoffer long expressed rage and jealousy over Mr. Kenney-Prentiss and other women, to include his lifelong friends.

55. Ms. Hoffer wrote of her feelings:

> "When I learn that you are sexting, went out with, have had sex with, another woman, I want to murder you with my bare hands. I want to put my knee on your chest and choke the breath out of you until your face turns blue. It would be so easy. You are really fucking helpless when you drink too much."

56. While living together, Ms. Hoffer told Mr. Kenney-Prentiss that he should never go anywhere alone with any of his female friends (i.e. restaurants). And people in committed relationships should never hang out alone with the opposite sex. However, Ms. Hoffer would regularly spend time with her male friends.

57. Ms. Hoffer told Mr. Kenney-Prentiss to cut ties with his female friends as a condition of staying together. And Ms. Hoffer needed "to know the details of your recent communications with any of them." As she explained, "[o]ur relationship isn't about other people. It's just you and me."

### 4.6. Threats

58. Ms. Hoffer has repeatedly threatened Mr. Kenney-Prentiss, often because he did not want to be with her.

59. For instance, in 2019, Ms. Hoffer threatened imminent suicide since Mr. Kenney-Prentiss said he did not want to be in a relationship with her. (Mr. Kenney-Prentiss asked for her reason for wanting to commit suicide, "because I don't want to be with you, you are going to kill yourself?" Ms. Hoffer replied "[y]es, yes that's it."). Mr. Kenney-Prentiss was concerned to the point that he called emergency services. Ms. Hoffer reacted with fury and threatened him with a restraining order.

60. A year after Child was born, Ms. Hoffer told Mr. Kenney-Prentiss she was pregnant again. And Ms. Hoffer threatened that she would get an abortion because he did not want to be with her. (When Mr. Kenney-Prentiss told her, "[y]ou kept threatening an abortion," Ms. Hoffer replied, "[y]es, because you showed no interest in trying to build a healthy relationship").

61. Ms. Hoffer's most frequent threat was to cut Mr. Kenney-Prentiss out of Child's life. Some examples include, "I really think you ought to temper your expectations about how much time you're going to spending with [Child] in the future," "[w]e are extraordinary, we will never be just friends […] Better to just walk away and let [Child] and I be extraordinary if you won't join us," "[d]on't presume to tell me what we are and are not going to do with regard to [Child]. You forget that I have full custody of him. You don't get to be a part of this family if you're going to destroy it from within," and "unless you want to lose your son and his mother completely I need to hear from you."

62. After Mr. Kenney-Prentiss bought presents for the children, Ms. Hoffer threatened to send them back because Mr. Kenney-Prentiss did not want to be with her and had been hostile with her "I am sending them back because I know that had you had a choice, you wouldn't have sent [the presents]."

63. Ms. Hoffer threatened to contact Mr. Kenney-Prentiss' friends, family, and employer with disparaging remarks.

64. Sometimes, Ms. Hoffer threatened to keep Child away from Mr. Kenney-Prentiss for long durations. For instance, when Mr. Kenney-Prentiss once asked, "now you're threatening to prevent me from seeing or talking to my son for the next month?" Ms. Hoffer replied "Yeah, I am. That is exactly what I'm doing."

65. Ms. Hoffer also threatened block Mr. Kenney-Prentiss from Child because she wanted him to get into therapy.

66. Ms. Hoffer told Mr. Kenney-Prentiss he has a myriad of serious psychological conditions, to include psychopathy, borderline personality disorder, narcissism, obsessive compulsive disorder, alcoholism, and bipolar disorder. (Mr. Kenney-Prentiss is formally diagnosed with ADHD).

67. Mr. Kenney-Prentiss was made aware of Ms. Hoffer's desire to be vindictive and to humiliate others. For example, Ms. Hoffer describes a time that she purposely humiliated a student:

> "He lost a job offer because of his behavior, and I'm not sorry in the slightest. He wound up sleeping on an acquaintance's sofa for a year. Fuck that guy. He completely deserved to be eviscerated. I'm glad that I didn't wuss out."

68. Ms. Hoffer has regularly threatened to hinder Child's and Mr. Kenney-Prentiss' phone contact. Ms. Hoffer has threatened to completely stop their FaceTime calls. Ms. Hoffer also threatened to heavily restrict calls between Mr. Kenney-Prentiss and Child.

69. While living together, Ms. Hoffer would regularly threaten to kick Mr. Kenney-Prentiss out of the house.

70. Oftentimes, Ms. Hoffer's threats were not explicitly stated. For instance, she would offer support to Mr. Kenney-Prentiss in the non-profit; but whenever his female co-founders came up, or when Ms. Hoffer decided to ask Mr. Kenney-Prentiss about them, Ms. Hoffer would explode with rage and jealousy.

71. Other times, the ultimatums were framed as an either-or, with one choice being the "good" choice (re: what she wanted). Otherwise, there would be consequences. For instance, Ms. Hoffer said, "[i]f you can't be a responsible and supportive co-parent, I will put 30-minute timers on your calls [with Child]").

72. Ms. Hoffer would make sure that Mr. Kenney-Prentiss was aware of the consequences of disobeying her. When Mr. Kenney-Prentiss refused to cut off contact with his female friends, Ms. Hoffer stated, "[y]ou seem pretty hell-bent on hurting me all the time with it, so go right ahead. Consequences are up to you […] you don't get the benefit of the doubt. It is not my fault that I don't trust you […] [y]ou have to live with the consequences of what you did. End of story."

73. Another example of subtle threats. In 2022, after Ms. Hoffer broke up with Mr. Kenney-Prentiss via text, she wanted him to come to Indianapolis instead of Cleveland to talk about their relationship. When Mr. Kenney-Prentiss initially refused, she wrote, "[s]urely it doesn't merit an actual conversation, or so you seem to be saying. Which is pretty telling actually. I'm not worth a conversation, and apparently neither is the future of your son."

74. Before he moved out, Mr. Kenney-Prentiss asked Ms. Hoffer if she would permit Child to spend time with him during the summer. She replied with an ultimatum, "I suppose I will have to weigh the cost to [Child's] social development and kindergarten readiness against the hit he would take to his mental health when his father decides to live five hours away and not be a part of his life for months at a time. Or you may choose to live nearby, in which case there would be no call to weigh the evils that your decision would work on our son."

75. Ms. Hoffer also made it known to Mr. Kenney-Prentiss that she is "naturally violent" and wrote, "I often want to hurt people. I enjoy thinking about hurting them. I know that I have much quicker impulse to kill than other people."

76. Ms. Hoffer told Mr. Kenney-Prentiss that he was "lucky [she wasn't] being physically violent with [him]." When upset, Ms. Hoffer said that she could have been "slamming doors, yelling, and being violent." She later explained, "Yes, you're lucky. I am not like that, though I feel like doing those things. Other people might. It's natural to be angry. I am doing my best to be reasonable in my interactions with you."

### 4.7. Living Together in Indianapolis

77. Living with Ms. Hoffer was extremely deleterious to Mr. Kenney-Prentiss.

78. Ms. Hoffer isolated Mr. Kenney-Prentiss. When he said that he missed his friends and family in Ohio, Ms. Hoffer told Mr. Kenney-Prentiss to "get new friends and family" in Indianapolis.

79. Ms. Hoffer would humiliate Mr. Kenney-Prentiss in front of others. Mr. Kenney-Prentiss wrote, "I'm afraid to bring you around more people b/c of what you might say at my expense."

80. Mr. Kenney-Prentiss attempted to launch a non-profit with two of his longtime female friends as co-founders. Ms. Hoffer not only disparaged the project but also reacted with jealousy and rage when they were brought up. And Ms. Hoffer made clear that Mr. Kenney-Prentiss was prohibited from spending time with either without inviting her / their significant others. Needless to say, the non-profit did not materialize.

81. For many of their fights, Ms. Hoffer would tell Mr. Kenney-Prentiss what he thought, felt, and intended. And if Mr. Kenney-Prentiss disagreed, a fight would ensue.

82. Ms. Hoffer would regularly instruct Mr. Kenney-Prentiss on his mistakes and downsides. That Mr. Kenney-Prentiss was "broke," "unemployable," "abusive," and "controlling." And that Mr. Kenney-Prentiss was lucky that Ms. Hoffer was with him because of how subpar of a partner he was.

83. Ms. Hoffer would regularly tell Mr. Kenney-Prentiss that he didn't want to spend time with her, can't be in the same room with her, and was responsible for how tired and behind on work she was. When Mr. Kenney-Prentiss would be sick and need rest, Ms. Hoffer told him he was trying to avoid her and the kids. When Mr. Kenney-Prentiss wanted to go to bed early, Ms. Hoffer told him he was sabotaging their intimacy. And when Mr. Kenney-Prentiss would spend evening time with her, Ms. Hoffer would complain that he kept her up too late and caused her to be exhausted and behind on work the following day.

84. Ms. Hoffer would be upset with how Mr. Kenney-Prentiss spent his weekends. If Mr. Kenney-Prentiss spent time with Ms. Hoffer on weekends, he had stolen her weekend work time. If Mr. Kenney-Prentiss spent time with Child instead, Ms. Hoffer would get upset because he did not include her.

85. Ms. Hoffer would be upset with Mr. Kenney-Prentiss for his moods. Ms. Hoffer would become upset if Mr. Kenney-Prentiss acted stoically, as if "everything was fine." And Ms. Hoffer would chastise Mr. Kenney-Prentiss for displaying emotions, saying he was being "overly dramatic."

86. For most of the time, Mr. Kenney-Prentiss maintained the house (i.e. cooked, cleaned) and provided childcare. Mr. Kenney-Prentiss was also a reserve Marine. He would travel for monthly duty and spend countless hours each week on various tasks for his unit. However, Ms. Hoffer was upset by Mr. Kenney-Prentiss leaving for Marine duty because it burdened her with all the household and childcare duties.

87. Ms. Hoffer punished Mr. Kenney-Prentiss for spending time with his friends. For instance, Mr. Kenney-Prentiss approached Ms. Hoffer to "plan and talk" about attending a friend's bachelor party. As a reaction, Ms. Hoffer became angry and lashed out at Mr. Kenney-Prentiss in front of their Child, saying that he would "miss your son's birthday" and that he just ruined her day. She explained, "[y]ou who are making me into a bad guy when you're the person who just ruined my day? Pretty clear that I'm not a priority. That's not reacting as a victim. That's just reality."

88. In 2023, Mr. Kenney-Prentiss decided to leave Ms. Hoffer and move back home. Mr. Kenney-Prentiss explained that he needed to move because Child needed a healthy, strong, successful role model for a father, not "someone miserable, put-upon, unhealthy, and alone. [Child] shouldn't see his male role model be constantly scolded, isolated, never doing anything right in the eyes of his mom." Ms. Hoffer classified Mr. Kenney-Prentiss leaving as "[y]ou chose Cleveland. Not [her and Child]."

### 4.8. Mr. Kenney-Prentiss' Abuse?

89. Ms. Hoffer has long told Mr. Kenney-Prentiss that he makes her sad, upset, angry, and hurt. And since at least 2018, Ms. Hoffer has told Mr. Kenney-Prentiss that he was abusive.

90. After Mr. Perry discovered her pregnancy via Mr. Kenney-Prentiss, Ms. Hoffer began blaming Mr. Kenney-Prentiss for ruining her stable life and her happy family.

91. Ms. Hoffer would regularly blame Mr. Kenney-Prentiss for ruining her day. For example, after Ms. Hoffer told Mr. Kenney-Prentiss that he needed to leave her alone and she was going to cut him out of Child's life, Ms. Hoffer became upset because Mr. Kenney-Prentiss did not readily respond to her texts. She wrote, "[d]o you want me to have an awful day again today? Because you shutting me out makes me feel hurt and sad and panicked."

92. Ms. Hoffer told Mr. Kenney-Prentiss that he has abused her for a wide variety of reasons, to include turning her questions back at her, using sarcasm, and not answering questions via text. For example, before they were together, the parties wrote:

> **Mr. Kenney- Prentiss**: "I am busy this next weekend. Every time we interact in the past several weeks, you are either hostile or demeaning. I'm afraid to even talk to you because I always know the shoe is going to fall. Today was terrifying."
>
> **Ms. Hoffer**: "Busy with what? I think I've made myself pretty clear. You know what you need to do. Have you considered that maybe I'm hostile and demeaning because I'm angry and hurt? Have you asked yourself why I might be angry and hurt or maybe just read your messages again to find out since I've already told you? […] Don't wanna tell me where you're going next weekend? You just wanna leave it hanging there so I feel jealous. That's super mean of you. That's the kind of thing I'm talking about. You're just mean. There wasn't even a reason to tell me that. Why did you just tell me that? I expect an answer. Otherwise it's just abuse. Which is of course the answer, right? You did it to hurt me. Well stop. I'm not going to let you hurt me anymore. Get out."

93. Oftentimes, Ms. Hoffer said that Mr. Kenney-Prentiss was being abusive when Mr. Kenney-Prentiss would disagree with her about his own thoughts, feelings, and intentions. One example of many:

> **Ms. Hoffer**: Your question about why I am with you was a passive aggressive way of saying that you think I don't really believe that your communication and treatment of me are abusive. But if you want an answer.
>
> **Mr. Kenney-Prentiss**: Another inaccurate projection onto my thoughts.
>
> **Ms. Hoffer**: Now you are gaslighting me.
>
> **Mr. Kenney-Prentiss**: ?
>
> **Ms. Hoffer**: Trying to make me mistrust my own assessment of your communication.
>
> **Mr. Kenney-Prentiss**: No
>
> **Ms. Hoffer**: Ya, keep going. Defend yourself! Tell me that I'm wrong and have no people skills or judgment. That'll make it better.

94. Ms. Hoffer alleged abuse when Mr. Kenney-Prentiss would temporarily block her number, even while they lived together.

95. Before leaving Ms. Hoffer, Mr. Kenney-Prentiss observed, "I'm told I'm abusive and gaslighting you at least once a week, and you often tell me how bad I am with people, how I can't get a job, how bad my behavior is, how bad my family is, etc etc etc."

96. After Mr. Kenney-Prentiss left Ms. Hoffer, she increased the number of times she called Mr. Kenney-Prentiss abusive.

97. After moving out, Mr. Kenney-Prentiss would attempt to engage with Ms. Hoffer about their need to co-parent. For instance, he asked, "[a]re you willing to have an open, honest and respectful conversation with me in order to build a healthy and effective communication plan?" Ms. Hoffer testified that this message was mocking her, and was otherwise passive aggressive, harassment, and abusive.

98. In communicating with Ms. Hoffer, Mr. Kenney-Prentiss referenced a document he wrote while in Europe with her. Written on March 17, 2018, it listed many things that Ms. Hoffer had said about him and threats she made. On one occasion, Ms. Hoffer wanted Mr. Kenney-Prentiss to carry Child and go with her to see a castle. Mr. Kenney-Prentiss did not want to go, so Ms. Hoffer threatened him. As Mr. Kenney-Prentiss wrote, Ms. Hoffer "[s]ays that if I didn't go to the castle with her, she'd lose where the car was and hurt [Child] because I wouldn't be carrying him." In her protection order petition, Ms. Hoffer wrote, "The accusation that I would harm my baby because [Mr. Kenney-Prentiss] wouldn't sightsee with me is deeply, deeply hurtful. It is gaslighting. He is gaslighting me. Not once or twice, but every day, and he is laying a groundwork to make me look like a monster in court. I am so exhausted and hurt and scared, and I worry nonstop for our son."

99. Ms. Hoffer was not one to take responsibility for her harmful actions. For instance, during a deposition, Ms. Hoffer stated her biggest mistakes in her relationship with Mr. Kenney-Prentiss was her trying "to engage with [him] as though [he] didn't have the sensitivities that [he has]" and not accommodating Mr. Kenney-Prentiss' mental health issues "in a way that didn't submarine the rest of the family or my own needs."

100. Ms. Hoffer told Mr. Kenney-Prentiss that she was a prior victim of abuse and that he needed to be sensitive to her needs. Ms. Hoffer told Mr. Kenney-Prentiss that she was abused by all her prior partners. Ms. Hoffer reported that her first husband was physically abusive, held her at gunpoint, and tried to murder her. Ms. Hoffer reported that her ex-fiancé was highly abusive, that he degraded her, would get mad if she "talked to friends without him," and "he was cruel to me […] he isolated [Ms. Hoffer] from [her] friends and family."

101. Ms. Hoffer also told Mr. Kenney-Prentiss that he was more abusive than all her prior partners.

102. A year after Mr. Kenney-Prentiss moved out (and during a deposition in their custody case), Ms. Hoffer began alleging that Mr. Kenney-Prentiss was abusive towards all the children.

### 4.9. Ms. Hoffer's Double Standard

103. Ms. Hoffer would justify and defend her own actions while criticizing the same actions when done by Mr. Kenney-Prentiss. Often, Ms. Hoffer's behavior was much worse.

104. Ms. Hoffer said that Mr. Kenney-Prentiss slamming a door was abusive and scary. However, when Ms. Hoffer slammed doors or otherwise got angry, it was Mr. Kenney-Prentiss's fault. She stated that, "[e]verybody slams doors sometimes. It's not great, but everyone does it." And after slamming and breaking a door, Ms. Hoffer explained:

> "You're damn right that broke— that I snapped and yelled and slammed the door. Who could bear up under any of this? Who could bear this constant erosion, these constant low level criticisms and slights and little aggressive remarks, without breaking? You broke my composure. Stop pushing me. You don't love me. No one who loved me would treat me like this."

105. On one occasion, in frustration, Mr. Kenney-Prentiss threw a sweatshirt on the ground. Ms. Hoffer was upset, writing, "Please, no more physical displays of anger in front of the kids or me. It's scary. And it teaches them boorish behavior. It scares me. And it scares them. You are a grown man, not a 14 yo boy." However, Ms. Hoffer repeatedly yelled, threatened, and physically displayed her anger in front of Mr. Kenney-Prentiss and the children. Some examples include Ms. Hoffer slamming the door in Mr. Kenney-Prentiss' face while he was speaking, and threatening Mr. Kenney-Prentiss in front of Child that he would not see Child for a long, long time.

106. Mr. Kenney-Prentiss would sometimes block Ms. Hoffer's phone number, to include when they lived together. In response, Ms. Hoffer called this behavior "scary," "hurtful," "flatly irresponsible as a parent," "isn't how a parent behaves," and "is bad parenting." However, Ms. Hoffer felt entirely justified blocking Mr. Kenney-Prentiss' number whenever she pleased, especially after he moved out of their house in September 2023. As Ms. Hoffer explained, "[y]ou are not entitled to unfettered access to my personal accounts."

107. After Mr. Kenney-Prentiss left Indianapolis, Ms. Hoffer began demanding that Mr. Kenney-Prentiss "confine your communication with me to the subject of [Child]." But when Mr. Kenney-Prentiss had often said the same thing years earlier, Ms. Hoffer refused, writing, "[c]ommunicating only about [Child] is not what I want. I want for us to be a real family." And on another occasion:

> **Mr. Kenney-Prentiss**: [Child] Item: I would like to FT him in a little bit. Since it's past 5 I require the use of your phone.
>
> **Ms. Hoffer**: You are being extremely rude. It's upsetting and is making it difficult for me to be happy and interactive. Please stop deliberately interfering with my parenting. You are not entitled to the use of my phone. You have talked to him once today already. In the future, do not promise him additional calls. It's bed time.

108. After Mr. Kenney-Prentiss left Indianapolis, Ms. Hoffer began demanding to restrict all their communication to Our Family Wizard ("OFW"). When Mr. Kenney-Prentiss attempted to communicate outside of OFW, she called it abusive and scary. At the same time, Ms. Hoffer initiated commutations with Mr. Kenney-Prentiss outside of OFW when she pleased.

109. After Mr. Kenney-Prentiss left Indianapolis, Ms. Hoffer would occasionally prohibit Child from using her cell phone for FaceTime. And yet, when Mr. Kenney-Prentiss asked Ms. Hoffer to send the iPad with Child for his trip to Cleveland, Ms. Hoffer refused and threatened Mr. Kenney-Prentiss into having Child use Mr. Kenney-Prentiss' cell phone for FaceTime.

110. Ms. Hoffer would allege that Mr. Kenney-Prentiss sending multiple messages in a row was "abusive" and "scary." But when she sent multiple messages in a row, and Mr. Kenney-Prentiss told her to stop or otherwise did not respond, Ms. Hoffer would call Mr. Kenney-Prentiss' non-responses abusive.

111. In their on-again-and-off again relationship, both parties would initiate intimate conversations with one another. In her testimony, when Mr. Kenney-Prentiss initiate, Ms. Hoffer claimed it was scary and abusive. But Ms. Hoffer had no problem when initiating it whenever she wanted despite Mr. Kenney-Prentiss telling her that he didn't want to be with her.

112. In the years before moving in together, Ms. Hoffer would become incredibly jealous and angry with Mr. Kenney-Prentiss seeing any other woman. However, Ms. Hoffer saw no issue with her living with Mr. Perry and, after he moved out, dating other people when her and Mr. Kenney-Prentiss were not together.

113. Ms. Hoffer regularly employed au pairs to help with the children. Ms. Hoffer would instruct Mr. Kenney-Prentiss to leave the au pairs alone when it came to coordinating Child's activities, all while effusively apologizing to the au pairs. Ms. Hoffer would also instruct Mr. Kenney-Prentiss to work exclusively through the au pairs because she did not want to talk to him. On one occasion, Ms. Hoffer wrote, "[n]o matter what you think of stoicism, your hurtful messages and rude ones affect my mood and would affect most people's. If you can't be kind, I will have to cut off contact with you. You will work through [the au pair]."

114. Mr. Kenney-Prentiss and Ms. Hoffer would engage in substantive conversations. When they would disagree, Ms. Hoffer would send Mr. Kenney-Prentiss articles from various websites (i.e. Fatherly, NPR, Slate). However, Ms. Hoffer told Mr. Kenney-Prentiss that she would only accept articles from him that were peer-reviewed and published in a reputable journal.

115. Ms. Hoffer diagnosed Mr. Kenney-Prentiss with a wide array of psychological disorders. When she did, both parties engaged in the subject and Mr. Kenney-Prentiss explored the possibility in good faith. In 2023, when Mr. Kenney-Prentiss thought that Ms. Hoffer had Vulnerable Narcissism, a major subtype of Narcissistic Personality Disorder, Ms. Hoffer promised that she would investigate it, get evaluated for it, and ensure that third parties would be involved. And yet, this never happened. Instead, Ms. Hoffer later cited Mr. Kenney-Prentiss' mentioning of this hypothesis as highly abusive behavior.

### 4.10. Ms. Hoffer Commits Lawfare

116. Ms. Hoffer had long prepared herself to win in court against Mr. Kenney-Prentiss.

117. Ms. Hoffer threatened to "fight any attempt" Mr. Kenney-Prentiss made to formalize his rights to Child via the legal system. Ms. Hoffer said that she would be "ruthless." And given the huge disparity in their wealth and connections (i.e. lawyers, judges), Ms. Hoffer would destroy Mr. Kenney-Prentiss.

118. Ms. Hoffer began raising the possibility of a lawsuit with Mr. Kenney-Prentiss well before Child was born. Sometimes, Ms. Hoffer openly admitted it, writing "I want a record of it in case you sue me […] leave us and sue me. Find someone who is younger and baser and meaner and leave and try to take [Child] away," and "I fear that you were going to try to take [Child], and then I will need to take legal action."

119. Ms. Hoffer likewise prepared to win in court against Mr. Perry should he ever challenge her. She made sure to prevent Mr. Perry from having "extra days" with their children, because "if God forbid there should be a custody suit, it gives him grounds to sue me for support."

120. Ms. Hoffer would also threaten Mr. Perry with litigation should he not do as she wished. Ms. Hoffer flippantly told Mr. Kenney-Prentiss that if Mr. Perry did not act in the way she wanted, she could get him to comply by threatening litigation.

121. Ms. Hoffer took photos of Mr. Kenney-Prentiss prescription medication for potential use in court.

122. After Mr. Kenney-Prentiss moved out, Ms. Hoffer went through his personal documents to look for evidence without Mr. Kenney-Prentiss' knowledge or consent.

123. By 2022, Ms. Hoffer had familiarized herself with Indiana law. For instance, after breaking up with Mr. Kenney-Prentiss over text message while he was in Norway, Ms. Hoffer told Mr. Kenney-Prentiss that he is "welcome to have [Child] during the times I specified. Under Indiana law, if you use [sic], you can have your to nine weeks a year with him."

124. In December 2022, unbeknownst to Mr. Kenney-Prentiss, Ms. Hoffer consulted with a lawyer about a potential custody case and stated to a third party that "there isn't enough for a restraining order."

125. On many occasions, Ms. Hoffer accessed Mr. Kenney-Prentiss' personal items (i.e. messages, documents) without his consent or knowledge for litigation. Meanwhile, Ms. Hoffer would make unsubstantiated allegations mixed with threats about legal action. For instance, she told Mr. Kenney-Prentiss, "I fear that you were going to try to take [Child], and then I will need to take legal action, and I do not want you monitoring my Web usage from Cleveland." (Ms. Hoffer has never presented evidence about Mr. Kenney-Prentiss ever monitoring web usage).

126. Ms. Hoffer has told Mr. Kenney-Prentiss about her connections with judges and current/former students in the courts of appeal, citing it as an advantage she had over him if he would ever dare to challenge her in court.

127. After Mr. Kenney-Prentiss left her, Ms. Hoffer refused to co-parent in good faith. By February 2024, it had gotten so bad that Mr. Kenney-Prentiss sent Ms. Hoffer a letter to preserve records for "our upcoming custody dispute."

128. Unbeknownst to Mr. Kenney-Prentiss, Ms. Hoffer began keeping a journal in September 2023 where she ostensibly documented her fear of Mr. Kenney-Prentiss to later use in court against him. Before that point, she wrote in a journal on her iPhone, but refused to turn it over during the litigation. Later, she claimed she never had the journal app on her iPhone.

129. After receiving the letter to preserve records, Ms. Hoffer wrote to Mr. Perry that she needed "to get this PO in before [Mr. Kenney-Prentiss] files a custody case."

130. At the end of February, Ms. Hoffer filed her (later-dismissed) petition for protection order against Mr. Kenney-Prentiss.

131. Despite the letter to preserve records, Ms. Hoffer spoliated evidence on multiple occasions. Most egregious was her getting a "whole new computer" in the Fall of 2024.

132. Due to Ms. Hoffer blocking him from seeing Child, Mr. Kenney-Prentiss opened a custody case against Ms. Hoffer.

133. After six months of paying for lawyers, Mr. Kenney-Prentiss could no longer afford it. Starting in October 2024, Mr. Kenney-Prentiss had to represent himself and exhaust his life savings.

134. Mr. Kenney-Prentiss attempted to conduct depositions of Ms. Hoffer, Mr. Perry, and Ms. Hoffer's au pairs. For his first deposition, Mr. Kenney-Prentiss provided the subpoena and gave actual notice to Ms. Hoffer's au pair via text message. Due to Ms. Hoffer and Mr. Perry's actions, the au pair chose not to appear for her deposition. Mr. Kenney-Prentiss also attempted to serve legal process to the au pair via USPS certified mail, addressed to Ms. Hoffer's residence. The envelopes were returned even though the au pair still had a room in the house and would appear at Ms. Hoffer's house multiple times a month.

135. Ms. Hoffer again conspired with Mr. Perry when Mr. Kenney-Prentiss tried to depose him. Previously, Ms. Hoffer provided his correct mailing address under oath. However, the subpoena sent via USPS certified mail was returned and never delivered. Meanwhile, Mr. Perry blocked Mr. Kenney-Prentiss' cell phone number and ignored emails about his deposition. He also chose not to appear for his deposition on its scheduled date.

136. Four months into the custody case, the court announced, without explanation, that a different judge would preside going forward. Unbeknownst to Mr. Kenney-Prentiss, the new judge worked with Ms. Hoffer as an adjunct professor on the faculty of the McKinney School of Law. Ms. Hoffer made the new judge aware, via court filings, that she was on McKinney's hiring and executive committees. The fact that Ms. Hoffer is the tax chair was well known and publicized. By virtue of her position alone, Ms. Hoffer holds considerable power and influence over the judge's professional prospects at the McKinney School of Law.

137. Mr. Kenney-Prentiss discovered this work relationship months after the new judge took over. The trial judge denied Mr. Kenney-Prentiss' motion to disqualify herself over this ongoing and undisclosed conflict of interest.

### 4.11. Ms. Hoffer's False Allegation of Rape

138. Ms. Hoffer's has alleged that Mr. Kenney-Prentiss raped her on August 29, 2022. She first began claiming Mr. Kenney-Prentiss raped her in her deposition on July 8, 2024.

139. According to Ms. Hoffer, she "had been sick for several days." They argued over text that night. Ms. Hoffer said she told him that "I just wanted to get some sleep because I was sick."

140. Ms. Hoffer continued, "[n]ext thing I know, he was in my room, and I asked what he was doing there, and he said he was there to use me, and I asked him to leave and he didn't leave, he got into bed and -- yeah, he got into bed and had sex with me, put his hands around my throat." On another occasion, Ms. Hoffer alleged that Mr. Kenney-Prentiss "asked if he could come over to my room. I made it clear that I did not want company. He came over anyway. I asked what he was doing there. He said, 'You are acting like a bitch, and I am going to use you now.' I said that I wanted him to leave. He did not leave."

141. Ms. Hoffer was emphatic she said no — "on this night, I was so clear, I was sick, I wanted to go to sleep, we'd been fighting, like I don't know how much clearer." "I did ask him to leave, and I was scared [she was asked when] When he showed up, I asked him what he was doing there, and I asked him the leave," that "he knew that I was upset and scared," that "he knew he didn't have consent. He did it anyway," and that "he suggests by inference that I didn't object, but actually asked him to leave."

142. Ms. Hoffer claimed that "this was incredibly traumatizing and scary," that it "wasn't a minor issue," and that she was "really frightened." She reported that "[a]fter that time, I locked the doors of the main house every night."

143. But Ms. Hoffer's allegation is demonstrably false.

144. Ms. Hoffer admitted that she encouraged Mr. Kenney-Prentiss to approach her for sex whenever he wanted, including when they were arguing. She testified, "I made it clear to him that he should approach me about sex whenever he was interested in it." In fact, Ms. Hoffer would sometimes scold Mr. Kenney-Prentiss for not approaching her for sex during a fight.

145. For years, they attempted to address their lack of sexual satisfaction in their relationship. Ms. Hoffer regularly told Mr. Kenney-Prentiss what she wanted. Both parties wrote texts and emails and letters addressing the issue. For a long time, Ms. Hoffer was clear on what she wanted from Mr. Kenney-Prentiss.

146. From the beginning of their knowing one another to 2023, Ms. Hoffer would regularly tell Mr. Kenney-Prentiss to 'use her' or otherwise take charge and engage her in sex. Ms. Hoffer would tell Mr. Kenney-Prentiss:

> "You'll have to use brute force […] so many men are so weak. You know what you want. That moment when your restraint breaks and you are really you makes me so hot."

> "Do you know what I want to do right now? I want to fight - fight to overpower you. To push you down, and to struggle until you pin me against the floor and fuck me hard until I'm dripping wet with your cum and too breathless to do anything but moan with pleasure. I want you to lay down on top of me when you're done because you can and you own me and you won."

> "i can't fight you when you take me, when you push me down, when you own me. that's when I most own you. when you can't stop. when control is what makes you lose control.

> "I was confused and hurt by it all at the time, and I remain confused and hurt with no clear path forward. One bit of info I got from you was that you think a lot of good sex is necessary to keep the ship afloat. But I'm aging. It's fine to approach me of course. That's what I'm here for. It's maybe one clear signal in what is a world of haze for me."

> "I can't keep my hands off of myself thinking about you. Hard. Fuck me hard. I want to feel your raw power and know that there is nothing I can do to stop you."

> "Wish I could be there to let you use me."

147. Ms. Hoffer also repeatedly told Mr. Kenney-Prentiss to be less attentive to whether she was enjoying sex or being hurt during sex. For instance, Ms. Hoffer replied "I agree with this completely" when Mr. Kenney-Prentiss wrote "[i]n long term relationships, I believe it's acceptable, and even preferred, if couples have sex when one of them isn't particularly in the mood." Ms. Hoffer also told Mr. Kenney-Prentiss, "I'm happy to have sex when I'm not initially in the mood. I don't mind a man being selfish sometimes. It's a relief. Asking me to give an A+ each time is sort of selfish, actually."

148. And on another occasion:

> "You also have said that you enjoy sex less because sometimes you hurt me. I feel pretty hopeless about this. […] I love sex, and sometimes it's going to hurt me. […] If I can't tell you when something hurts me without it making you feel diminished, we can't have sex anymore. If you want to have sex without worrying that you are going to cause some kind of pain or discomfort, you have to find someone else. It's that simple. I can't tell what is going to hurt and when, because I don't always know, and sometimes something feels very good for a while and then hurts. I have to be able to tell you. And you have to be ok with the fact that you're going to hurt me and that I want to have sex anyway."

149. A week before the incident on August 29, 2022, Ms. Hoffer instructed Mr. Kenney-Prentiss, "Awake! Want to wrap me up soon? Rules: (1) you come straight over, no shower. I can't smell anything anyway. (2) you use me like a blow-up doll."

150. Two days before, Ms. Hoffer asked Mr. Kenney-Prentiss, "what would you like me to do tonight after shower? Do you want massage?"

151. On the day before, Ms. Hoffer asked Mr. Kenney-Prentiss, "Are you still here? Want after shower snuggle sex? […] Oh dang. Ok. I hear [Child]. Poor buddy."

152. On the night of the incident, they argued over not having sex. Ms. Hoffer criticized Mr. Kenney-Prentiss because his recent text was the "first indication" she received that he wanted sex. Ms. Hoffer and Mr. Kenney-Prentiss said goodnight. After Mr. Kenney-Prentiss texted "Night," he went to Ms. Hoffer's room, and they had sex.

153. After Mr. Kenney-Prentiss left, Ms. Hoffer sent a long text to Mr. Kenney-Prentiss about a myriad of parenting and relationship issues. Two minutes later, Ms. Hoffer sent another text and then a screenshot. Finally, after not receiving a reply from Mr. Kenney-Prentiss, Ms. Hoffer wrote, "[t]his was not even close to consent. Now I know that I am not safe in my own home and that if I say no, I need to lock my bedroom door."

154. Ms. Hoffer and Mr. Kenney-Prentiss continued texting the next day. Ms. Hoffer said, "[I] don't think you intended to do anything wrong." "I believe that you were not trying to hurt and scare me." Ms. Hoffer called it a "misunderstanding. Not a big deal in the long run." She told Mr. Kenney-Prentiss, "[y]ou thought I had given prior consent. So you're in the clear."

155. Ms. Hoffer also asked Mr. Kenney-Prentiss, "[a]re you breaking up with me?"

156. On September 1, 2022, Ms. Hoffer wrote Mr. Kenney-Prentiss a long, handwritten letter about the incident. Mr. Kenney-Prentiss had been both surprised and crushed by the "not even close to consent" text. In the letter, Ms. Hoffer wrote:

> Dear James,
>
> I love you! I do not think that you are, as you said, "a monster." You are a man whose heart is in the right place and who cares deeply about this family.
>
> You are insisting, though I have not used the word, that I have accused you of rape. I have not and will not do that. Rape requires knowledge of a lack of consent. The facts simply don't support the use of that word. Here they are, as documented by text in part—
>
> 1. You invited me to have sex.

2. I told you that, in light of an earlier disagreement & your comments by text, that I was injured, sick, & exhausted, & that I "want to try again to sleep. Good night."

3. You came to my room. I asked why. You responded that you were there for sex. I did not verbally object to "To use you."

4. I was scared and upset but did not voice those concerns. It was dark, so you could not see my face.

5. After you left, I highlighted our earlier conversation, iterated non-consent, and expressed fear by text.

6. You later explained that, based on prior conversations, I had given consent to this scenario.

7. You expressed the view that I had not clearly withdrawn that consent.

8. I agreed with you, by text and in person, that the act was the result of a misunderstanding, & that you did not intend to hurt or scare me.

This is clearly not rape.

I am writing this letter to you in my own hand to assure you, as a present sense memorandum admissible in evidence, that I do not, did not, and cannot possibly believe that you committed any kind of sexual offense, and certainly **not** rape.

I also want to assure you of these things:

1. I have talked to no one about this.

2. I suffer no lasting harm, and I do not fear you now that I understand what happened,

3. I will not discuss this with anyone other than you for any reason whatsoever,

4. Though I hope that we will love each other & never be opponents in court, should the worst happen, I will **never ever** raise this as an issue in any context.

> Even if you had understood what you were doing, I would never carry it beyond our home. I love you, and you are JJ's father. I have no desire to bring you down, and every possible reason to want you to be stable, successful, and most of all, happy & present, if not for me then at the very least for him.
>
> This was a misunderstanding. It seems like you did not mean to scare or hurt or degrade me. For my part, I certainly didn't mean to accuse you of rape. I expressed anger and fear, not an accusation or threat.
>
> I am sorry for misunderstanding your motivation for coming into my room— I took your words at face value [margin note: "I'm going to use you"] and didn't know that there was anything more behind them.
>
> I hope this helps clear things up.
>
> I love you. — S.

157. In 2022, Ms. Hoffer's story was that Mr. Kenney-Prentiss "came into my room. I asked why. You responded that you were there for sex. I did not verbally object to 'To use you' I was scared and upset but did not voice those concerns. It was dark, so you could not see my face." And that "This is clearly <u>not</u> rape."

158. When she filed her protection order petition, Ms. Hoffer had to indicate whether she was "a victim of a sex offence" or whether Mr. Kenney-Prentiss "committed a sex offense against her," or "caused me to involuntary engage in sexual activity by force, threat of force, or duress." Ms. Hoffer answered all those questions in the negative.

159. In 2024, Ms. Hoffer claimed – under oath – that Mr. Kenney-Prentiss "most certainly raped me." She testified that she "asked him to leave" and he "put his hands around my throat." That she "made it clear that [she] did not want company." That Mr. Kenney-Prentiss told her "You are acting like a bitch" and that she "said that I wanted him to leave." She now claims that "I was so clear" on saying no "I don't know how much clearer" she could have been." That Father "knew that I was upset and scared," "knew he didn't have consent [but] did it anyway."

160. In 2025, Ms. Hoffer now claims that she is "in fear of physical harm" and "wonder[ed] when [Mr. Kenney-Prentiss] would finally snap, and hit or rape me."

161. Ms. Hoffer did not mention this incident until right before Mr. Kenney-Prentiss left Ms. Hoffer in September 2023. Ms. Hoffer had just told Mr. Kenney-Prentiss that he was lucky she wasn't physically violent with him. The parties texted:

> **Ms. Hoffer**: "Yes, you're lucky. I am not like that, though I feel like doing those things. It's natural to be angry. I am doing my best to be reasonable in my interactions with you."
>
> **Mr. Kenney-Prentiss**: "Lol. Yes. Like I said. You said I was lucky that you weren't being physically violent with me. Look. I'll be there before 6pm. No need to message before or after unless something goes amiss here, which it won't. Then I'll text [the au pair] during the week to coordinate. You can stop writing now."
>
> **Ms. Hoffer**: "Why lol? Har har physical abuse is so funny. You act like no one ever threw a lamp at you or smashed a hole in your ceiling with it or held you hostage at gunpoint all night or held you down and forced you to have sex with them. You don't feel lucky. But maybe you should. Good night."

162. Mr. Kenney-Prentiss attempted to address this with Ms. Hoffer via email on multiple occasions that month. He wrote:

> "You accused me of rape/forcible sex/sexual assault. It has fed into your unfounded paranoia about me. Addressing it will enable a healthier, more accurate and truthful co-parenting relationship."

163. Ms. Hoffer later testified under oath that these emails were "horrifying" and "incapacitated [her]" and "came out of the blue." She also testified that Mr. Kenney-Prentiss "brought the non-consensual sex incident up with no prior reason. I had not mentioned it. He pulled it in from thin air." And after receiving the email, Ms. Hoffer "cried off and on for the rest of the day."

164. Ms. Hoffer has told multiple people about this incident.

### 4.12. Ms. Hoffer's False, Misleading, Contradictory, and Baseless Allegations

165. Ms. Hoffer's has made numerous false, contradictory, and baseless allegations against Mr. Kenney-Prentiss, many of them under oath. The following are a sample of many, many more.

166. Ms. Hoffer claimed that she was "paralyzed by fear" that Mr. Kenney-Prentiss would show up unannounced and kidnap Child. On one occasion, she picked up the boys "from school early on Friday to take them to a safe location." And yet, Ms. Hoffer testified that she had no evidence that Mr. Kenney-Prentiss ever threatening to show up unannounced, no evidence of Mr. Kenney-Prentiss ever showing up unannounced, no evidence of Mr. Kenney-Prentiss threatening to kidnap Child, and no evidence of Mr. Kenney-Prentiss ever kidnapping Child.

167. Ms. Hoffer claimed, "I was nauseated and crying. I couldn't sit up, but I couldn't sleep either. I worried that [Mr. Kenney-Prentiss] would compromise my credit cards, email, or bank accounts." And yet, Ms. Hoffer testified that she had no evidence of Mr. Kenney-Prentiss ever threatening to access her personal records without her consent, and no evidence of Mr. Kenney-Prentiss accessing her personal records without her consent.

168. Ms. Hoffer claimed, "I fear that [Mr. Kenney-Prentiss] is going to kill me" and "I am scared that he is going to go into a rage and kill me. I am terrified, and I don't know what to do. Who would even believe me?" And yet, Ms. Hoffer testified that she had no evidence of Mr. Kenney-Prentiss ever making overt threats of physical harm, no evidence of Mr. Kenney-Prentiss attempting to cause her physical harm, and no evidence of Mr. Kenney-Prentiss ever causing her physical harm.

169. Ms. Hoffer testified she had no evidence that Mr. Kenney-Prentiss ever committed animal cruelty, threatened to follow her around, followed her around, threatened to disseminate explicit photos, disseminating those photos, threatened suicide, attempted suicide, threatened to contact friends, family, or her employer with disparaging remarks, or for posted disparaging remarks about her on social media.

170. Ms. Hoffer alleged that Mr. Kenney-Prentiss threw a sofa into her late father's boat as an abusive and scary message meant to frighten her. Not only did Ms. Hoffer not witness this, but Mr. Kenney-Prentiss explained that the chair was moved from the workout room and placed in the boat along with other things stored in the boat (i.e. cardboard boxes, furnace filters).

171. Ms. Hoffer alleged that Mr. Kenney-Prentiss wanted her dead or gone when he said, "Ok. I guess this is about to get ugly. I truly with it didn't have to come to this, but you left me no choice." This caused her to become "so upset that I am vomiting." She told Mr. Kenney-Prentiss, "[y]ou are scaring me." In truth, Mr. Kenney-Prentiss was asking Ms. Hoffer whether she was ever going to engage and address his unanswered co-parenting questions that had built up for six months. After Ms. Hoffer chose to respond with silence, Mr. Kenney-Prentiss responded with the "about to get ugly message." And the message immediately after? Mr. Kenney-Prentiss' letter to preserve records for their upcoming custody suit. Ms. Hoffer failed to mention this and simply used the occasion to once again claim that she feared that Mr. Kenney-Prentiss would kill her.

172. As of 2025, Ms. Hoffer now alleges that Mr. Kenney-Prentiss abused all three of the children. However, Ms. Hoffer's contemporaneous communications fail to mention this. Even in May 2023, when Mr. Perry asked Ms. Hoffer if Mr. Kenney-Prentiss was "bad to [Half Sibling 1]," Ms. Hoffer replied, "He's mostly just riding herd on him about stims." (i.e. trying to prevent the child from making fart noises, chewing his hand).

### 4.13. Ms. Hoffer's Parental Misconduct

173. For years, Ms. Hoffer threatened to keep Child away from Mr. Kenney-Prentiss. Once Mr. Kenney-Prentiss left Ms. Hoffer, those threats became a reality.

174. Ms. Hoffer's *ex parte* order of protection only protected her. There were no restrictions on Mr. Kenney-Prentiss interacting with Child. However, Ms. Hoffer used the protection order to deny all parenting time between Mr. Kenney-Prentiss and Child from April 2024 to October 2024.

175. When denying or otherwise restricting parenting time, Ms. Hoffer repeatedly asserted that Mr. Kenney-Prentiss had "no rights" with Child. That lasted until Mr. Kenney-Prentiss obtained a copy of the paternity affidavit that both he and Ms. Hoffer signed the day after Child was born.

176. Mr. Kenney-Prentiss and Child watched the solar eclipse together in April 2024. Ms. Hoffer would later misrepresent this event to fabricate reasons to deny all parenting time between Mr. Kenney-Prentiss and Child.

177. Prior to the (later-dismissed) protection order, Ms. Hoffer and Mr. Kenney-Prentiss agreed that Child would be with his father in Cleveland for Memorial Day weekend and for half of the summer. Ms. Hoffer prevented any of this from happening.

178. Ms. Hoffer also unilaterally canceled pre-planned and already-agreed-upon parenting time between Mr. Kenney-Prentiss and Child in February 2024, February 2025, and Memorial Day Weekend 2025.

179. It was not until Mr. Kenney-Prentiss had a provisional court order that he was able to regularly see Child (November 2024).

180. Ms. Hoffer would not share Child's medical information with Mr. Kenney-Prentiss. For instance, in February 2024, Ms. Hoffer rushed Child to the emergency room. Mr. Kenney-Prentiss found out hours later from his mother. When he called Ms. Hoffer, she refused to talk and hung up on him.

181. After Ms. Hoffer was diagnosed with autism, she sought to evaluate Child for autism, too. She ensured that the evaluators only spoke with her, her new au pair, and Child's kindergarten teacher. She told the evaluators not to consult with Mr. Kenney-Prentiss. It took months for Mr. Kenney-Prentiss to become aware of the evaluation. Ms. Hoffer refused to share Child's report to Mr. Kenney-Prentiss until the court ordered her to provide it.

182. Ms. Hoffer falsely represented the report. Ms. Hoffer told people that Child was diagnosed with Oppositional Defiant Disorder. The report said no such thing.

183. Before Mr. Kenney-Prentiss moved out, Mr. Perry was prohibited from coming to their residence and prohibited from spending time alone with Child. However, once Mr. Kenney-Prentiss left, Ms. Hoffer began sending Child to Mr. Perry's house for weekends, often without telling Mr. Kenney-Prentiss.

184. While living in Indianapolis, Mr. Kenney-Prentiss read *The Lord of the Rings* to Child when Child was five years old. As a joke, Child called Mr. Kenney-Prentiss "Stinker" instead of "dad" or "daddy." Ms. Hoffer encouraged this, and from that point on, Mr. Kenney-Prentiss was called "stinker" or "stink" by both Child and Ms. Hoffer.

185. Ms. Hoffer and Mr. Kenney-Prentiss had long established a once-a-day Facetime rule for whomever was not physically present with Child that day. Ms. Hoffer used this to threaten and control Mr. Kenney-Prentiss. Even prior to moving out, Ms. Hoffer would say things like, "[y]ou and I have no agreement in writing, and as a non-custodial parent you are entitled to 'regular' phone contact, which does not have to be daily."

186. Ms. Hoffer would punish both Mr. Kenney-Prentiss and Child when Mr. Kenney-Prentiss would not call at the time convenient for her. For instance, she told him "[h]e's asking for you. I told him that you decided to play with someone else today. I hope you're having fun and that it's worth it."

187. Ms. Hoffer would regularly interfere with the FaceTime calls between Mr. Kenney-Prentiss and Child.

188. One salient example. After he moved out, Mr. Kenney-Prentiss was visiting a female friend. Child, prompted by Ms. Hoffer, asked Mr. Kenney-Prentiss where he was. Ms. Hoffer proceeded to do all the following:

- Mr. Kenney-Prentiss told Child that if you say the same word over and over again, it starts to sound weird. Ms. Hoffer jumped in and told Mr. Kenney-Prentiss, "especially if you've been drinking."
- When Mr. Kenney-Prentiss told Ms. Hoffer not to interfere with their calls, Ms. Hoffer continued to speak with hostility to Mr. Kenney-Prentiss in front of Child.
- Ms. Hoffer sang a made-up song in the background with the lyrics "you shouldn't have moved out."
- The female friend had a pet ferret. When the ferret came up in conversation, Ms. Hoffer jumped in again to tell Child that ferrets had mites and were not clean.
- Ms. Hoffer also tried to communicate with Mr. Kenney-Prentiss' female friend that she needed to "know the truth" about a non-existent STI infection, saying over and over again that her being with Mr. Kenney-Prentiss "wasn't consent." Ms. Hoffer would later write that she "would do it again," and:

> "I also am just so angry. It hasn't even been two months, and he's already back in bed with an ex. There is no way he told her beforehand about the risk. He told [Child] that he had to take care of his sick grandma, but he's in Brooklyn with his ex. Not with his grandma. Not getting help so that he can stop ruining women's lives. Not here getting healthy for [Child]. What am I supposed to tell [Child]?"

189. Sometimes, Ms. Hoffer would jump into their FaceTime and get angry with Mr. Kenney-Prentiss, where she would either stop the call or make Child so upset that Child would hang up.

190. On one occasion, after Child hung up, Mr. Kenney-Prentiss called back. He overheard Ms. Hoffer telling Child that she was "proud of [Child] for standing up to Stinker."

191. Mr. Kenney-Prentiss lived in constant fear that Ms. Hoffer would restrict or otherwise prohibit his and Child's FaceTime. Sometimes, Mr. Kenney-Prentiss would make repeated calls to the kids' iPad until Child answered. Mr. Kenney-Prentiss was told that sometimes they didn't hear the iPad. Also, Mr. Kenney-Prentiss feared that if he didn't repeatedly call, Ms. Hoffer would cite Mr. Kenney-Prentiss' lackluster effort to deny FaceTime, or otherwise claim that they didn't get any calls that day.

192. One salient example. Mr. Kenney-Prentiss tried to reach Child by FaceTime on September 21, 2023. He had already moved out. During the evening, Child called Mr. Kenney-Prentiss. Mr. Kenney-Prentiss was on a work conference call, so he told Child he would call him back when it ended. After it was over, Mr. Kenney-Prentiss began calling the iPad. Child was still awake when Mr. Kenney-Prentiss called. Instead of letting Child answer, Ms. Hoffer picked up the iPad, put it on silent, and put it in the cupboard. Mr. Kenney-Prentiss began calling Ms. Hoffer's phone to try and reach Child. Both Mr. Kenney-Prentiss and Ms. Hoffer's au pair told her that he was calling to try and talk to Child. Mr. Kenney-Prentiss emailed Ms. Hoffer, and wrote, "[u]nblock me and let me FaceTime my son so I can say goodnight to him. This is beyond cruel. This is pure torture." Ms. Hoffer would cite this incident in her petition for her protection order, calling the incident "terrifying" and said "I was so exhausted. I made sure, one last time, that all of doors and windows were locked [… and] tried to sleep. It was impossible." Ms. Hoffer later testified that she let it repeatedly ring.

193. Notably, during the same night of numerous phone calls, the au pair wrote to Mr. Kenney-Prentiss, "i dont think shes ever called you scary, shes called you lots of things, but ik what you mean." Ms. Hoffer had already disparaged Mr. Kenney-Prentiss to her au pair numerous times before this night. And yet, she had failed to mention any amount of fear of Mr. Kenney-Prentiss, contrary to what she wrote in her PO petition.

194. Despite no one asking for it, the court's temporary parenting time order established a four-times-a-week FaceTime schedule. Using this, Ms. Hoffer explicitly told Child that he was not allowed to call his father beyond the four times a week schedule.

195. After Ms. Hoffer received her *ex parte* protection order, she began refusing to allow Child to use her cell phone to FaceTime, regardless of how poor the Wi-Fi signal was in the house.

196. While they all lived together, Mr. Kenney-Prentiss had Child in ninja training, piano, and jujitsu. After he left, Ms. Hoffer unilaterally decided to take Child out of both piano and jujitsu.

197. Despite the *ex parte* order of protection only preventing Mr. Kenney-Prentiss from communicating with Ms. Hoffer, she outright refused to provide any information about Child to Mr. Kenney-Prentiss. This included vacations, where Child stayed overnight, and medical issues. Ms. Hoffer even encouraged the au pairs to lie to Mr. Kenney-Prentiss about Child's whereabouts.

198. Ms. Hoffer regularly exposed Child to her hostility towards Mr. Kenney-Prentiss. Even before he moved out, Child was exposed to Ms. Hoffer yelling at at him, threatening him that he would never see Child again, and calling him a liar. After Mr. Kenney-Prentiss moved out, this not only occurred on FaceTime, but also when Ms. Hoffer spoke negatively him to third parties around Child. Child would occasionally comment to Mr. Kenney-Prentiss about how much Ms. Hoffer disliked him.

199. When Ms. Hoffer was alone with Child, she would report behaviors that Mr. Kenney-Prentiss never saw from Child (i.e. extreme violence, disobedience, rage). While Mr. Kenney-Prentiss was away, Ms. Hoffer would regularly tell him that Child hates him, hates spending time with him, and hates Cleveland.

200. Well before Mr. Kenney-Prentiss moved out, both he and Ms. Hoffer agreed that they needed to get a therapist for Child. This was because of the transition of Mr. Kenney-Prentiss moving out of the house, as well as to help Child manage the conflict between his parents. Child is on Mother's health insurance. That was 2023. Over two years later, Ms. Hoffer has still not obtained a therapist for Child despite Mr. Kenney-Prentiss' repeat requests.

### 4.14. Ms. Hoffer Wantonly Violated the Indiana Parenting Time Guidelines

201. Ms. Hoffer has denied Child regular and consistent time with Mr. Kenney-Prentiss. Ms. Hoffer would later both deny **and admit** this under oath.

202. Ms. Hoffer, in blocking Mr. Kenney-Prentiss and refusing to communicate with him, has refused to keep communications concerning a child kept between the parents often making Child the Mr. Kenney-Prentiss' only source of information on what's happening (i.e. vacations, travel plans, overnights, information regarding extracurricular activities). Ms. Hoffer would later deny **and admit** this under oath.

203. Ms. Hoffer has denied Child the ability to have private communications without interference from the other parent. Instead, Ms. Hoffer has regularly recorded their conversations. Ms. Hoffer would later deny **and admit** this under oath.

204. Ms. Hoffer has failed to ensure that she avoided speaking negatively about Mr. Kenney-Prentiss in or near the presence of Child, nor did she discourage such conduct by relatives or friends. Ms. Hoffer would later deny **and admit** this under oath.

205. Ms. Hoffer has regularly denied Mr. Kenney-Prentiss reasonable phone access to Child without interference her and has denied ensuring that calls and messages left by Mr. Kenney-Prentiss were promptly communicated and returned. Ms. Hoffer would later deny **and admit** this under oath.

206. Ms. Hoffer has engaged in unacceptable interference with communication by refusing to answer a phone and refusing to allow the child or others to answer and turning off the phone or using a call blocking mechanism or otherwise denying the other parent telephone contact with the child. Ms. Hoffer would later deny **and admit** this under oath.

207. Ms. Hoffer has regularly interfered with such communication through her attempts to block access to, and contact with, the other parent. Ms. Hoffer would later deny **and admit** this under oath.

208. Ms. Hoffer has refused to provide emergency notifications to Mr. Kenney-Prentiss and refused, when traveling out of the area with Ms. Hoffer, she has refused to inform Mr. Kenney-Prentiss on the itinerary of travel dates, destinations, and places where the child or the traveling parent can be reached, or the name and telephone number of an available third person who knows where the child or parent may be located. Ms. Hoffer refused to immediately notify Mr. Kenney-Prentiss of any medical emergencies or illness of Child that required medical attention. Ms. Hoffer would later deny **and admit** this under oath.

209. Ms. Hoffer has refused to share information about Child, to include failing to inform Mr. Kenney-Prentiss of all organized events in Child's life which permit parental participation. Ms. Hoffer would later deny **and admit** this under oath.

210. Ms. Hoffer has interfered with communication between Mr. Kenney-Prentiss and Child and has worked against promoting a positive relationship between the children and the other parent and has violated the standard that no person shall block reasonable phone or other communication access between a parent and child or monitor or record such communications. Ms. Hoffer would later deny **and admit** this under oath.

211. Ms. Hoffer has consistently canceled scheduled parenting time between Mr. Kenney-Prentiss and Child. Ms. Hoffer would later deny **and admit** this under oath.

212. Ms. Hoffer has utilized a number of unacceptable excuses for denying parenting time including Child unjustifiably hesitates or refuses to go, Child has to go somewhere, Ms. Hoffer did not want the child to go, and because Mr. Kenney-Prentiss failed to meet preconditions established by Ms. Hoffer. Ms. Hoffer would later deny **and admit** this under oath.

213. Ms. Hoffer has allowed child hesitation to influence parenting time decisions and allowed Child to make the decision on whether scheduled parenting time takes place. And Ms. Hoffer has repeatedly saddled Child with parenting time decisions, resulting in Child having to shoulder the burden of the decision. Ms. Hoffer would later deny **and admit** this under oath.

214. Ms. Hoffer has refused to provide Mr. Kenney-Prentiss the opportunity for additional parenting time when it became necessary that a child be cared for by a person other than Ms. Hoffer, and Ms. Hoffer failed to first offer the other parent the opportunity for additional parenting time. Ms. Hoffer would later deny **and admit** this under oath.

215. Ms. Hoffer refused to make every effort to discuss options to disagreements, including mediation, to resolve disputes before going to court, and immediately refused Mr. Kenney-Prentiss's request for mediation. Ms. Hoffer would later deny **and admit** this under oath.

216. Ms. Hoffer has established a pattern of attempting to undermine Child's relationship with Mr. Kenney-Prentiss. Ms. Hoffer would later deny this under oath.

217. Ms. Hoffer has created a toxic and alienating environment for Child. Ms. Hoffer would later deny this under oath.

218. Ms. Hoffer has jeopardized Child's emotional health to settle a score with Mr. Kenney-Prentiss. Ms. Hoffer would later deny this under oath.

219. Ms. Hoffer has refused to allow Child frequent, meaningful, and continuing contact with Mr. Kenney-Prentiss. Ms. Hoffer would later deny this under oath.

220. Ms. Hoffer failed to demonstrate a spirit of cooperation in co-parenting with Mr. Kenney-Prentiss. Ms. Hoffer would later deny this under oath.

221. Ms. Hoffer has denied Child a relaxed, secure relationship with each parent without being placed in a position to manipulate one parent against one another. Ms. Hoffer would later deny this under oath.

222. Ms. Hoffer has refused to provide a physically safe and adequately supervised [environment] when in the care of each parent and to have a stable, consistent and responsible childcare arrangement when not supervised by a parent. Ms. Hoffer would later deny this under oath.

### 4.15. Ms. Hoffer's Campaign of Desolation

223. Ever since Mr. Kenney-Prentiss left Indianapolis, Ms. Hoffer has waged a campaign to destroy him.

224. Ms. Hoffer disparaged Mr. Kenney-Prentiss to her au pairs, to Child's school, and to other third parties, often with false and derogatory information.

225. On top of spoliating records, Ms. Hoffer has also withheld many documents from discovery. For instance, even though the parties' finances are relevant in custody matters, Ms. Hoffer has categorically refused to turn over documents about her financial holdings, her commercial real estate, and her hidden assets.

226. When he left Indianapolis, Mr. Kenney-Prentiss moved to Cleveland without all his personal property. In September 2023, he began writing to Ms. Hoffer asking when he could pick up the rest of his stuff, especially because Ms. Hoffer barred him from stepping foot inside of her house and otherwise refused to communicate with him. Ms. Hoffer never responded. Instead, Ms. Hoffer waited until March 2024 to tell Mr. Kenney-Prentiss that she moved all his stuff into a nearby and expensive storage center. Mr. Kenney-Prentiss has not been able to afford to get his belongings back ever since.

227. Ms. Hoffer attempted to contact Mr. Kenney-Prentiss' Marine Corps unit. Ms. Hoffer also threatened to contact the Ohio State Bar Association to harm Mr. Kenney-Prentiss' career.

228. Mr. Kenney-Prentiss' grandmother passed away in August 2025. Ms. Hoffer and Mr. Kenney-Prentiss agreed that Child would attend the services. However, right before visiting, Ms. Hoffer threatened not to bring Child. Ms. Hoffer also refused to bring Child to the memorial service despite their prior agreement and where Mr. Kenney-Prentiss would give a eulogy. And instead of having Child spend time with his father the day after the service, as had been agreed, Ms. Hoffer unilaterally decided to drive Child home without him seeing his father.

229. Throughout all of this, Ms. Hoffer has demonstrated a complete lack of empathy. Ms. Hoffer presents herself as a victim, but is almost always the aggressor.

### 4.16. Mr. Kenney-Prentiss' Good Faith Effort After Leaving

230. After Mr. Kenney-Prentiss left Indianapolis, Ms. Hoffer refused to co-parent with him. Ms. Hoffer would regularly call Mr. Kenney-Prentiss' actions scary, abusive, and terrifying. Mr. Kenney-Prentiss attempted address this on multiple occasions, even writing to Ms. Hoffer "you told me you were scared, in fear, terrified of me, if I knew what you were afraid of, I could not do that thing and thus build a healthier co-parent relationship." Ms. Hoffer never responded.

231. Mr. Kenney-Prentiss attempted to improve his and Ms. Hoffer's communication so that they could co-parent for Child. Ms. Hoffer unilaterally demanded the use of OFW. She told Mr. Kenney-Prentiss that she would answer the questions he sent via email if he sent them in OFW. After Mr. Kenney-Prentiss sent the questions via OFW, she refused to answer them. Meanwhile, Mr. Kenney-Prentiss offered various actionable ideas to better communicate. Ms. Hoffer chose not to engage.

232. Mr. Kenney-Prentiss suggested that he and Ms. Hoffer get a couple's therapist so they could work on being effective co-parents. Ms. Hoffer chose not to engage.

233. Mr. Kenney-Prentiss asked for the contact information of Ms. Hoffer's attorney. Ms. Hoffer would reference her unnamed attorney in their communications. Mr. Kenney-Prentiss asked for their information so that he could communicate through them instead of Ms. Hoffer, preventing her from feeling "terrified." Ms. Hoffer refused. As it turns out, Ms. Hoffer did not have any lawyer at the time.

234. During a January 2024 Child exchange, Ms. Hoffer invited Mr. Kenney-Prentiss up to her hotel room to spend time with her and Child. This was a positive experience. Mr. Kenney-Prentiss wrote after to ask whether she would like to have the three of them spend more time together to "be something positive to build on, for the three of us." Mr. Kenney-Prentiss also told Ms. Hoffer "[w]e lay ground rules ahead of time so you feel safe, secure, and comfortable." Ms. Hoffer would later cite this as "sexual innuendo" and further grounds for a protection order.

### 4.17. Harmful Effects on Mr. Kenney-Prentiss

235. Living with Ms. Hoffer had a deleterious effect on Mr. Kenney-Prentiss. After leaving Ms. Hoffer, Mr. Kenney-Prentiss got worse in the wake of Ms. Hoffer's refusal to co-parent, her protection order lawsuit, and her keeping Child away from him.

236. Even before moving out, Mr. Kenney-Prentiss was afraid of Ms. Hoffer. When attempting to engage with her, he wrote:

> "I live in fear of how you'll react, of what you'll say, of your actions (suicide?), of you kicking me out, of me losing my son…prior to leaving for the Marines, there seemed to be weeks upon weeks where I just had to agree with whatever you wanted out of a sense of self preservation. Fear and powerlessness. It's omnipresent. Plus, there's the not-insignificant fear that you may murder me one day and cover it up as a suicide or accident. I know you've thought about it before…I can only imagine that you've planned for exactly that in our new environment."

237. While living together, Ms. Hoffer regularly noted that Mr. Kenney-Prentiss acted "like an abuse victim." She would become upset because Mr. Kenney-Prentiss seemed to "find it terrifying that someone half your weight wants to hug you."

238. However, Ms. Hoffer was emphatic she was not abusing Mr. Kenney-Prentiss. She wrote, "I'm not abusing you. I'm certainly not an abuser. You act as though you are abused."

239. According to Ms. Hoffer, it was Mr. Kenney-Prentiss' fault for acting like an abuse victim. Ms. Hoffer explained that him presenting like an abuse victim "doesn't mean that I'm abusing you. It could also mean that you're reacting strongly to things that other people might not."

240. Ms. Hoffer did not react well when Mr. Kenney-Prentiss began citing her behavior as potentially abusive. For example, Ms. Hoffer wrote, "[p]lease stop calling me abusive, unless you want me to reciprocate."

241. When Mr. Kenney-Prentiss would criticize her, Ms. Hoffer was not receptive, "Your criticisms of me mean nothing. You are crazy. You never make sense."

242. While living with Ms. Hoffer, Mr. Kenney-Prentiss' medical provider diagnosed him with "Adjustment Disorder, with Mixed Anxiety and Depressed Mood" because Mr. Kenney-Prentiss' "emotional symptoms of sadness, hopelessness, and worry occurred in response to an identifiable stressor and were not present in other areas of his life." That identifiable stressor was Ms. Hoffer and her abuse of Mr. Kenney-Prentiss.

243. Ms. Hoffer's abuse of Mr. Kenney-Prentiss was not immediately apparent to him. His medical provider documented in 2021 that Ms. Hoffer was being "very critical and emotionally abusive, but [Mr. Kenney-Prentiss] does not seem to see this."

244. Mr. Kenney-Prentiss' medical provider observed that his "depression has gotten much worse because of the current situation [living with Ms. Hoffer] and not being able to see friends or family or do the things he used to love doing."

245. By 2023, Mr. Kenney-Prentiss' medical provider noted that Mr. Kenney-Prentiss was "starting to realize that he has been in an abusive relationship, that [Ms. Hoffer] is a controlling and abusive narcissist and that his family and friends who have been telling him to leave for years are 100 % correct. I sent him some information about this personality disorder, testing for this and criteria as well as resources for victims of NPD and how they can recover and get their rights for parental custody."

246. After Mr. Kenney-Prentiss left Ms. Hoffer, his medical provider noted that Ms. Hoffer "is restricting phone calls to his son and acting as if he is threatening her when she blocks his calls and then says he is calling too much […] [Ms. Hoffer] has been playing mind games and trying to drive him crazy with how she deals with co-custody of their son. She is extremely manipulative and uses his good nature against him."

247. It was Mr. Kenney-Prentiss' medical provider's professional opinion that Mr. Kenney-Prentiss "has been the victim of domestic abuse and emotional abuse and manipulation" and "[Ms. Hoffer] has manipulated, abused, and harmed [Mr. Kenney-Prentiss]. She has also used his love for their son against him by threatening and then restricting his ability to see or spend time with [Child]."

248. His medical provider also noted that Mr. Kenney-Prentiss "does not pose a risk of physical harm to [Ms. Hoffer] or their children, and there is nothing to indicate that he has ever expressed any desire to harm or do violence to them."

249. In an affidavit, one of Mr. Kenney-Prentiss closest friends noted that "[Ms. Hoffer] was emotionally abusive towards [Mr. Kenney-Prentiss] and that the environment created by [her] contributed to a decline in [his] mental health." And when Mr. Kenney-Prentiss lived with Ms. Hoffer, she testified, "I became concerned for his mental health. Whenever we would speak, [he] would express feelings of anxiety, sadness, and unhappiness as a result of [Ms. Hoffer's] unpredictable moods and manipulation." The close friend also observed that while living with her, "[Mr. Kenney-Prentiss] distanced himself from all of our friends. [Mr. Kenney-Prentiss] later told me that he had a constant feeling of shame and failure while living with [Ms. Hoffer]."

250. Another one of Mr. Kenney-Prentiss' close friends testified that [Mr. Kenney-Prentiss] changed after moving in with [Ms. Hoffer] […] [Mr. Kenney-Prentiss] expressed to me that he was experiencing anxiety and feelings of personal failure because of what can be described as a punitive, power-based relationship with [Ms. Hoffer]. She would threaten to withhold [Child] if he did not do as she wanted."

251. Mr. Kenney-Prentiss' sister testified "Before [Ms. Hoffer], [Mr. Kenney-Prentiss] was my annoying older brother, but he had hope and optimism for his life. After meeting [Ms. Hoffer] and especially after moving in together with her in a relationship, my brother changed. He is always critical of himself now and is really focused on my mood and is over apologetic when he talks to me and to others. [Mr. Kenney-Prentiss] is now hypervigilant to my mood and checks in during conversations to make sure I am not upset by what he said. It's like he's always afraid of doing something wrong or making someone upset."

252. Mr. Kenney-Prentiss' sister noted "[he] seemed to put up with more abuse than anyone should in a relationship. He would tell me he didn't know what to do and no matter what he did it seemed like [Ms. Hoffer] would get angry with him."

253. After Mr. Kenney-Prentiss moved out in September 2023, the situation with Ms. Hoffer got worse.

254. Ms. Hoffer's refusal to co-parent, her unilaterally canceling parenting time, and her filing the protection order caused Mr. Kenney-Prentiss enormous amount of stress, anxiety, and harm.

255. When Mr. Kenney-Prentiss moved out, he was still in the Marine Corps Reserves. However, due to Ms. Hoffer's filing of the protection order and the overall stress she caused him, Mr. Kenney-Prentiss had to leave the Marine Corps.

256. Ms. Hoffer's post-separation abuse negatively impacted Mr. Kenney-Prentiss' ability to be his grandmother's primary caretaker and to begin his legal career anew in Cleveland.

257. Due to the legal issues with Ms. Hoffer, Mr. Kenney-Prentiss exhausted his life's savings on legal bills. After six months, Mr. Kenney-Prentiss could no longer afford it.

258. Ms. Hoffer did not see Mr. Kenney-Prentiss from February 2023 to December 2023 because of the protection order. When she first saw him, Ms. Hoffer remarked that Mr. Kenney-Prentiss' had changed so drastically that she thought he had cancer. Since she last saw him, Mr. Kenney-Prentiss had lost twenty (20) lbs.

259. Ms. Hoffer's post-separation abuse was acute enough to cause Mr. Kenney-Prentiss to consider suicide. If Ms. Hoffer would have won her protection order case against him, Mr. Kenney-Prentiss would have committed suicide.

260. Mr. Kenney-Prentiss informed Ms. Hoffer that he would have committed suicide had she won her protection order case against him. Ms. Hoffer's immediate response was to tell Mr. Kenney-Prentiss "you should have lost that case."

### 4.18. Ms. Hoffer Wanted Mr. Kenney-Prentiss Gone

261. For years, Ms. Hoffer would express the desire for Mr. Kenney-Prentiss to permanently leave her and Child.

262. Ms. Hoffer wanted Mr. Kenney-Prentiss to either be committed to her or gone for good. For instance, she wrote:

> "For the record, I was clear this summer that I wanted to commit. You held me at arm's length. I won't let you pin this failure on me. You gave up. […] You made me feel like I wasn't good enough. But that's laughable. […] You could have been everything. You chose not to do the work. You need to own that, to think about what it will do to [Child]-- the way that it will permanently affect his life for the worse-- the way that it will permanently affect our lives for the worse, and then make the right decision. Make a man's decision. Stop blaming me and attempting to minimize me on the basis of your mistaken impression of my mental health. I'm a superhero over here, managing your panic attacks, your depression, your shameful treatment of me, my work, my family, supporting my friends. I thought you were a superhero to, or I never would have brought you here or into his life. If you can't be our superhero, I want you to do what's right and leave us alone for good."

263. On another occasion, after Mr. Kenney-Prentiss refused Ms. Hoffer's advances, she told him "[p]lease leave. We could have been happy. I want you gone. What kind of role model could you possibly be? […] Do [Child] a favor and leave us alone. After this, you have to know that you aren't man [of] the house material."

264. Mr. Kenney-Prentiss long thought Ms. Hoffer wanted him to commit suicide. For instance, he told others "I constantly get the feeling from [Ms. Hoffer] that her and [Child] and everyone's life would be better if I were gone. She even told me not to come home and to take a job [elsewhere] instead. And that I need to be supervised in order to visit [Child]."

265. Ms. Hoffer knew what would happen to Mr. Kenney-Prentiss if she denied him parenting time and falsely accused him of serious wrongdoing. She wanted it to happen.

## 5. Causes of Action

**<u>First Cause of Action</u> — <u>Defamation</u>**

5.1. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.2. Ms. Hoffer defamed Mr. Kenney-Prentiss on multiple occasions. Some of Ms. Hoffer's comments were defamatory per se, in that she imputed criminal conduct, a loathsome disease, and sexual misconduct onto Mr. Kenney-Prentiss.

5.3. Ms. Hoffer has previously admitted to telling third parties that Mr. Kenney-Prentiss raped her, a demonstrable false claim.

5.4. Ms. Hoffer has also told third parties about Mr. Kenney-Prentiss' non-existent STI, his potential to kidnap Child, and his myriad of alleged (and false) mental health issues. This occurred both in emails and texts with third parties, as well as oral communication between Ms. Hoffer and her associates (i.e. au pairs, friends). And Ms. Hoffer attempted to, and sometimes succeeded, in contacting Mr. Kenney-Prentiss' associates with disparaging remarks.

5.5. Ms. Hoffer's defamatory comments were made with malice, causing great damage to Mr. Kenney-Prentiss.

**<u>Second Cause of Action</u> — <u>Invasion of Privacy</u>**

5.6. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.7. Ms. Hoffer invaded Mr. Kenney-Prentiss' privacy via intrusion. Ms. Hoffer, without Mr. Kenney-Prentiss' knowledge or consent, intruded through several unlawful and highly offensive intrusions upon the property of Mr. Kenney-Prentiss, to include going through his electronic communications with others, searching his personal files and property, and surreptitiously taking photographs of his belongings for later use in court proceedings.

5.8. Ms. Hoffer continued to do this well after Mr. Kenney-Prentiss left their shared residence.

5.9. Ms. Hoffer publicly disclosed private facts about Mr. Kenney-Prentiss. Ms. Hoffer disclosed certain private facts about Mr. Kenney-Prentiss to a large enough number of persons such that the matter was sure to become public knowledge.

5.10. Specifically, Ms. Hoffer regularly and widely disseminated private facts about Mr. Kenney-Prentiss, many of them false, to employees of Child's school. This included false comments about Mr. Kenney-Prentiss mental health, effects on Child, and substance abuse. These facts are highly offensive to reasonable persons and lacked newsworthiness.

5.12. Ms. Hoffer presented Mr. Kenney-Prentiss in a false light. As stated above, Ms. Hoffer gave publicity of Mr. Kenney-Prentiss, most notably to Child's school, that placed him in a false light, attributing characteristics and conduct he did not have, and was highly offensive to a reasonable person. Ms. Hoffer had knowledge and acted in reckless disregard to the falsity of the false light.

**<u>Third Cause of Action</u> — <u>Malicious Prosecution</u>**

5.13. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.14. Ms. Hoffer instituted an action against Mr. Kenney-Prentiss, namely, her protection order case against him. Ms. Hoffer acted maliciously by doing so. Ms. Hoffer did not have probable cause to institute her action against Mr. Kenney-Prentiss, as many of the reasons have already been set forth in this Complaint. As stated in the introduction, after Mr. Kenney-Prentiss informed Ms. Hoffer that he would have committed suicide if she would have won, her immediate reply was to tell Mr. Kenney-Prentiss that she should not have lost her case.

5.15. Ms. Hoffer's petition for an order of protection was denied, thereby terminating in Mr. Kenney-Prentiss' favor on the merits.

5.16. In short, Mr. Kenney-Prentiss was improperly subjected to legal process by Ms. Hoffer and was considerably harmed as a result.

**<u>Fourth Cause of Action</u> — <u>Abuse of Process</u>**

5.17. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.18. Ms. Hoffer brought her petition for an order of protection against Mr. Kenney-Prentiss with ulterior purposes and motives.

5.19. Ms. Hoffer also had ulterior purposes and motives when Ms. Hoffer committed parental interference and misconduct, and when Ms. Hoffer spoliated evidence in the cases with Mr. Kenney-Prentiss.

5.20. As stated above, Ms. Hoffer withheld Child from Mr. Kenney-Prentiss and otherwise waged a campaign of parental interference and alienation under the cover of the later-dismissed protection order. This included specific instructions to Child's school not to allow Mr. Kenney-Prentiss to pick him up.

5.21. All of Ms. Hoffer's actions were willful uses of the process not proper in the regular conduct of the proceedings. Ms. Hoffer pursued her protective order not for her own personal protection, but to deprive Mr. Kenney-Prentiss of his parental rights and to gain an advantage in the impending custody litigation.

5.22. In her actions with Mr. Kenney-Prentiss, Ms. Hoffer demonstrated an extortionate perversion of lawfully initiated processes to illegitimate ends.

**Fifth Cause of Action — Crime Victims Relief Act**

5.23. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.24. Ms. Hoffer violated the Indiana criminal code by interfering with custody, thus making Ind. Code § 34-24-3 applicable, which caused pecuniary loss to Mr. Kenney-Prentiss, as has been heavily outlined already in this Complaint.

5.25. As a direct result of Ms. Hoffer's criminal acts, Mr. Kenney-Prentiss incurred substantial expenses (legal fees, travel for court, etc.) and lost income by having to leave his employment to focus on regaining custody — all recoverable pecuniary losses.

5.26. Ms. Hoffer also committed criminal conversion by knowingly or intentionally exerted unauthorized control over Mr. Kenney-Prentiss' property. This includes most Mr. Kenney-Prentiss' household goods that remained at Ms. Hoffer's residence, even after Mr. Kenney-Prentiss attempted to get them back (with the communication that was ignored by Ms. Hoffer).

5.27. Due to the huge expense in regaining access to their Child and litigating with Ms. Hoffer, Mr. Kenney-Prentiss has lacked the necessary funds to remove his personal property from storage in Indiana. This likewise caused Mr. Kenney-Prentiss to incur substantial expenses. As a result of Ms. Hoffer's criminal acts, Mr. Kenney-Prentiss suffered pecuniary losses including, but not limited to, attorney's fees, court costs, and lost income.

**<u>Sixth Cause of Action</u> — <u>Tort of Conversion</u>**

5.28. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.29. Ms. Hoffer appropriated Mr. Kenney-Prentiss' personal property and exercised dominion over it, to the exclusion and defiance of the rights of Mr. Kenney-Prentiss, and otherwise withheld it from his possession, as stated above, particularly in the Fifth Cause of Action.

**Seventh Cause of Action — Intentional Infliction of Emotional Distress**

5.30. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.31. Ms. Hoffer intentionally inflicted emotional distress on Mr. Kenney-Prentiss. Ms. Hoffer's conduct towards Mr. Kenney-Prentiss was both extreme and outrageous. As a result of Ms. Hoffer's extreme and outrageous conduct, Mr. Kenney-Prentiss suffered tremendous pain, anguish, and harm.

5.32. Whether intentional or with reckless disregard, Ms. Hoffer caused severe emotional distress to Mr. Kenney-Prentiss. His mental state deteriorated to the point of considering suicide. Short of that, Ms. Hoffer's actions have caused Mr. Kenney-Prentiss to suffer a myriad of harmful psychological effects (i.e. nightmares, insomnia, depression, anxiety). Ms. Hoffer's conduct has been outrageous by any civilized standard.

**<u>Eighth Cause of Action</u> — <u>Tortious Interference with Parental Rights</u>**

5.33. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.34. Ms. Hoffer's extreme and outrageous conduct resulted in the loss of relationship and emotional pain for both Mr. Kenney-Prentiss and Child.

5.35. Ms. Hoffer's tortious interference also caused Mr. Kenney-Prentiss to incur significant expenses.

5.36. Ms. Hoffer intentionally and with affirmative conduct detained and prevented Child from seeing his father, attempted to alienate Child from his father, and otherwise interfered with their relationship.

**<u>Ninth Cause of Action</u> — <u>Civil Conspiracy</u>**

5.37. Mr. Kenney-Prentiss realleges and incorporates, on behalf of himself, each and every paragraph of this Complaint as though fully set forth herein.

5.38. Ms. Hoffer, along with Mr. Perry and Ms. Hoffer's au pairs worked together to commit several wrongful acts with unlawful purposes, including interference with custody, evading service of process, refusing to abide by duly issued orders, and conversion of Mr. Kenney-Prentiss' property.

5.39. Ms. Hoffer advised the au pair, resulting in her not appearing for her deposition. Ms. Hoffer advised her au pairs that they could lie to Mr. Kenney-Prentiss about his whereabouts.

5.40. Ms. Hoffer, in concert with Mr. Perry and her au pairs, worked in concert to conceal where Child was from Mr. Kenney-Prentiss and worked in concert to thwart legal service of process.

5.41. And Ms. Hoffer coordinated with Mr. Perry to procure and preserve a bad faith and frivolous protective order for leverage against Mr. Kenney-Prentiss.

5.42. These acts harmed and damaged Mr. Kenney-Prentiss.

## 6. Prayer for Relief

Wherefore, Plaintiff, individually, prays for judgment against Ms. Hoffer as follows:

A. Compensatory damages in an amount to be determined at trial, including special damages and emotional-distress damages.

B. Punitive damages as permitted by law.

C. Treble damages and reasonable attorney's fees under Ind. Code § 34-24-3-1 (Crime Victims Relief Act) based on Defendant's violations of Ind. Code § 35-42-3-4 (interference with custody) and/or Ind. Code § 35-43-4-3 (conversion).

D. Pre- and post-judgment interest.

E. Costs under Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920, and — where authorized by statute or contract — reasonable attorney's fees and expert-witness fees.

F. Such other and further relief as the Court deems just and proper.

**Demand for Jury Trial**

Plaintiff demands a trial by jury on claims so triable.

Respectfully Submitted,

*/s/James M. Kenney-Prentiss/s/*
**James M. Kenney-Prentiss**
Plaintiff, *Pro Se*
1220 W 6th Street, Suite 303
Cleveland, Ohio 44113
440-212-6672
JMKP@JusticeInCleveland.com

## 7. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

October 2, 2025
Date of Signing

***/s/ James Michael Kenney-Prentiss /s/***
Signature of Plaintiff, *Pro Se*