UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES MICHAEL KENNEY-PRENTISS )
)
Plaintiff, )
)
-v- ) CASE NO.
) 1:25-cv-02018-MPB-MJD
STEPHANIE RENEE HOFFER, )
)
Defendant. )

The deposition upon oral examination of JAMES MICHAEL KENNEY-PRENTISS, a witness produced and remotely sworn before me, Debbi S. Austin, RMR, CRR, Notary Public in and for the County of Hendricks, State of Indiana, taken on behalf of the Defendant via Zoom videoconference on July 31, 2026, at 12:01 p.m., pursuant to the Federal Rules of Civil Procedure.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
(800)869-0873

APPEARANCES

(All participants via Zoom videoconference)

FOR THE PLAINTIFF:

Pro Se

FOR THE DEFENDANT:

Philip R. Zimmerly, Esq.
BOSE MCKINNEY & EVANS, LLP
111 Monument Circle
Suite 2700
Indianapolis, IN 46204
pzimmerly@boselaw.com

ALSO PRESENT: Stephanie Hoffer

know, the Reserve Marine Corps thing at the same time and, you know, trying to do all the crazy litigation stuff with Stephanie. So, like, I wasn't working for him full-time until probably like mid to late 2024, but I don't remember the specific time frame.

Q In any event, when -- during the time that you've been working for him from approximately April of 2024 until the present, he's paid you weekly. At first it -- it sounds like it was about $500 per week, and at some point in time it became $750 per week; is that correct?

A Yeah, that's when I started regularly working for him. Prior to that, he paid me like for, you know, like, by, I guess, contract worker, however you classified it. He -- I remember he liked what I did or something, so he paid me money to support. But it wasn't a regular thing I don't think for -- until a while.

I'd have to look at my bank records to really, you know, confirm when everything happened, but yeah, that's the long and the short of it.

Q Do you have any other employment other than the work that you're doing with Mr. Maher?

A No.

Q Are you still involved with the United States Marine Corps?
A No.
Q When did you -- when did your time with the Marine Corps come to an end?
A My time at the Marine Corps came to an end in the summer of 2024.
Q And were you honorably discharged?
A So the way the Reserves work is there's not necessarily a discharge. So I've been discharged from active duty several times. Each of those times was an honorable discharge. But the way the Reserves work is like you're basically a free agent. So you're on a set of orders or you are part of a unit, but -- let me back up.
So in the Selected Marine Corps Reserves, there's two types of Marines. There's obligated Marines, and there's non-obligated Marines. So the obligated Marines are people on like their initial commission or their initial enlistment or actually all enlisted Marines are obligated because they enlist like for a certain period of years.
So I was required to regularly drill in the Marine Corps until -- I want to say 2016, you know, like that first four-year commitment. But then

after that, I didn't have to continue with the Marine Corps where I could come -- you know, like come and do a year of active duty, drop off for a couple of months and go to Vienna with Stephanie.

So my time with the Marine Corps, you know, ending was not that I got discharged or let go or anything. It was just like I just stopped, you know, drilling, and then I dropped to something called the Initial Ready Reserve, which is a pool of Marines who are like available in case World War III breaks out, you know, basically. Like there's no obligations. There's, you know, nothing you have to do, but you're essentially, you know, a free agent who's just kind of out there in the ether.

Q So you're -- if I'm understanding correctly, you are, to use your term, you're sort of a free agent, that if you decided to reup with the Marine Corps, if there was an opportunity, you could reup with the Marine Corps if you chose to do so?

A So I -- I don't know right now because I don't know how long someone could be out in the IRR and come back in. Like, I don't know if I've waited too long. I know practically, it's impossible. But even if I wanted to and the stars aligned, like, I

would really have to see if I'm, like, no longer on the rolls or if I'm like ineligible, like, I just don't know.

Q Okay. And your sort of separation with any role with the Marine Corps in the summer of 2024, was that by your choice?

A Yeah, yeah. I mean, yeah, I had to -- yeah. Like, I was just -- yeah. I had to get rid of something, right. Like, I couldn't do everything. Like, I couldn't stop taking care of my grandma. And I had to deal with all, like, the state court cases and whatnot and it just -- you know, yeah, something had to go.

(Deposition Exhibit 1 marked for identification.)

Q Okay. I'm going to ask you to take a look at a document that we've marked as Exhibit 1.

A Okay.

Q This is a 13-page document. It's a decision from the Indiana Court of Appeals, J.K. versus S.H. --

A Yeah.

Q -- dated August 27, 2025.

Do you recognize this document?

A I do.

Q And is this the -- an appellate decision pertaining

to the protective order that Miss Hoffer sought against you?
A Yes.
Q Is this a true and accurate copy of that order?
A As far as I could tell.
Q I just wanted to have you scroll down to page 3.
A Yes.
Q Which are paragraphs 3 and 4 of the order where the Court of Appeals sort of provides a summary of the procedural and evidentiary record that came to the Court of Appeals in that appeal. And so the first statement, "Mother and Father are the unmarried parents of a six-year-old child."
The reference to Mother, that's Stephanie Hoffer; is that correct?
A That's correct.
Q And Father is you, Mr. Kenney-Prentiss?
A Yes.
Q At that point in time, you were the unmarried parents of a child who was then six years old?
A That's correct.
Q The Court then says "After their volatile romantic relationship ended and their co-parenting became equally problematic, Mother petitioned for a protective order against Father, alleging he

stalked her and engaged in a pattern of harassment against her."

Was that a true description by the Court of Appeals?

A Yes.

Q The Court of Appeals then writes "The trial court granted an ex parte order for protection, and Father later moved for summary judgment on Mother's protective order petition."

Is that a true statement?

A Yes.

Q "Father's motion also sought an award of attorney fees based on his view that Mother's petition was frivolous and filed in bad faith. The trial court denied Father's motion as well as the motion to reconsider that Father filed afterward."

Are those true statements?

A Kind of. The order that denied the summary judgment motion and the award for attorney's fees, there were several pending motions at the same time. And Judge Kincaid, the state court judge, said in the order, if I remember correctly, like, all pending motions are denied.

So it didn't seem like it was, you know, with particular to any issue. It was just everything

that was pending was summarily denied without looking into it. So that's the more accurate way to put it. You know, like, the merits of the thing never got looked at.

Q Okay. So, but in any event, the trial court denied your motion for summary judgment; is that true?

A Yeah. In -- I think at the time there was the motion for summary judgment. There was -- in the summary judgment motion, there was the request for attorney's fees. Pending at the same time, there was a motion to compel with respect to certain discovery things. There was a motion to, I think, consolidate the custody case and the protection order case into the same case so that they would be both moved to one court instead of two.

There might have been more. I don't remember, but the -- you know, the state court just said, you know, deny everything. To just kind of -- I thought it was, you know, procedurally a pretty clean thing to do, just so, you know, it made it simple from the Court's perspective so I could understand why they just said no to everything.

But I didn't read it as, like, a specific, you know, on the merits, you know, denial of those things because, you know, like procedurally, right,

Stephanie never filed a motion opposing summary judgment or the attorney's fees thing.

So the procedures under Rule, what is it, 56, weren't followed with respect to, like, there being different motions on the same thing to let the Court decide. It was just, you know, get rid of everything, right.

And summary judgment and the attorney's fees thing were together, so because, you know, there was never an opposition brief and a hearing on it and all that kind of stuff, then, like, I just don't see it as a denial like on that specific issue. It was just more of a housecleaning thing.

Does that make sense?

Q I understand what you're saying. I mean, I think that my question is just simpler than that. It's true that the trial court denied the motions that you filed as it relates to summary judgment and any petition for attorney's fees; is that true?

A Mostly or in a way, yes. But in another way, no, based on what I just said.

Q Next sentence, paragraph 4, the Court of Appeals writes "The trial court then conducted an evidentiary hearing on Mother's petition for protective order at which Mother presented hundreds

of written communications that the parties had exchanged during the six months before the issuance of the ex parte order for protection."

Is that true?

A I don't remember the time frame that she included in the messages, but I do remember she submitted, you know, hundreds of pages, excuse me, of the written communication I think e-mails and Our Family Wizard messages to the Court as evidence.

Q Okay. So the one thing that you'd said that you're not certain about is just the time frame of the communications referenced in that statement by the Court of Appeals.

A That's correct.

Q And just for the record, because we'll talk, I'm sure, about it later, Our Family Wizard is what?

A It's a third-party app that co-parents use to communicate about family and child care and stuff like that. So courts sometimes mandate it. It's a way that, you know, so when someone writes these things, it's my understanding that if someone writes something like, you know, all -- people could see it, like court personnel, or parenting coordinators or their attorneys, everything's kind of like out in the open with respect to parties'

communications.
You have to subscribe to it. And yeah, just, you know, it's like a messaging app.
Q Okay. Now, the Court of Appeals then says in the second sentence of paragraph 4, "In these communications, Father was often profane as he repeatedly accused Mother of bad parenting, poor character, and undiagnosed mental illness."
Is that a true statement?
A It's true that I did accuse Stephanie of bad parenting, poor character, and an undiagnosed mental illness. I don't know if often is an accurate characterization. But I certainly, you know, did it, like, a number of times, as you can see from the messages.
Q Next sentence, "Father also repeatedly told Mother that he and Child would be better off without Mother in their lives."
Is that a true statement?
A I don't know how repeatedly I said it. I know I said it at least once. If she would just leave, you know, J and I alone and stop being, you know, like, terrible to both of us, because it was just -- it was just so bad at the time. I mean, it's still bad.

Q And the next sentence, the Court of Appeals writes "And he repeatedly turned discussions to his and Mother's prior romantic relationship despite Mother's requests in the communications that she and Father only discuss matters involving Child."
Is that a true statement?
A I don't think that's true. There's a lot of things that Stephanie claims were romantic overtures that were not, that she said in her petition. But yeah, you know, there was one -- but, you know, like, there was one instance where I called Stephanie just kind of like at an ends and, you know, suggested maybe to fix things like we get married because it might stop all like, you know, the horribleness. But it wasn't repeatedly romantic overtures, where that seems to be a mischaracterization.
Q But when did that --
A I'd have to look at the messages themselves that we could bring up. But, you know, it just -- from my memory, just it doesn't seem like it's accurate to say that it was repeated, you know, romantic things.
Q Okay. And when was that? You mentioned a proposition of marriage. When was that in terms of

time frame?
A I think it was in early 2025, like in January maybe. You would have to look at Stephanie's Our Family Wizard journal entry about it, where she writes about it to pinpoint, like, exactly when it happened.
Q Okay. And is that a proposition that happened in person, over the phone, in writing?
A It was over the phone.
Q Okay. While you take issue perhaps with the sort of characterization by the Court of Appeals that discussions repeatedly turned to a prior romantic relationship, is it true that Miss Hoffer requested in the communications that she and you only discuss matters involving the child?
A She did say that. And she would frequently follow it up with non-child discussions, but yeah. Yeah, she said in a number of occasions, like please confine your communications to J. A lot of times it was confusing because I was talking about things relating to J. I mean, we could talk about that if, you know, you want to, but it was just crazy-making.
(Deposition Exhibit 2 marked for identification.)

Q Okay. I want you to, if you would, open up Deposition Exhibit 2.
A Okay. I have it up.
Q This is the -- a two-page document. Is this the written order that was issued by Judge Kincaid following the hearing on the petition for a protective order?
A It is.
Q In your understanding, is this a true and accurate copy of that order?
A Yes.
Q And on page 2, is it true that the Court granted your motion for dismissal?
A Yes. It was -- I forget what Indiana trial rule it was, but it's after the plaintiff gives a case before the defendant -- or the respondent presents their own case or calls witnesses that they move for the judgment on the evidence, because even in the light most favorable to Stephanie in her best case that she made, it still was not sufficient, you know, grounds to grant it, right.
So with the appeal that we just -- you know, with the appellate thing, we just saw too, right, that's in light of me not presenting my side or citing any evidence whatsoever because the only

person that presented evidence in the thing was Stephanie.
Q Is it also true that the Court, at the same time that it granted your motion for dismissal, that it ordered that you limit your communications with Miss Hoffer to legal affairs and through counsel?
A So that's a disagreement that Stephanie and I seem to have. We see this language here, you know, locally a lot.
So it says in the order, "It is further ordered that the same, this Order, does not constitute an unfettered license to communicate directly with the petitioner" -- that is Stephanie -- "for though the Respondent" -- me -- "may offer communication to" Stephanie, "whether it is responded to or even accepted is up to her.
"Communication should be limited to that necessary for the parties to complete their legal affairs and said communication with Petitioner" -- Stephanie -- "on her election, may be by and through her counsel." In this case, it's one of her three lawyers that was representing her in this case. -- "or other such attorney as the case may be."
So we see this language a lot. You know, it's

like peacekeeping language, basically, where, you know, there's no statutory authority. There's no authority for the Court to order people what they can and can't say because her petition was dismissed and the case is over, right. So it doesn't have any legal force to it, but it's still important.

You know, courts say it a lot where it's like, Hey, look, be good to each other, you know, don't violate the -- don't violate the law, right. So this can be read as, you know, don't violate the stalking and harassment statutes, right, where it's not this separate legal force thing. It's just peacekeeping language in a dismissed -- you know, in a dismissed case.

Q You would agree, though, that there is language in this order in which Judge Kincaid orders particular things with regard to the communications between you and Miss Hoffer?

A It says "It is further ordered that the same, this Order, does not constitute an unfettered license to communicate." I mean, it says what it says. I don't know what to say, like ...

Q Okay, that's fair.

A But it doesn't have, you know, legal force to it.

It's just, like I said, peacekeeping language.
Q You don't think that this order from Judge Kincaid has legal force?
A Correct.
(Deposition Exhibit 3 marked for identification.)
Q Okay. If you would go to Exhibit 3.
A Like, let me clarify. The order dismissing it based on the petition order or the protection order statute obviously has legal force to it. But the peacekeeping language essentially says don't violate the law, right. Like, it -- I mean, it's more of a warning than anything. Like, Hey, you know, don't just, you know, like -- don't harass this person.
Q Okay. If you'd open Exhibit 3.
A 3, okay. Okay, yeah.
Q This is a document that I believe you produced to the plaintiff in discovery given the Bates stamp at the bottom of the document, 32908; is that correct?
A 32908. Yes, that's the Bates number.
Q And is this a true and accurate copy of a -- are these iMessages between you and Miss Hoffer from February 2nd of 2023?
A Yes.

Q Or I guess on -- this is all happening on February 2nd of 2023; is that correct?
A Yeah, between 6:44 p.m. and 10:05 p.m.
Q And in the large gray bubble from 10:04:23 p.m. Eastern, that large gray bubble is Miss Hoffer's text to you; is that correct?
A The gray texts are from Stephanie.
Q And the blue texts are from you?
A Yes.
Q And in that large gray bubble, in the third sentence -- or I guess the third paragraph, she writes "None of G[redacted] Le[redacted] or I do, but both are caused by strains of HPV (not the kind that I carry, but instead these are both non-carcinogenic)."
Is that a -- is that what she states there?
A Yes.
Q Were you aware that Miss Hoffer was a carrier of HPV?
A That's what she says. It doesn't make sense to me. In looking back -- so like your recent discovery requests that I'm going to respond to, like, I asked my doctor when I had health insurance about HPV and STIs in general, but specifically about HPV.

And she said that, you know, it usually -- you know, it just, like, goes away on its own. Like, it doesn't last for, like, what is it, more than a year, year and a half, or something, right. But according to Stephanie she's had HPV, you know, from -- I don't know when she first said it, like 2018 maybe.

It just seemed -- like unless she kept getting it, I -- you know, she said she had it in 2023. Whether or not that's true, I don't know. Like, she could have gotten the diagnosis back in 2018 or before and just thought she still had it. Or maybe not. Or she's just making it up. Like, I don't know what to tell you. But she claims to be carrying it on this day.

Q And it sounds like she had told you about being a carrier of HPV in 2018; is that true?

A I don't remember the exact year. I'd have to look at the messages and search for the HPV or e-mails or look at any sign of kind of like contemporaneous stuff. But it was years before this.

Q That she had -- that she had disclosed that to you?

A Yes. Yeah. But I just don't remember -- you know, if it's not in the records, she might have just told me on the phone or something, but it was, you

opinionated on the quality of those hospitals, right.

So like back when my grandmother's second husband, my Grandpa Al died, back in 2012 or -- 2012 or 2013 or something -- no, it was 2012, in December, that UH was great, like, they took care of him, you know. And you know, they were just really on top of it.

But then taking care of my grandma, and I have a strong hatred for UH now, just because it was just so ungodly frustrating dealing with them. And the clinic has a great reputation. They always treated me well. They treated my grandma well.

And yeah, you know, the Cleveland Clinic, you know, like you said, world eminent, you know, clinic and the greatest city in the history of the world. And they had, branches you know, branches out in Strongsville and Brunswick and all that stuff. So they're kind of everywhere here.

(Deposition Exhibit 4 marked for identification.)

Q Okay. If you'd turn to Exhibit 4.

A Yep.

Q This is another document that you've produced in discovery with a Bates stamp of 33501; is that

correct?
A Yes.
Q And is this a true and accurate copy of a text message exchange between you and Miss Hoffer on April 19th of 2023?
A Yes.
Q And in the third paragraph of that first gray bubble, Miss Hoffer writes "If you are a decent person, you will tell your new partners up front that you may be an HPV carrier, that you have significant mental health issues that will affect your long-term behavior in any eventual relationship, and that you left your family behind. If you are seeing more than one person at a time, you should be open with each of them about it. Otherwise, you do not have true consent but are instead lying through omission to get your needs taken care of at the expense of your partner's needs."
So was Miss Hoffer asking you to share that you could be a carrier of HPV with any physically intimate partners that you may have?
A What she -- what you read is what she said. Yeah, you quoted it exactly. If you are a decent person, you will tell your new partners up front that you

may be an HPV carrier, et cetera, et cetera.

(Deposition Exhibit 5 marked for identification.)

Q Exhibit 5.

A Yes. There's some great photos.

Q This is another document that you produced with a Bates stamp of 33529; is that correct?

A Yes.

Q And in the second gray text bubble, the second paragraph of that text bubble, she writes "And please, you have to tell whoever it is (if it is anyone) that you are likely carrying a dangerous strain of HPV."

Is that correct?

A Yes.

Q Again, she's sharing her concern that given the fact that you had physically intimate contact with her as a -- since she's a carrier of HPV, or that she believed that, that you should disclose that to other future partners so that they're aware of that potential that they might contract the same virus; is that true?

A I don't want to project her motivations on that. Like I said, I don't even know if she was a carrier at the time, but what you quoted her saying is what

she texted.

(Deposition Exhibit 6 marked for identification.)

Q If you would go to Exhibit 6.

A Yes. Two-page document Bates stamped 36452, 36453.

Q These are -- this is an Our Family Wizard exchange that you have produced in discovery; is that correct?

A Yes.

Q Is this a true and accurate copy of an exchange between you and Miss Hoffer on November 13th of 2023?

A Yes.

Q So on the second page, the message 39 of 8702 from Stephanie Hoffer to you, subject line regarding Moral duty to warn.

A Yes. Re: Moral duty to warn.

Q And in the body of that message, there is a paragraph that begins "You are carrying a high risk strain of HPV."

Do you see that?

A Yes.

Q So Miss Hoffer writes to you "You are carrying a high risk strain of HPV that is not covered by the available vaccine. For me, it is currently an

active infection and has been for months -- months during which we had intimate contact. It is exhausting and upsetting, and I have to have periodic painful biopsies until it goes away, IF it does. There is a chance it will end in terminal cancer for me, and now maybe also for her."

Was it true that Miss Hoffer had an active HPV infection and that she disclosed that to you?

A I don't know. That's why her medical records would be probative.

Q So you don't know whether or not she had an active HPV infection, but it is true that she did disclose to you that -- or at least make the statement to you that she did have an active HPV infection; is that true?

A Yeah, she said what you quoted her as saying.

Q Okay.

A An active infection that has been for months, months that we had intimate contact. I think our last intimate contact was like July of '23 or something.

Q Now, in --

A Oh, yeah, so on the first page, I -- you know, I do talk about how the doctor told me HPV goes through your system like a cold, and it's usually gone in a

year or two. So yeah, that had got to be obviously after the one medical appointment I talked about. But yeah, since that's, you know, closer in time, that's got to be a lot more accurate to what she said.
Q Okay. So that the -- you're looking at on the first page, this is your message to Miss Hoffer at 11:43 a.m. on November 13, 2023?
A Yes. And if you look at the one, two, three, four, fifth paragraph from the bottom that starts "You kept yelling and scolding," near the middle of it is when I said "Plus, my doctor told me HPV goes through your system like a cold, and it's usually gone in a year or two."
Q So that was the meeting that you had with your physician at the Cleveland Clinic that you described to me?
A Yes.
Q And I think this record perhaps has helped us to put a better sort of time frame as to when that visit to the Cleveland Clinic was. I think you had sort of estimated that it was in the spring of 2024. This seems like sometime -- it would have been sometime in the fall of 2023; is that correct?
A Yes. I was mistaken before when I said -- I don't

know, I might have said early '24. But yeah, 2023 makes sense because here it is.
Q And you in the same paragraph write "And for the record, Yana knows everything."
Who is Yana?
A Yeah, Yana, she -- yeah, she is my ex. She lives in New York City. And this was in November. So she was my date to the Marine Corps birthday ball with my unit at the time. And like, around here, you know, Yana and I were talking again. So that's who she is.
Q What is Yana's last name?
A Yakutilova. Y-A-K-U-T-I-L-O-V-I -- L-O-V-A. But she's -- well, she's Uzbek, but her full name is Yana Yanina Yakutilova Tarantiva. She has four names. But I don't know what, like, her official one is. I think it's Yakutilova.
Q Did you tell Yana that you are at risk for being a carrier for HPV?
A Yes.
Q What specifically did you tell her?
A I don't remember. But I knew I told her about it. And yeah, she -- you know, she knew me back when I was in New York City the first time, so, you know, she had known me, what -- that was 2023. What,

like eight years, nine years or something at that point.
Q Have you ever tested positive for HPV?
A No.
Q Have you ever taken a test to determine whether or not you were -- if you were a carrier for HPV?
A No.
Q Now, in this same e-mail, the message 38 of 872, you refer to Miss Hoffer or her actions as, quote, vile, immature, self-centered, despicable, wrong, immoral, narcissistic, disgusting, evil, childish, unfit to be a parent.
A Yes.
Q You used all those descriptions of Miss Hoffer and/or her actions?
A Yes. That's how I described her for what she did during FaceTime with me and my son.
Q And you also state in this message to Miss Hoffer that she is, quote, a monster; is that correct?
A Yes.
Q And what had happened on a FaceTime call?
A So I think this message sums it up fairly well. So I was -- so let me back up.
J and I, or Stephanie, J, and I, we had a policy for years and years that whatever parent was

like the nonresident parent with J -- J, JJ -- that the other non-present parent would have a FaceTime call with him to, you know, keep, you know, keep up on -- just kind of be like a constant presence in his -- you know, in his life.

And even -- even in Kuwait, right, like, you know, I think -- my memory tells me Stephanie and I called I think on FaceTime every day for me to talk to J, but I'm not sure. Like, I wish I had the phone logs or -- no, did I call from my phone? I think I must have called -- yeah, because of the Wi-fi. But, yeah, you know, even all the way back then, we regularly FaceTimed. So we would have a FaceTime call every day.

So then after I moved out in September of 2023, we continued to have, you know, the once-a-day FaceTime call. So during this particular day, I was in New York City for, you know, the birthday ball, stuff like that. And I'm talking to J on FaceTime. And Stephanie interferes with that FaceTime to put it -- to put it lightly, right.

So yeah, I remember this. You know, like I said, she interjected with hostile comments about me, which she had done several times. So, like,

when I told J when he repeats the same thing over again, it starts -- it starts to sound weird. There's actually a psychological term for that that I don't remember off the top of my head, but it's just like something that happens.

And then Stephanie jumped in out of nowhere, this is what I wrote, and said, you know, it happens, that happens, especially if you have been drinking, if you've been drinking, what Stephanie said, you know, directed at me. She wasn't part of the conversation, but she felt compelled to jump in right there in front of our six-year-old son to make that comment, right.

When I said repeatedly not to talk to me there or interfere with my calls, and if you wanted to, you know, talk to me like an adult, you could unblock me on texts, calls, and e-mails. Stephanie just kept scolding me. In the background, she sang a song that J and I could hear with the lyrics, "you shouldn't have moved out" where she was just singing that in the background. It's not like to an actual song, but just a song that she made up, saying that a lot for both of us to hear.

So there's a ferret, Mr. Noodle, he's adorable. He's Yana's ferret, and part of what I

like to do with J, like, I would send him pictures or videos, like I sent him sometimes videos of me or, you know, of various dogs, and I would send him pictures and videos of Mr. Noodle because Mr. Noodle is so adorable and great.

And in this conversation when the ferret came up, Stephanie needed to jump in to tell J that ferrets had mites and had to remind -- tell J, our son, again, about my cardboard/mite reaction to the old cardboard she put in what we called, you know, the daddy wing. You know, like, it's just she needed to paint things as bad.

And, like, he was -- it's so -- I can't tell you the feeling when your son's excited about something, just like pure, you know, like -- and as adults we don't have this, but one magical thing about J is just like he -- and kids, right, they just get so happy and excited about something. It's just, you know, there's no, like, complicated layers. You know, it's just happiness and joy and like here's this animal, this cute animal who, like, he -- you know, like, hearing his voice, Mr. Noodle.

And Mr. Noodle is also a character from Sesame Street, so it made it kind of doubly cute. And to

have Stephanie jump in and like need to dampen it, need to make it a negative thing, need to make him feel disgusted or not like ferrets. Like, it's just so -- it's horrible to see. It's just a horrible thing to do.

Like, I'm sorry, I got sidetracked. Yeah, so the next part, yeah, she was -- Stephanie was yelling at me, scolding me about how Yana -- and she was trying to talk loud enough so Yana could hear and, quote, know the truth if I didn't tell her anything and it wasn't consent and she kept saying it over and over again.

And it's just like, why -- why do that on -- when you're co-parents on FaceTime with your six-year-old? Like, why say all that? Why jump in? It's just -- it was just so awful. And yeah, like, Stephanie would jump in with FaceTimes with hostility. That certainly wasn't her first time, and it just -- it was just horrible. It was just a horrible thing to do.

Q What specifically, when you -- in this sort of subparagraph where you say you kept yelling and scolding about how Yana knows -- needs to, quote, know the truth, closed quote, and if I didn't tell her everything, it, quote, wasn't consent, closed

quote, over and over again while I was sitting there FaceTiming me.

Is that what Ms. Hoffer specifically said, that Yana needed to, quote, know the truth and that if you didn't tell her everything, it, quote, wasn't consent?

A Yes. Those are direct quotes from Stephanie when she was talking about the HPV stuff out loud.

Q What specifically did she say?

A Other than those two quotes, I mean, this is November of '23, what, two and a half years ago. I know she talked about HPV. And she was just, yeah, kind of yelling into the phone.

But yeah, the two, you know, direct quotes was, you know, Yana needed to, quote, know the truth, and if I didn't tell her everything, it wasn't consent, like that, you know, captures the nexus of what she was talking about with -- when she was talking about HPV and whatnot. But yeah.

Q Show --

A I can't say any more, you know, specifics because, like I said, the conversation was, you know, several years ago. I might have more in like contemporaneous text messages, but I don't remember that off the top of my head. If I saw it, yeah, if

I had better records in front of me, maybe I would remember more or there was more documentation. I just -- I don't remember right now.

Q Did she expressly use the term HPV on the call?

A Yes.

Q And did she in the context of that conversation identify herself as a carrier of HPV?

A Like, I doubt she said something like me, Stephanie Hoffer, I currently have an HPV infection and I infected James because we had sex, or something like that, right, but I don't -- when a person you've been recently sleeping with yells about HPV infections or HPV, like, I think if not explicit, at least it's implied that Stephanie was a carrier, right. You know, making me, you know, a carrier too.

But like I said, I don't know explicitly what Stephanie said or specifically. But I don't know how you would hear that conversation and not assume or know that or think that Stephanie's trying to say that she is also a carrier because that doesn't make any sense given the context.

Q So while she may not have it stated, I'm a carrier of HPV, that was expressly -- that was at least implicit in the communications that she was making

to you on this FaceTime call?
A Yes.
MR. ZIMMERLY: Okay. We have been going about an hour and 15 minutes, which would be a good time to give Debbi a break.
MR. KENNEY-PRENTISS: Oh, sure.
MR. ZIMMERLY: So let's go ahead and go off the record and refill our coffees and take a bio break. Why don't we plan to come back in about ten minutes, at about 1:25. Is that okay?
THE WITNESS: Sounds perfect.
(Recess taken.)
(Deposition Exhibit 7 marked for identification.)
BY MR. ZIMMERLY:
Q Okay, back on the record. If you would go ahead and open what we've marked as Exhibit 7.
A Got it.
Q This is a 58-page document. It is the complaint --
A Yes.
Q -- that you filed to initiate this lawsuit; is that correct?
A That's correct.
Q On page 2 of the complaint, under the header "The Parties," you write "Mr. Kenney-Prentiss is a

citizen of Ohio. From 2020 to 2023, Mr. Kenney-Prentiss lived with Miss Hoffer in Zionsville, Indiana."
Is that a true statement?
A Yes.
Q Where in Zionsville did you live?
A [redacted], Zionsville, Indiana 46077.
Q Was that a home owned by Miss Hoffer?
A Yes.
Q And as I understand it, you stayed in an in-law suite of the home, not a separate house; is that correct?
A If you're asking me if we lived together and we moved in together as a couple, yes. There was an attached in-law suite, or that's what the sellers called it, above the garage. And that's where my bedroom was. Stephanie and my office was -- our home offices -- Stephanie had two home offices, but that's where she did like her Zoom calls and teaching. Our workout room was downstairs. Yeah, so it had -- it was an extension of the house, essentially.
Q Okay. If you would -- the next set of questions I'm going to ask you are in relation to paragraphs 152 to 154 of the complaint.

A Okay. On page 27.
Q So we're going to talk about this incident from the August 29th of 2022 time frame. Okay?
A Uh-huh.
(Deposition Exhibit 8 marked for identification.)
Q I'm going to ask you to open Exhibit 8. And these are text messages that bear a Bates stamp Hoffer_48 through 53.
A Yes.
Q Is that correct?
A Yes.
Q So these are text messages that Ms. Hoffer has produced to you in the course of this litigation. And so the gray and the blue bubbles are flipped. You are -- your communications are in the gray. Her communications are in the blue. Is that correct?
A Yes.
Q And is this Deposition Exhibit 8, is this a true and accurate copy of the messages that you exchanged between you and Ms. Hoffer on August 29th of 2022 and August 30th of 2022?
A I -- I don't know. And the reason why -- I haven't reviewed these. I don't know if Stephanie's

changed it or not. I assume not. Would you mind if I compare them to my own that I sent you?
Q That would be fine.
A Bates numbering. Okay. Let me just find the texts. Sorry, there's a lot to scroll through to find the correct document. Oh, yeah. Duh, it's in -- yeah. Side by side. And this is -- should be this one. Okay.
So I'm on the Bates numbers that I sent you Hoffer Bates No. 47387. And I have them both side by side. And let me just go through them. Sorry, it's just kind of, like, different formatting, so I'm just making sure. It's like I don't want to say anything that's ...
Q Well, what I might suggest is, do you have the document that you're looking at that you have greater confidence in?
A Yes.
Q Would you just go ahead and e-mail that to me, and we'll mark it as Exhibit 19. And we'll just work from that document.
A Okay. It's 2.1 gigabytes, so I could put it in like a Google Drive thing if that works.
Q Ooh.
MR. ZIMMERLY: Let's go off the record. Let's

figure this out.

(Discussion held off the record.)

(Deposition Exhibit 19 marked for identification.)

BY MR. ZIMMERLY:

Q So this -- what you just sent to me is a 21-page document. It's the messages between you and Stephanie Hoffer on August 29, 2022, through August 30th -- well, actually, it goes all the way through September 7th of 2022; is that correct?

A Yes. I just wanted to make sure it was comprehensive.

Q And we've marked this as Deposition 19, Exhibit 19.

A Yes. For some reason the print to pdf got rid of the Bates stamps, but I could reread the Bates stamps if you want me to.

Q This is fine.

A Okay.

Q So in this --

A Page 5 is where your thing started.

Q Right. And so this exchange, your messages are in the blue, and Ms. Hoffer's messages are in the gray; is that correct?

A That's correct.

Q And is this a true and accurate copy of your

messages that were exchanged on August 29th and August 30th of 2022?
A Yes.
Q And as I understand it, there was a sexual encounter on the evening of August 29, 2022. There was a dispute about the nature of that encounter and whether there was consent. But what I want to hear from you is what happened. What happened on the night of August 29, 2022?
A Just from the top?
Q From the top.
A Okay. So in the days prior to that day, like, several times during the week leading up, I don't have those -- and I didn't include those text messages, but Stephanie had asked me a couple times for sex and it didn't happen.
So on this night I remember, you know, I was in my bedroom; she was in hers. We sleep in separate bedrooms because she -- Stephanie said that she can't sleep with anyone else in bed with her because then she can't go to sleep. And for my purposes, Stephanie snores, and it prevents me from, you know, going to sleep.
So one thing we did when we moved in together was get separate -- you know, separate bedrooms,

which meant that we would sometimes text each other from our respective beds.

So, you know, the text messages kind of tell the story, right. Like, I texted her, probably going to go to bed.

Ok, no action tonight, I'll hop in the shower.

She says what she says in the gray. Then the texts kind of like speak for themselves.

And then as you can see like from -- so at 9:33 is when I say "Night." And I remember, like, putting my phone down and then laying there and like I -- and, you know, indicate on page 5, I recount what Stephanie had previously told me on lots of occasions, right, like that's the second from the bottom, you know, message.

"Stephanie: I'm turned on by James wanting me. Treat me like a blowup doll. Why don't you want to have sex with me? We said anytime you wanted. You never have sex with me." And "Also Stephanie: I'm not a service animal. Don't just use me for sex."

And that was in kind of reference to the text messages before. I feel like I can't do anything right. So we were obviously having a point of friction in our relationship where we're not

communicating well. And for the billionth time in a row, I felt like no matter what I did she was going to get angry and criticize me.

So I remember laying there, and Stephanie had told me on lots of occasions, you know, you should approach me for sex, treat me like a blowup doll. You should have -- you know, what would be great if when we were fighting if you just held me down and had sex with me. And we had, you know, sent letters and e-mails, you know, to one another about how to improve our sex life.

So I was laying there. Then I said, you know, like to myself, like, Well, I'm just going to go over there and have sex with her. Like, she told me to, you know, lots of times and stuff. And she said, like -- like I said, hold me down and have sex with me. And I thought, Okay, yeah.

And then, you know, she said that, and it's -- and then she's like, and then afterwards I'll feel better. And I remember we would have these conversations about, like, I needed -- like, for me, I sometimes felt like I needed things to be okay and I needed to feel good about myself in the relationship in order to have sex, and she was the opposite. She wanted to have sex, and then that's

how she felt good and happy and, you know, giggly about, you know, the relationship, right. So for her it came first. And it would put her in a good mood and et cetera.

So I said, Okay, you know, like, I'm just going to go over there and have sex with her. So I walk in, you know, the room. She said, Why are you here?

I said -- and she wrote this in her letter, and I said, To use you. And then I got in bed with her. We had sex. And then I went back to my room, right.

And then at 10:11, she sends me that long message afterwards. And then, you know, 10:13, sends me another message. 10:14, sends me another message. And then finally after I didn't respond, she writes, This was not even close to consent. Now that I know I'm not safe in my own home and if I say no I need to lock my bedroom door. But the lamp -- I never really was safe to begin with, was I?

And it was just like, yeah, that was not a good period of time. So that's, you know, the long and the short of it, so to speak. That was not an intend -- I did not intend that pun. But yeah,

that's what happened.
Q So the period of time that you described where you went to her room is between when you send the text at 9:33:45 p.m. night and when she sends you a text at 10:11:29 p.m.; is that correct?
A Yeah, uh-huh.
Q So what happened in the bedroom, in her bedroom is -- whatever happened is between those two time stamps, 9:33 p.m. and 10:11 p.m.; is that correct?
A Yes.
Q And you described going into her bedroom, and I think you used the phrase that you said that you were going to use her. Is that what you said to her?
A Yes.
Q Did she say anything to you?
A No.
Q Was there any other verbal communication between the two of you?
A Not that I recall. I don't think so. We might have said good night. Yeah, I -- like I said, it happened in 2022. She -- so Stephanie in a letter that I turned over said, you know, she quotes me in saying, you know, to use you is the exact quote.
I don't deny or I don't have a reason to doubt

why that -- why I said that. I'm, like, because she had told me to do exactly that a lot. So I was, like, echoing her words back to her and why I was there, to, you know, make things better, to connect with her and because I -- you know, so yeah, I don't remember any other words.

Like I said, we could have said good night to one another, I'm not sure. Or, you know, good night, I love you buts or something, right, but yeah. You know, I can't recall anything specific.

Q Did you hold her down? You've made reference to that, but physically during that sexual encounter, did you hold her down?

A I don't think so. I don't remember holding her down. When we had sex in her bed and she would often complain that I wanted to have sex with her for long periods of time, foreplay and oral sex and like, you know, just really, you know, enjoying the whole thing. And she would often tell me it would just be, you know, great if I did it, you know, quickly and stuff, just got straight to it.

So in her bed, like, like a lot of the times, we'd be like laying on our sides, and I'd be behind her. Sometimes I'd be on top. Sometimes she'd be on top. But I don't -- yeah, I don't see why I

would hold her down. Like, that doesn't make sense.

Q Okay. I want to -- given sort of the nature of what's been alleged in the complaint and this specific -- I want -- rather than talking about other encounters that you had with Ms. Hoffer, in terms of the time that you were in the bedroom on August -- in her bedroom August 29, 2022, how long were you in the room?

A I don't know. Or I don't recall. It could have been 10 minutes. It could have been, you know, 20. It could have been, you know, like -- I don't remember.

Q And describe what you remember about -- after -- so you recall going into her room saying that you were going to use her.

A Uh-huh.

Q What was the nature of -- like, describe for me what you remember about the physical contact that you had with Ms. Hoffer in her bedroom on August 29, 2022.

A The things I remember is I walk in. I remember the light was off. She asked me what I was doing. I don't remember saying to use you, but I don't doubt that I said it because it makes sense. I remember

having sex with her. And then, you know, I left. You know, obviously it was, you know, good and enjoyable, but I don't remember anything else outside of that. You know, because like, it was four years ago, almost.

Q And you've referenced this text that she sent to you. It's on page 6 of 21 where after the interaction in her bedroom she writes to you, quote, This was not even close to consent.

A Yes. She said that.

Q Did you understand that to mean that she had not consented to the sexual encounter?

A As you can see from my messages when I woke up at like 4:02, right, because there's the medication that I sought like, you know, that night because I didn't respond. But I guess I obviously was confused. But it was clear that, like I said, now you have accused me of rape and for being a scary threatening partner because I came by and had sex with you as per your previous instructions.

Yeah, like it was pretty flooring and shocking. And yeah, just like a huge gut punch. It was a bad situation. I don't know if I'm asking -- I don't know if I'm answering your question. Just looking at this again, and yeah, it

was, yeah, just really, really just -- yeah, like I said, shocking. You know, like a gut punch. You know, it just took all the wind. Yeah, it was so horrible, so quickly, so unexpectedly, just bam.
Q It looks like you have a series of text messages on August 30th.
A Yeah.
Q And then -- and then sort of starting on August 31, it's just texts from Ms. Hoffer to you until September 5th of 2022 when there was a response to you, FWIW, for what it's worth.
A Uh-huh.
Q I read your, parentheses, legal, closed parentheses, letter.
A Yes.
Q What happened in between that exchange of text messages on August 30, 2022, and your text message there on the September 5th at 11:31 p.m., on September 5th?
A Yeah, so, you know, as you can see, we texted on August 30th. You know, there was like a little admin thing, but it all just kind of, like, hit me. I can't possibly describe to you just, like, the depth of, yeah, like, I just laid in bed for, what, five days. I slept. I didn't do anything. Right,

like, I just -- yeah, I just -- I felt, you know, like, I don't know how to describe it, right, just dead. Just over. Yeah. It was just -- it was a horrible thing to go through. It was a horrible ...

You know, and I -- like, so many weird conflicting emotions, right. It's like, here's this person who I loved, who, you know, like, I want to protect and, like, you know, Stephanie's great. We had the potential when we work to just be, like, a great couple.

And I did things exactly the way she told me to. I felt like I tried so hard to make things work. And then to be accused of just, like, the worst possible thing. Yeah. I just slept and laid in bed and didn't -- yeah, just didn't do anything.

Q There's a reference in one of Ms. Hoffer's texts to you in that interim period where she makes reference to you sleeping with a pistol by your head. Had you been sleeping with a pistol by your head?

A No.

Q Did you have a gun? Did you have a gun in your room?

A I did have a gun in my room. So I own a firearm,

and it is a handgun. It's James Bond's gun, a Walter PPK. Then it was -- you know, my dad had a lot of guns. It was the first gun I purchased. And I usually had it out, inaccessible to, like, you know, any of the kids obviously up on a shelf in my closet. Not in my room, but like in our big walk-in thing.

So I remember thinking, I wonder -- you know, like, I want to make sure Stephanie doesn't steal my gun because she's, like, afraid I'm going to off myself or something. So I got it, and I put it on the floor, you know, like my -- in my side table, and I put it, like, near the wall, you know, but just kind of like -- you know, like, it wasn't accessible. It was in the case. I just remember moving it to the room to prevent Stephanie from, like, taking it. Yeah, it was just in the room.

Q So during this interim time frame from August 31 to this text at September 5, 2022, you had gone into this -- was it a walk-in closet where the gun was?

A Yes, so on -- so on the top floor, like, you'd walk up the stairs and there's our offices, like, our shared offices. And, like, the blue screen for her, you know, for Stephanie to record things in front of.

And then there's a hallway, and there's a bathroom off the hallway. And opposite the bathroom, there's a walk-in closet, like, where my shirts and pants and Marine Corps gear was put in. And then there's a door, if you keep going down the hallway, and then it's my bedroom.

So between those two dates, like, yeah, I got up, you know -- I used the bathroom because obviously I didn't, like, wet the bed. And yeah, at some point I obtained, you know, the firearm from the closet, you know, the walk-in closet. I don't remember when, but it happened at some point obviously.

Q And you moved it from a shelf in the walk-in closet and put it next to your bed or next to the nightstand next to your bed?

A It was like -- I don't remember exactly where I put it, but I think it was, like, against the wall on the other side of my nightstand over there. Like, it could have been underneath my nightstand. I don't remember. Yeah, he -- you know, it happened a long time ago. I don't remember exactly where it was, but, you know, I remember things that did not happen, right. Like, I did not sleep with it or have it next to my head.

Q Why did you move the gun?
A Because I suspected Stephanie would steal it or take it, and I didn't want her to do that.
Q Why did you believe that she was going to steal or take the gun?
A Because she would have been afraid I was going to off myself or she would work herself up and be afraid that I was going to off myself so she would remove it or get rid of it or something. So that's where my suspicion came from.
Q Why did you suspect that she would believe that or have that feeling?
A She -- I'd have to look through our text messages, but I know she'd expressed concern about, you know -- obviously about my mental health prior to that day.
And objectively it makes sense if, you know, someone doesn't leave a room and just lays in bed all day, like, they're obviously not super chipper. And Stephanie would overreact to things a lot. So a lot of my relationship with her was like, you know, getting to the point where I would, like, predict -- you know, so much about it was trying to predict behavior and to avoid triggering bad responses to try not to make her angry or upset or

something, right.

So, like, it makes sense that someone would react or overreact to someone not leaving their room for several days with, like, fear of suicidality or something. So it made sense that she would -- might overreact and try to take it to prevent, you know, any suicide from happening or as a reason to just get rid of it and make a big deal about it or to just kind of up the ante with how charged things were or something. I don't know.

Like, her reactions were unpredictable, but a lot of it was, yeah, just like overreacting or getting angry about things that, you know, like, I said or did. You know, so she could have made, like, a whole fight about that too, right. Like, I don't know if she was going to, you know, try to make a fight about it or in retrospect like, you know, maybe she was looking forward to use it as leverage as something else she could have power over or something. I don't know.

What motivates her is, you know, anyone's guess. But, you know, there is a lot of reasons why she would have tried to seek it out, if that makes sense.

(Deposition Exhibit 10 marked for

identification.)
Q I'd like to talk now about your -- well, I'd like you to open Exhibit 10.
A Okay. I've got to find it again. 10. My -- yeah, my discovery response.
Q These are your responses and objections to the first set of interrogatories and the first request for production of documents; is that correct?
A Yes. I do have some more documents to get you. Like I said, I was going through some stuff, and I need to get you, you know, the medical stuff. And I think there's a few more Marine Corps documents I need to get you. There's just, you know, obviously a lot of stuff.
Q So, but this is a true and accurate copy of your responses to the interrogatories and requests for production?
A Yeah. I don't see why it wouldn't be.
Q And if you would go to Interrogatory No. 2.
A Which page is that on?
Q I'm scrolling down here. It is starting on page 10.
A Okay. Got it.
Q In this interrogatory, plaintiff asked you to please identify all defamatory statements allegedly

made by Ms. Hoffer about you, including, A, the defamatory statement; B, the individual to receive the statement; C, when and where the statement was made; and D, all documents reflecting or relating to the contents of the defamatory statement.
A Yes.
Q And you've provided an answer here with a number of bullet points that go from page 10 through page 17; is that correct?
A Yes.
Q Is this a full and complete list of the defamatory statements that you allege that Ms. Hoffer made about you?
A I don't know if it's full and complete. I know that these are the ones that I'm aware of.
Q So there's no other statements that you're aware of that you haven't included on this list?
A Okay, let me see something. That's -- yeah, I'm pretty sure.
Q And in this list --
A (Inaudible.)
Q I'm sorry, I didn't hear you.
A Oh, sorry, yeah. I tried to be comprehensive.
Q Okay. And in this list, when statements are in quotes, is that an exact quote of what Ms. Hoffer

said?
A I think so. Sometimes, you know, typing it out, I don't know if there's typos or anything, but I'm pretty sure that those are exact quotes.
Q Do you agree that the statute of limitations for a defamation claim in Indiana is two years?
A I don't know that to be true, but I don't have a reason to be false.
Q So --
A I don't know.
Q So to try to -- you know, that's my understanding and belief. And so to try to save us some time today, I'm going to start with the statement that is within that two-year period from when you filed your complaint on October the 1st of 20- -- or October 2nd of 2025. So a two-year lookback period would take us back to, you know, October 2nd or October 1st of 2023.
So if you would scroll to page 13.
A Yes.
Q There are a series of comments that you referenced from August 21, 2023. The one I want to ask you about first is the one October 24, 2023, where you're referencing a statement from Ms. Hoffer to Carrie Hagan.

Do you see that?
A Yes.
Q Who is Carrie Hagan?
A It's a text message, a screenshot text message that Stephanie provided in discovery in one of the cases. I believe she's another professor at IU, but I'm not certain. But it's one of Stephanie's friends, or at least someone Stephanie communicates with, obviously.
Q She's a law professor, that's your understanding?
A I -- I don't remember exactly. I think so, but if you have better information, then I don't -- yeah, I don't remember exactly.
Q And the -- you're saying that this was a text message from Ms. Hoffer to Carrie Hagan, whoever she is?
A Yes.
Q And was anyone else copied on this text communication?
A I'm not aware of anyone else.
Q And how did you become aware of this text?
A Stephanie provided it in discovery.
Q Is that in the custodial dispute or the protective order dispute?
A Yeah, I -- maybe both. I'm not sure. Or maybe

just one. It was one of the two. At least one of the two.

THE WITNESS: Can we take a break in a second too?

MR. ZIMMERLY: Sure. Let's take a break now. How long do you need?

THE WITNESS: Maybe till 2:20?

MR. ZIMMERLY: That's fine. It would be a good time to take a break. So we'll come back at 2:20.

THE WITNESS: Cool, thank you.

(Recess taken.)

BY MR. ZIMMERLY:

Q Back on the record.

A Okay. And I'd like to clarify one thing in a second too.

Q Sure, go ahead.

A Okay. So I can't say for certain, and I think these may be some typos. So I'm not sure all of the quoted material are exact quotes. You know, for instance, at the top of 14, you know, Ms. Hoffer told Yana, he's carrying a high-risk HPV for which there's no vaccine coverage, I think that's -- I think I just accidentally put that in quotes, but that was when she was around and the

FaceTime thing happened and Yana was there and Ophi was there. Ophi was the au pair. And that's when Stephanie interrupted the FaceTime. So apologies if there is a few typographical things, but ...
Q Okay. And so you're referring to -- on the top of page 14, you're referring to the bullet points pertaining to statements, the alleged, Ms. Hoffer made on November 13, 2023 --
A Yeah.
Q -- that we've talked about, those were the -- that's the conversation that we talked about, the FaceTime call that is referenced in what we've marked as Exhibit --
A 6.
Q -- 6?
A Yeah.
Q There's one -- while we're on Exhibit 6, I did have a question about that.
A Let me bring it back up. Okay.
Q There is -- we had talked about Mr. Noodle and the ferret and the mites. And you in your statement to Ms. Hoffer in Deposition Exhibit 6, you say that her reference to the ferrets having mites was to, quote, remind J about my cardboard/mite reaction to the old cardboard you put in the daddy wing (after

it sat in the garage for a year).
What are you -- what's that a reference to?
A That's a reference to an incident that happened on the eve of me moving out of our residence in September of 2023.
I know it's also referenced, like, I think you were about to ask about it in the response to the interrogatory, about the thing about bugs. But, I mean, I could tell you about that experience. It's something Ms. Hoffer has, you know, lied, overblown about. But it's something that happened right before I moved out.
Q What -- well, what happened? Tell me about the mites, the cardboard, the daddy wing. What happened?
A Yeah. So first, the daddy wing is what we collectively called the place that -- you know, like, where my bedroom was. It was a cute name that J would refer to, you know, that side of the house. So that's why it was called the daddy wing.
So I was packing up all my stuff because movers were scheduled -- you know, because I had made the decision to go. Stephanie obviously didn't want me to go. And I was -- you know, Stephanie had all these boxes. She gave them to me

to use to, like, pack up my things and tons of books, et cetera.

So, you know, the moving truck was scheduled to come. So I was packing up stuff. And then I was in the bathroom or by the sink or something, and I felt what felt like something biting the top of my foot, just like a single bite thing. I looked down, and there's like a red spot. So I thought, Oh, crap, that's weird. Looked around.

Then I called Stephanie. And I said, like, I think something just, you know, bit me. She was out -- is that when she took J to practice or something or -- I don't know where she was exactly, but she's the one that said, Oh, the cardboard might have mites. Stop what you're doing, blah, blah, blah. Like, you know, put the boxes out outside, we'll figure it out.

And she kind of got spun up about it on the phone, which then spun me up because, you know, like, I'm about to move out and I'm about to -- so, you know, move into my grandma's house who was 86 at the time, I think. Or 85, 86. And, like, I don't want to bring a bunch of mites to Cleveland. Like, Hey, I'm moving in, and, you know, here's a mite infestation, right.

So we both, you know, kind of freak out, I guess, about Oh, crap, well, let's make sure there's no mites or anything. And then I Google, you know -- you know, like everything I could about seeing if like how to test to see if there are -- because they can't be -- you know, they're not invisible. It's really hard for them to be visible.

So I tried to take, you know, like, the evidence-based approach to see if there were mites, right. If you wear white socks and if you -- there's something about like water or something too, like putting a ball of water out and putting something by it. So I'm, you know, like, taking the things out of the boxes, get the boxes outside. Stephanie said she would take care of the boxes.

And like, I don't know, just -- it just really derailed the whole plans on moving out, right, like I'm about -- I can't in good conscience move back to my grandma's house with a potential, you know, insect infestation.

So it's like, well, shit, you know, have to cancel the movers. And because I put so much stuff in the boxes, like, I don't know if my shit -- you know, if my belongings have, you know, the bugs

with them. So tried to see what -- you know, like had to cancel, what was it, UPS or whatever, you know, delivery, you know, moving folks, and then we could figure it out to see, like, if there were, you know, some sort of an infestation of some sort because that would have been bad.

And as it turns out, I think my mom told me way after the fact or something, I don't remember the details, but apparently I might be kind of allergic to cardboard. But -- so that could have been it and that could have caused the reaction.

But I remember thinking, like, Stephanie doesn't want me to move and move out. Like, and she had said -- by that time she had said so many, you know, false things and she's already done things to, you know, like, make sure that I don't leave her or that we're together or something, right, like, you know, that, as I said in the complaint, like, she's said she was going to commit suicide because I wouldn't be with her, threatened to never let me see J again, like, all of these things, so it's like this cardboard had been sitting in our garage for a year.

It's like, did she do something there? Like, I -- like, when you live with somebody and it's

just like you don't know what's true and what's not true. And they've already done so much and threatened so much before, like, what's within the realm of the possible that she would go to to like, you know, prevent me from, you know, going. So I thought that that was a possibility.

As it turns out, like, what was it, she got a report, and she said, like -- or the report said that there was mold or there was something. She lied about that in like a court filing somewhere where she said the test results came back all negative and that's not true; that the people did find something, but there were no, you know, insects or, like, an insect infestation. So that's what happened.

Q Did you ever describe -- well, what was your sort of -- you said you were spun up. What did you mean by that?

A Oh, yeah, like, she on the phone kind of freaked out. Oh, my God, you know, there might be mites. Like, blah, blah, blah, make sure everything's outside and, you know, like, and I'm, like, reacting of when someone's really concerned and kind of freaks out. You know, like, Oh, shit, like, I don't want to bring mites back. You know,

that's kind of bad. And like, Holy shit. Like, all my stuff, if all my shit -- all my stuff in these boxes and it's just like, Well, fuck, this is horrible, and it's, like, a stressful time and I'm about to move out.

And, you know, like, making the decision to move out was horrible. Like, a big part of me, you know, didn't want to leave. And, you know, stressful time, and I was just told that, yeah, like, all my stuff might have a bug infestation. Like, that's not a pleasant situation to be in.

Q So she was freaking out, and you were freaking out?

A Yeah. She freaked out first, and then, like, I was like, yeah, then I kind of like, Oh, shit, you know, got spun up about it.

Q Okay. So going back to what has been marked as Exhibit 10, page 13, looking at this text message that you've identified between Ms. Hoffer and Carrie Hagan where she writes "I panic wrote to the school because James was having that weird meltdown about bugs."

A Yes.

Q What do you allege is defamatory about that statement?

A What's defamatory about the statement, and this is

kind of seen in a pattern for which Ms. Hoffer, Stephanie, talks about, is it wasn't an independent weird meltdown about bugs. You know, like, this pretty clearly makes it seem like I'm an independently insane person who's currently having a meltdown, like, unable to function about bugs, which is not true.

Like, was I anxious at the time because of the move and the stuff and was I anxious because Stephanie told me about a potential for bugs? Those things are true. But it wasn't just this weird James is unhinged and acting insane like independent of her and just kind of like this -- you know, like she paints me as this deeply, you know, troubled crazy person to everyone, right. And that is the defamatory nature of that stuff.

Q Okay. So, but the statement itself, she doesn't write that you're unhinged. She doesn't write that you're a crazy person. What she says here is that she panic wrote to the school. So she's saying that she herself in a panic wrote something to the school because James was having that weird meltdown about bugs. And you yourself had said that you were freaking out about the bugs, weren't you?

A I wouldn't classify it as like -- the statement

James is having a weird meltdown about bugs is not accurate to the situation.
Q And what about that's not accurate?
A It's not accurate because I wasn't having a meltdown about bugs.
Q What were you having a meltdown about?
A I wasn't having a meltdown.
Q Okay. But you were freaking out about the bugs?
A I was anxious and nervous that there could be bugs based on what Stephanie told me about the potential, you know, yeah, about potentially, you know, mites being there. But I didn't, like, just classify it as a freakout or meltdown I don't think is accurate.
Q So you think it would have been more accurate if she had said I panic wrote to the school because James was nervous about bugs?
A No, because, like, to classify it as James was nervous about bugs, like, what would be accurate to say is like, you know, James is anxious about moving out and, you know, like, worried that, I don't know, like -- worried about a lot of things. Worried that he might, you know, accidentally bring bugs to his grandmother's house or that they're in their, you know, stuff. And it's not only James,

but we were both, you know -- like, both Stephanie and James were, you know, worried that there might be, you know, bugs in the cardboard.

So worried, like, but not, you know, saying -- like, calling it a weird meltdown is just not an accurate description because it infers that she doesn't understand why I'm, you know, weird, as in abhorrent, as in, you know, she doesn't know why. And a meltdown means debilitated. She knew exactly why I was worried about it because she told me about it, and it wasn't a meltdown.

So yeah, like that's just not an accurate characterization about it.

Q Okay. Let's turn to -- well, let me ask you: What damage did you suffer from that alleged statement?

A The damages suffered from that statement and other statements, right.

Q Well, let me stop you -- let me stop you right there because I want -- I want you to tell me about the damage from this statement, from Ms. Hoffer to Ms. Hagan that you only learned about through discovery in one of the proceedings. What was the damage to you?

A Yeah, so there's a couple things. If Carrie Hagan is who I think she is, if she's a law professor or

someone in the legal field, right, it's damage -- it makes it seam like I'm a crazy person with respect to the legal community, right. Indiana, Cleveland. Like, it's all kind of insular. And in the academic legal world, it's a fairly small community in the Midwest, I guess I'd say.

And as a lawyer in the up-and-coming legal community, that obviously damages my reputation within that group. You know, and there's a whole bunch of issues related to that.

And, like, Stephanie has long threatened to contact people or she's tried to contact people with saying bad things about me, and like I don't -- you know, like, I'm not going to -- if I get a firm job or if I get like, you know, some -- if I'm successful in life, she's -- you know, stuff like this is out there and she's going to prevent me and try to, you know, like do things to harm that later, right.

So I guess it's prevented me from, you know, seeking opportunities out there.

Q Okay, let me ask you -- I'm sorry. Are you done? I didn't mean to cut you off.

A Oh, sorry. I was rambling. And yeah, keep going.

Q You have never met Carrie Hagan, have you?

A No. I mean, maybe, but probably not.
Q And you've never spoken to Carrie Hagan about whether or not she's ever shared the text message that she allegedly received from Ms. Hoffer about Ms. Hoffer's panicked message to the school; right?
A I don't know anything about what Carrie Hagan has done.
Q Right. So while you sort of have -- I guess you could speculate that it could affect your legal standing in the Midwest, do you have any direct knowledge of this particular statement from Ms. Hoffer to Ms. Hagan having any impact on your legal career?
A It's impacted the way I approach job searching and the way I've, like, acted within my profession. But I, you know, can't tell you that firms haven't hired me or applications haven't been accepted because of this particular statement. I can't say that. I just know that it's affected me and prevented me from doing things. It's -- it's just hanging out there. It's just, you know ...
Q And you learned about this through the legal process as a part of a custodial dispute or a protective order proceeding; correct?
A Yes.

Q Okay. Let's go to the next statement referenced, October 30, 2023. "Ms. Hoffer stated the following to Jen Hilton and Tammy Mazelin."
A Uh-huh.
Q Let me start by asking you, who is Jen Hilton?
A That was our son's teacher at Pleasant View Elementary.
Q And who is Tammy Mazelin?
A She is another school personnel person. I don't remember off the top of my head. Like I said, my brain is kind of mush right now.
Q And there's a statement here, "I told him that his dad hadn't been happy here because everyone's" brains -- "everyone's brain is different and his dad's brain needs lots and lots of contact with family and friends to stay happy."
Is that a quote of something in writing?
A Yes, I'm 99 percent sure.
Q Were you present for this statement?
A No.
Q And have you ever met Ms. Hilton or Ms. Mazelin?
A Not Ms. Mazelin. I don't know if I've met Ms. Hilton.
Q And how did you learn about this statement from Ms. Hoffer to Ms. Hilton and Ms. Mazelin?

A Through the legal cases.
Q It was through discovery?
A Yeah.
Q And Ms. Hoffer is telling -- according to this, telling Ms. Hilton and Ms. Mazelin -- she's telling somebody, him, that their dad hadn't been happy here because everyone's brain is different and his dad's brain needs lots and lots of contact with family and friends to stay happy. What -- what about that was defamatory?
A Like I said, it's part of a pattern. There's a lot of statements like this that in the abstract might be -- you know, if this is like the only thing she ever said, right, it seems potentially innocuous. But the point of it, the thrust of it, the meaning behind it, is, like I said, I'm a deeply -- like, the implication and what -- you know, the subtext is what Ms. Hoffer is saying is that, like, I'm a crazy, incapable human being, you know, who, you know, can't be, you know, normal, right.
Like, it's not true. Kind of objectively, right, because I've lived apart and been fine on my own, like, away from friends and family. I guess the fact that a brain is different is I guess objectively true based on everyone. And yeah,

like -- and I could have been happy out there, but it's just Ms. Hoffer once again stating that I'm this deeply broken person who -- yeah, like this deeply psychologically unwell person.
Q Okay. But I want to focus on what the text actually says. Okay?
A Okay.
Q So there are a couple of terms that you used when you're saying -- you're making -- you're sort of attributing statements that are not actually in the text. You used the terms crazy, incapable, can't be reasonable, deeply broken, psychologically unstable.
That's not in this text message, is it?
A No.
Q And it is true that you were unhappy in Zionsville with the situation there; is that true?
A Yes.
Q And it is true that everyone's brain is different?
A Yes.
Q And is there anything sort of wrong with believing that somebody needs to have contact with family and friends to be happy?
A I guess I don't understand the question.
Q So if I were to say something about someone says,

you know, my friend so-and-so really needs to be about -- around his friends with his family and friends to be happy, is there anything necessarily defamatory about my stating such an opinion?
A Potentially. And it's like -- you know, it's, what's it called, not a conditional, you know, like an offense statement or something. Like, this person needs to be around constantly friends and family in order to be happy or his happiness is contingent on this, which means if you flip it, this person's incapable of being happy unless he has this constant attention from his friends and family.
So, you know, I guess logically it can mean that -- it logically can mean something negative, and -- but this list, I try to be as influenced as possible, right, like I said, in the abstract, without considering everything else, can be seen as an innocuous statement. However, given the totality of what Ms. Hoffer has said in context, it does have this negative implication just based on how the sentence is phrased.
Does that make sense?
Q You are coming at this with a history of a relationship with Ms. Hoffer where you're sort of

able to put subtext to what's actually in the text.

But with regard to Ms. Hilton and Ms. Mazelin, they would -- they do not share that history; correct?

A They have a different history where that wasn't the first time Ms. Hoffer spoke to them, right. Like, they were made aware by Ms. Hoffer about a whole bunch of -- you know, she said a lot of -- excuse me -- disparaging things about me to them. And in the context -- you know, because, like, a sentence or a phrase or a quote absent context, like, it's, you know, hard to really discern what's going on there, right.

But, and, you know, it needs to be read in context, and it should be read in context in the history, not between me and Stephanie, but the history between Stephanie and her communications and interactions with them and school personnel, you know, generally.

Q Okay. And additionally, when this communication, Ms. Hoffer is sharing what statement she has made to your son; is that correct? Told him that his dad --

A Yeah, yeah, yeah. She's --

Q And so what she's explaining is what she -- the

explanation that she offered to your son about why you were moving out; correct?
A Yes.
Q And so you think it was somehow defamatory for Ms. Hoffer to tell your son that, you know, that you weren't happy there, that everyone's brain is different, and that your brain needing a lot of contact with family and friends to stay happy as an explanation to explain why his dad was moving away, you think that was defamatory for a parent to say that?
A It's inaccurate, and it was -- I could see why you would want to try to articulate something like that to a child, but it's still derogatory given the context in which Ms. Hoffer communicates that to school personnel, right. And, like why share that in the first place. Right, it's, you know, like -- number one, it's not an accurate statement. And, like, why would you phrase it that way in the first place to J? But, like, to not only say it to J, but then to relay it to third parties just seems inappropriate and of, like, an incorrect statement.
Q What damage did you suffer from that alleged statement?
A So this e-mail, like -- or this thing and -- sorry,

my brain is not working. For this quote and the other quotes cited by me to, like, school personnel and everything, right, like, I have been -- like, it's prevented me from having a relationship with J's school and being involved in him and his life there, where there's this entire cadre of people who Ms. Hoffer has communicated with about all these negative things. And they're the people that teach and take care of my school -- or take care of my son.

Like, you know, and it's potentially with other parents even though that's speculation there. But, like, the second and third order of facts and all of these people being fed a whole bunch of misinformation and disinformation about me prevented me from being in his life with respect to being involved with the school. And, like, being comfortable being in Zionsville, right. Like, you know, after everything she's said, like I'm -- you know, why would I ever move back or anything.

Yeah, I guess that's -- I know there's something else, but I can't think of it.

Q But you've never heard anything from Jen Hilton or Tammy Mazelin about this statement made by Ms. Hoffer to them where she explains sort of the

way that she's tried to explain to your son about why you left? They've never spoken with you about it?
A Correct.
Q At what times have you tried to interact with the school, in what instances have you reached out to the school to communicate with anyone there?
A Yeah, the only person I feel comfortable communicating with, and this is just more -- I mean, not even comfortable, but, like, I feel like, you know, necessary in a way is Ms. Megan Fishback, who is the school counselor and like J's, you know, de facto therapist kind of thing.
But no, like, I'm so hesitant to reach out to these people. I contacted -- when I sent the subpoena, I think I sent it to the principal. So that was an e-mail exchange. And I've met the principal in person when I lived in Zionsville. That was before all this. Or not -- actually, before all this as it turns out, but, like, yeah. Like, I wouldn't be able to approach them, right. Like, because everyone has just been told all of these things, these untrue statements about me.
Q Okay. So as I understand it, correct me if I'm wrong, in terms of you reaching out to school

staff, you've spoken to Ms. Megan Fishback who's the school counselor?
A Yes.
Q Is that correct?
A Uh-huh.
Q You in the context of sending a subpoena for records had a written communication with the principal of the elementary school?
A Yes.
Q Have you reached out to school staff in any other context other than those two instances?
A I don't think so. I don't recall doing it.
Q So to the extent that you're saying that somehow this has affected your relationship with the school, sort of the barriers that you're describing are self-imposed?
A They could be to some extent. Like, I -- you know, the reactions or stuff like that, like, I can't control and counterfactuals. But yeah, I guess me having not communicated makes sense. Does that make sense?
Q Well, you've never -- you don't even know what their reactions are because you've never spoken to Ms. Hilton or Ms. Mazelin?
A I don't know if I've spoken to Ms. Hilton, but I

know -- I'm fairly confident I've never spoke to Ms. Mazelin.
Q Okay. Have you ever signed up for the parent access account for the school?
A Yes.
Q When did you sign up?
A Squarespace or something -- or not square -- like Parentsquare.
Q And when did you sign up for that?
A I don't remember. It was after I moved home, back to Cleveland I got an account. But I don't remember when.
Q Is that an account that you utilize?
A It's on my phone. It doesn't share like a lot of information, but I've used it to, like, see J's test scores and, like, what's going on that way. But I haven't looked at it for his upcoming school year yet, though.
Q So there are --
A Or it's next week.
Q The next three bullet points on -- at the end of page 13.
A Yeah.
Q On Exhibit -- what have we got? -- Exhibit 10, also make reference to statements made by Ms. Hoffer to

Jen Hilton and Tammy Mazelin. And they're all on October 30, 2023. Is this part of an e-mail -- are you quoting from the same e-mail with regard to all four of these quotes or are they --
A I think it's from the same e-mail for all four.
Q Okay.
A I'm 99 percent sure.
Q So let's go through the next one here. James -- James' dad refuses to communicate with me at all ever since I asked him to use the Our Family Wizard app.
A That's just factually not true.
Q Had Ms. Hoffer asked you to use the Our Family Wizard app?
A Yes.
Q And had you complied with that request?
A Eventually.
Q Eventually you did?
A Yes, yeah. As you can see from the messages in, was it September of 2023. I don't remember when the first Our Family Wizard message that I sent was dated. But I did get an Our Family Wizard account, which, yeah, we quoted from, you know, earlier.
Q And do you know whether or not that was before or after October 30th of 2023?

A I'm pretty sure I was communicating with her through Our Family Wizard by October 30th. Fairly confident. But I would have to look. Like, times and dates are kind of hazy. I would trust, like, the contemporaneous records. I could -- in fact, I have, like, the Our Family Wizard messages. Like, I could pull them up and see exactly when I started writing on it. But I'm fairly confident that I was already on the platform by October 30th.
Q Okay. And what damage did you suffer from that statement?
A It's the same kind of damage that I said before, right. Like, Ms. Hoffer saying that, you know -- in the context and et cetera, et cetera, like, damage in the community, obviously. You know, preventing me from having a relationship with the school. You know, et cetera. Yeah, it's the same kind of thing I said before with respect to her messages to school personnel.
Q Okay. Next statement, "I've heard him say to J on FaceTime a couple of times recently that he's going to take J out of school on Friday and take him to Cleveland."
Had you told J that you were going to take him

out of school on a Friday and take him to Cleveland?
A No.
Q You never said that to your son?
A I don't think so. I think -- I would have to look at the notes and, like, the text messages at the time. I think I was supposed to have parenting time, and we were talking about having parenting time or something. And we talked about upcoming visits. But I was never going to pick him up from school and, like, kidnap him, right. Yeah. I don't recall me ever saying that. I'm fairly confident I never said it, which is why I included it here. Like I said, I would have to look at my notes from around that time, but ...
Q But Ms. Hoffer never uses the word kidnap in this communication. You used that word when you're referring to this. But she doesn't say, I heard him say to J that he was going to be kidnapped.
A What she's saying is that Ms. Hoffer alleged that I told our son that I was going to take him out of school without authorization and take him across state lines, right. Like, that's the meaning behind that, which is, you know, kidnapping, especially because she's communicated with the

school that, you know, I'm not permitted to pick him up and stuff like that.

So yeah, you know, I don't know how you read that sentence without seeing it as like -- like, he's going to just take J back to Cleveland. Like, he's going to kidnap him, essentially. You know, like, I don't know how else you read that based on everything else that she said.

Q What was the damage from this statement?

A That she's alleging that I'm going to commit criminal conduct to the people that watch over my son. Like, yeah, you know, the same kind of harm is, like, usual. And it's just alleging potential -- threatened criminal conduct and, like, yeah, it's just no bueno.

Q The next quote, "I think it will be super upsetting for J to be spirited out of school for a long car trip to a place he doesn't want to go," to reference to the communications we've been talking about.

A Yes. That's untrue because J does like to go to Cleveland.

Q But she's sharing her -- she's sharing her opinion as a mother that she thinks it would be super upsetting for J to be spirited out of school for a

long car trip to a place he doesn't want to go. That's -- she's sharing her views as a mother, isn't she?
A She is saying that she thinks it'll be upsetting for J with the false premise, with the untrue statement that J doesn't want to go to Cleveland or, you know, like -- in a place, excuse me, J doesn't want to go, right, which means J, you know, our son, doesn't want to go to Cleveland and be with his dad, right. Like, that's where -- right, and it's like why say that untrue statement, right.
It's like -- I can't think of a good analogy, but it's -- it's like I think it's going to be upsetting for this person if he's forced to, you know, commit terrorism with his dad or something, right, like, you know, because, you know, he's in a place -- and it's just in the con- -- in the structure of the sentence, there's an untrue statement. And that's the thing that's false about it. And that's the thing that's damaging about it.
Q Well, if every time a co-parent or a divorcee in speaking with school personnel shared their views about, you know, what sort of effect something the other co-parent or divorcee was going to have on the child, if that rose to the level of defamation,

do you think that -- do you think that makes sense?
And there's also no reference to terrorism in this comment, is there?
A No. I just -- I was trying to think of an analogy to prove a point, but I totally muddled it and it sucked. But I know there's an analogy there waiting to be discovered.
But, you know, so if Stephanie, if this and the comment about the other thing we talked about, I don't remember, if those were the only things that she said in the context of this whole thing, like, then it would be one thing. But, you know, conversations and comments are made in context.
And given everything she's said and all the false statements that she's, like, made to school personnel, legal professionals, people that give rise, you know, to actionable legal, you know, kind of behavior, right, where the things that Stephanie has done are just so outside the bounds.
And just, like, the pattern, like, the repeated pattern of all these false statements, that's where it becomes legal and actionable. Like, people can not get along, that's one thing. You know, there's acrimonious separations. But to do it to this extent for so long with so many

people, that's when it becomes an issue. And I guess that's a legal question. But, you know, so that's why -- you know, that's why this makes sense.

Q So you view all these communications that you've identified in response to Interrogatory No. 2 as being sort of part of a -- they're all interconnected to you. But with regard to -- what I'm talking about with Jen Hilton and Tammy Mazelin, are you aware of any other comments made by Ms. Hoffer to either Tammy Mazelin or Jen Hilton other then this e-mail that you've taken four quotes from?

A I think so. Yeah, there's -- there's a whole -- you know, so if you scroll up, you know, page 13, like, even back to page 12, there's just, you know, lots of Tammy Mazelins and Jen Hiltons. And I'm pretty sure Mazelin was written to later as well. I have to look at the e-mails again, right.

And I also don't have school e-mails from, what, 2024 to present, you know, or something like, you know, the newest batch. So who knows what she's continued to say to school personnel, you know, in general. I tried to have everyone on the cc line, but I may have not included certain

people, and for that I apologize. I'm going to have to go back and kind of review all this stuff. I tried to include all the people that were cc'd.

But yeah, I mean, there were a lot of comments.

Q Okay. And that's fair. You referenced comments above that page that go past the two-year mark.

But the comments that happened within the last two years of when you file the complaint, they appear to be limited -- unless we encounter them as we go through this list, they appear to be limited to that one e-mail that you've referenced; is that correct?

A Let me -- let me just scroll, okay.

Q No, I stand corrected. There's some that we'll get to.

A Yeah.

Q And we'll just know when we see them.

A Okay.

Q So let's turn the page to -- well, with regard to those -- that comment about the long car trip and whether or not J would be upset.

A Yeah.

Q With -- is your answer with regard to any alleged damage as it pertains to that comment, would it be

the same as to what the damage that you described earlier with regard to the other comment that was made to those two school personnel, or would it be different?
A I think so. I would have to -- look, I think I covered everything. If not, I'll supplement my answer. But nothing else comes to mind at the moment.
Q Now, let's turn to page 14.
A Okay.
Q There are three bullet points for November 13, 2023.
A Yeah.
Q Where there's a statement attributed to something they said to Yana, something said to Ophi, and another comment to Ophi. Is this all the same conversation?
A Yes. So it was either -- I would have to look again at Stephanie's communications with Ophi, those text messages. But it was either Stephanie jumped into the FaceTime and yelled about HPV and Yana was there obviously. And I think Ophi was there. But if not, Stephanie texted her about it. But, you know, Stephanie definitely told Ophi this kind of stuff. And I think those are text

messages, but I'm not exactly sure.
Q And these quotes that you've included, are they -- are they actual quotes of things that you said or are they paraphrases or what? What are they?
A I think those -- like I said, I think the things to Ophi might be quotes. The thing to Yana maybe a quote, if I've written it down contemporaneously. And it's somewhere in my notes or texts or something. But I would have to go to the text messages and to actually see for sure.
Q And we talked about the comments about HPV.
A No.
Q Ms. Hoffer had shared with you in the past her belief that she was a carrier for that virus; correct?
A She -- yeah, she told me about it, as we talked about.
Q And in having that conversation with you in the presence of Yana and Ophi, she was seeking to assure that you shared that information with Yana because she believed that you -- because of your contact with Ms. Hoffer, that would potentially put Yana at risk for that virus; is that correct?
A I don't know Stephanie's motivation. Like, I -- that would -- you know, that would be speculating

as to why she did it.
Q But is it possible?
A Is it possible that she jumped in and yelled in front of our son about HPV to Yana, her sole motivation was to inform Yana of the risk, then yes, that's possible.
Q Okay. Let's go to the next statement, November 17, 2023. Well, there are actually two directed to Stephanie Schaffer. Who is Stephanie Schaffer?
A Stephanie's aunt who lives in Lorain. She and Jason Schaffer both live in -- like, around Lorain, Ohio. It's a little bit outside of Cleveland. And, you know, Stephanie, especially Jason, is connected in the Cleveland area as a photographer and, you know, knows a lot of people locally, takes pictures of famous people, et cetera.
Q And how are you aware -- is this a text communication, a --
A Yes, yeah.
Q How did you become aware of this statement from Ms. Hoffer to Ms. Schaffer?
A Through discovery.
Q Okay. Was this one communication that -- you've got two bullet points, but is it one e-mail or one set of text messages?

A If memory serves, it's text message screenshots.
Q Okay. And Ms. Hoffer in the first bullet point you attribute to her that she said "He started to swear at me, telling me to fuck off because I'm a fucking evil narcissist. The kids were all sitting there."
A That is an untrue statement, unequivocally.
Q What about that is -- did you ever tell Ms. Hoffer to fuck off?
A I have told her to fuck off. I'm fairly confident I have.
Q And have you ever told her that because -- in the context of telling her that she's -- because she's a fucking evil narcissist?
A I don't -- I don't know that exact combination of stuff, but I didn't say it on FaceTime or on a call or swearing at him -- her with like all the kids there. Like, that's -- that's insane.
Q Okay. So you don't deny that you've sworn at her, that you told her to fuck off, that you have told her that she's a fucking evil narcissist, you don't deny those things?
A So I don't know if the exact quotes are accurate, but I do admit that, you know, the general thrust of those things, right, where you quoted the thing earlier and I called her evil. I have called her a

narcissist. And I've also sworn. So I don't see why that's, you know, not true, but the exact quote combination, I don't know if it's accurate. I'm just not sure if that exact stuff was put in combination.
Q Okay. And have you ever sworn at Ms. Hoffer in the presence of her children?
A That's -- so I -- there's a couple different versions of swearing, and I'm -- even though I can't, like, say for a hundred percent certain, I'm like 99.99 percent sure that I have sworn in person with Ms. Hoffer and children around just because it kind of like comes out as part of vocabulary, right, or like, you know, driving or something, right. You know, like someone cuts you off and, you know, they're a fucking piece of shit or something.
Because swearing, good or bad, is like part of the way I speak, as I have slipped up in this, you know, deposition a few times. I don't -- I have no doubt that I have used swearing language around Stephanie and the children.
I also know that I have not yelled at Stephanie or called her things in front of the children. Like, that -- you know, I did do -- you

know, like, Stephanie knows about these incidents. I, you know, did on one point, like, show anger and throw sushi against the garage in 2020. Stephanie and J were there.

And I did throw a sweatshirt on the ground in 2020 as, like, I was angry. But I'm not a yeller. I -- even in the Marine Corps, I never yelled. I'm not a yeller. I'm not a raise-your-voice kind of guy. And like, you know, I was always just very, very conscious -- and that's why the FaceTime jumping in was just so horrible, that she would do it in front of J. Like, yeah. You know, like, I never, you know -- yeah, just never screamed at her in front of the kids. Like, that's -- you know, like, that's bad. That's domestic violence. That's, you know -- like, that's abuse and not good for anyone.

Q But she's not -- this comment, she never says that you yelled at her or shouted at her. She said that you swore at her and that you told her to fuck off because she was a fucking evil narcissist. Correct?

A So that's what she says. Apologies, I imputed the yelling. She does not say that I was yelling at her. But I also didn't tell her in front of the

kids that she's a fucking evil narcissist. Like, that -- I don't remember ever doing that. That doesn't seem like something I would do.
Q Did you ever tell her to fuck off in front of your children, in front of the children?
A I don't remember ever doing that, and it doesn't seem like something I would do.
Q The next quote "James asked again and again to talk to J after dinner and J finally looked at me and sort of desperately asked if he could talk to Dad after dinner. It was screamingly obvious that he didn't want to."
A Yeah, that should probably be removed from this list. That's just the next text message thing that is just kind of divided into a separate thing. It paints the picture of J not, you know, like -- if you ask Stephanie, J hates me, he hates coming to Cleveland, he hates spending time with me, he doesn't want to talk to me, right, which, like -- so that's part of that pattern.
This thing in and of itself, like, yeah, is more here for context. But the statement itself, right, you know, it was obvious to her, which is her mental impression, it isn't what J actually said, so it's improperly in this list.

Q Okay. So you would stipulate that that is not definition?
A Correct.
Q Well, we're making progress.
A Yeah, yeah, yeah.
Q So I've crossed that one out.
So going to the earlier comment, you know, the fucking evil narcissist comment, what damage did you experience as a result of Ms. Hoffer telling Stephanie Schaffer those things?
A She's describing actions that I'm doing that are criminal conduct, right, and that -- like, just horrible conduct. She makes it look like yelling at your co-parent in front of your kid -- or not, sorry, not yelling, but being -- saying these things in front of your children with your co-parent, that's, like -- that's criminal conduct. That's like horribly immoral, you know, conduct, and that's, like, just kind of bad enough in and of itself.
But also at the same time, right, like -- and this is more speculation, but both Stephanie Schaffer and Jason Schaffer have, you know, had a steady stream of inaccurate information about me. And because they're, you know, involved in the

Cleveland community and stuff, right, like, it's just more in the same circles. Not legal community, but just in the same city, right. Like, this is what people are hearing about me in public or in the public sphere.

Can I prove that? No, because I don't have text messages from Stephanie Schaffer to third parties. So yeah, that's a good quote. But, you know, like, and it's -- yeah, the same thing. It's the same kind of justification with Ms. Carrie Hagan and, you know, like with the conduct all alleged here is just like, yeah, you know, basically criminal.

MR. ZIMMERLY: Okay. I need to -- if it's okay, I need to -- can we take a ten-minute break?

THE WITNESS: Okay.

MR. ZIMMERLY: So why don't we come back at 3:35, if that's okay.

THE WITNESS: Okay, yeah.

(Recess taken.)

BY MR. ZIMMERLY:

Q So we were wrapping up our comments or discussion about the texts with Stephanie Schaffer. I asked you about the damage, and you've never spoken with Stephanie Schaffer or her husband to find out

whether or not Ms. Hoffer's comment to her aunt had any professional reputational impact on you, have you?
A So a quick correction. It's Stephanie Schaffer and her son is Jason, not her husband.
Q Oh, okay.
A Yeah, Jason's around my age, and her aunt is, I don't know, in her fifties or sixties or something. But yeah, since this lawsuit started, you know -- yeah, the last time I spoke with both of them, I want to say, was 2022, maybe 2023, in Lorain. So it's been a number of years, but I haven't discussed the defamation stuff with them.
Q Okay.
A Yeah. Jason, what he texted Stephanie or said that h -- if he saw me he would hit me or something. It was like some sort of, you know, physical whatever. Not he told me, but he either texted Stephanie or told her or something, so I -- I don't think it would be the smartest thing to approach them for information.
Q But have you had any sort of professional relationship with either Stephanie or her son?
A No.
Q December 19, 2023, going back to the list, you

write "Ms. Hoffer stated the following to Ophi Bornemann: 'The James thing is a long story. He sent me a message in the app last night that made me worry that he was having a mental health crisis. He asked me to please call him, and because I was concerned for his safety, I did. Then he proposed marriage. But not in a good way."
A Yeah, we could stipulate that that's not defamatory.
Q I appreciate that. Thank you.
A Yeah.
Q March 4, 2024, "Ms. Hoffer stated the following to Maggie Ioannacci, Jen Hilton, and Tammy Mazelin."
So we've talked about Jen and Tammy. We know who they are. Who's Maggie Ioannacci?
A She's another school personnel person with whom I have not communicated with. So she is -- but I don't remember what her role is with the school.
Q And the statement that you attribute to Ms. Hoffer, is this some -- an e-mail that she sent or a text message?
A Yeah. These -- the things to the school are e-mails.
Q You became aware of them through discovery in prior legal proceedings?

A That's correct.
Q And so Ms. Hoffer in the first statement writes "Without getting into the details, I thought, and a court agreed, that it was necessary for our safety at the moment."
What about that was defamatory?
A The inaccuracy in that statement is the use of the word our, our safety, where even taking Stephanie's protection order thing at face value, which one should not do, she only ever sought protection for herself, didn't mention the children. But that, you know, the plain reading of that statement is the safety of our, which is Stephanie and our son, his safety that I was a danger to my son's safety, which means, you know, like, that I was committing or could commit criminal conduct or, you know, just that, you know -- yeah, I was a monster with respect to our son, and that's not true, and that's not a good thing to say.
Q So you think it would have been more accurate for her to say that, without getting into the details, I thought and the Court agreed that it was necessary for my safety at the moment?
A Yes.
Q What damage did this statement cause to you?

A It's the same damage as I cited earlier with respect to the school personnel. And it also, like the last thing we talked about, without explicitly stating so, you know, like claims that I in conducting -- can conduct criminal behavior, potentially violent, because safety implies violence, so, you know, it's like I'm a criminally violent person that endangered, you know, my son and Ms. Hoffer too.

So, and, you know, the Court agreed to the ex parte piece, right, so, like, taking into her version, it granted it. So I don't know if agreed is necessarily, like, a correct term, but yeah, it makes me seem like a violent criminal, you know, person.

Q But she doesn't say that she thought and the Court agreed that you were a violent criminal person, does she?

A She does not say -- she does not say that, but I think it's pretty easy to see if somebody says I sought protection for my safety from the Court, from this person, or we did. It means that, you know, like they're in fear for, you know, serious bodily injury or violence or something, right.

I don't know how you say that phrase without

meaning something, like, dangerous and criminal in nature. So that's, you know, my plain reading of it. But no, she never specifically says that I thought and the Court agreed that James is a criminally dangerous person, right. Like, the quote speaks for itself.
Q The next statement, "For the time being, and for the next two years if the order remains in place, James's dad should not pick him up from the school."
A Yeah, that is joined with the sentence that precedes it, once again, making it seem like -- you know, that statement makes it clear that I am a danger to my son's safety.
Q But that isn't -- I'm sorry, but that is a true statement. Pursuant to the protective order that was entered, you were not to be at the school; correct?
A I think you're right. I don't remember off the top of my head, but I know Stephanie sought protection or that I wasn't allowed to approach her -- Indiana University and her home. I don't remember if the school is, but I could see how it can be. But J wasn't the one protected by the order.
I would have to look at the order, but I just

don't -- I don't remember. I think you're right, though.
Q But if, in fact, the order says that you were to -- you were not to be at the school, it would be a true statement for her to say that for the time being, and for the next two years, if the order remains in place, James's dad should not pick him up from the school?
A Yeah, I -- yeah, that is fair. That is a fair statement. So we could stipulate to that not being defamatory. That's a good point. But still, in relation to the sentence before it means the bad things. But that statement in and of itself is true because I think it prevented me from going to Pleasant -- Pleasant View Elementary. That's true. That's what the order said.
Q Okay. So that's helpful.
A Or I guess I'm asking. I just wanted to confirm, you mind if I look real quick? It's like --
Q No, go ahead.
A Okay. There it is, okay. Yeah, Pleasant View Elementary School, you're right. And Zionsville Middle School. So yes.
Q Okay, I appreciate that. So we can stipulate that that comment was not defamatory?

A Correct.
Q Okay. March 5, 2024, "Ms. Hoffer stated the following to Maggie Ioannacci: 'It makes sense to enter the protective-order information for G[redacted] and L[redacted] too, though I would be shocked if there were a problem with James trying to pick them up. Better to be safe."
A That means that I'm also a danger to them, so I don't want to stipulate to that, right. Because why would it make sense to make sure to single them out too. Because that means that I'm not only a danger to my son, but I'm also a danger to my other kids.
Q Well, isn't what she -- it sounds like in the context of what she's communicating with Maggie is that there's some information that's being input into the school system regarding, you know, their record and who's allowed to pick them up that you were not on the -- you know, allowed to pick them up list.
And she's also saying that she didn't anticipate there being a problem with you trying to pick them up, but it would just be better -- you know, better to be safe and include that in their record. You still think that's defamatory?

A Yeah, that's a good point. It still implies that I'd be a danger to them in the context of talking about everything. But at the same -- yeah, yeah, we could stipulate to it. I think that's fair.
Q So we're going to cross that off the list?
A Yeah, that's a -- I think that's more of a fringe thing or -- yeah, that's fair. Like I said, I tried to be all inclusive with this. I didn't -- you know, I didn't want to accidentally leave something off and then, you know, not like -- you know, because like a lot of this stuff is to show context and to show the tenor and to show the defamatory nature of the communications. And I didn't want to, like, accidentally not include something to then, like, have it come back and, you know, bite me or something, right.
Q Okay, let's go to the next one. April 5th of 2024, "Ms. Hoffer stated to Stephanie Schaffer: 'Mostly he's been funneling information through poor J.'"
A Yes. That is -- I mean, she had done the ex parte order of protection, so I was not able to talk to her. This makes it seem like I am -- you know, like I'm subjecting J to harm. So once again, it's like, you know, not like in domestic violence abuse, like swearing and calling someone names in

front of the kid, but it's doing harm to my son because, like, I'm choosing to only communicate or to communicate mostly through J to Stephanie, right. And that's not the case.
Q Were you funneling information through J to Ms. Hoffer?
A No.
Q You weren't asking or in any way using your communications with J to somehow get information to Ms. Hoffer?
A I don't remember doing that. I know, you know, like I would talk to J or I would ask him questions because I didn't know what -- you know, what was going on and stuff. Or even because like it was a black box. I was supposed to see him, you know, for Memorial Day, right. So, like, and I wasn't allowed to ask Stephanie, you know, directly, and the au pair wouldn't respond.
So I'm like, J, do you know if you're coming here for Memorial Day or something, right, like, that's me asking him for information that he has. It's not me asking him because I'm asking Stephanie because that, like -- I was so careful to not, like, indirectly or try to communicate with her, right, where I was so -- I don't know if she -- how

much Stephanie told you about, but it got to the -- you know, like, I was so fearful of what Stephanie was going to do with the protective order that I didn't even feel comfortable dropping J off at -- you know, in her neighbor's driveway, which is side by side with our driveway, you know, after the eclipse because it would have -- like, I read it as in violation of the protection order because I was supposed to stay away from her residence.

So luckily we found a solution, but I really just made sure and I told, you know, Greta, who was the au pair at the time, you know, like please don't relay this to Stephanie. Like, I'm not allowed to talk to her. This shouldn't be seen as, you know, me attempting to communicate.

And at the time through some of this, like, you know, neither of us had representation, legal representation, like, work some of this stuff out, right. And we hadn't solidified the whole just through counsel thing.

So I was very mindful not to use J as a funnel for information to Stephanie. But I did sometimes ask him, like, what was going on because I was completely kept in the dark. And as it turned out, Stephanie decided to cancel Memorial Day parenting

time and summer parenting time and whatnot. And, you know, but I really didn't -- yeah, I did not want her to be able to say James is communicating to me because I know she would have, you know, done something with that or potentially done something with that.

Q What damage, if at all, did you experience from that comment, "Mostly he's been funneling information through poor J"?

A It's her saying that I'm harming my son, I'm actively harming my son. I'm selfish enough to use my son as a means to communicate to Stephanie, right. Like, it paints me as a bad father. It paints me as a harmful father. It paints me as a dangerous father to J. Unfit parent. Like, all of the things that are necessarily true if you accept the premise James is using his son to communicate to Stephanie, right. Like that's the harmful, you know, nexus of it. And that's the bad thing.

And that's -- you know, and it also, like I said, gets to what Stephanie, what I said about Stephanie and Jason Schaffer, right, like -- right, in their community the same way that, like, the school community and the legal community, but the message about me harmful to J or me actively

harming him, that's the bad thing.
Q But you've never spoken to Stephanie about this comment; correct?
A To Ms. Schaffer?
Q Yes.
A Correct.
Q And you didn't have any sort of business dealings with Ms. Schaffer?
A Correct.
Q Okay. So other than sort of your view that somehow this painted you as a bad father, this did not have any impact on your sort of -- any sort of business dealings or pecuniary relationship that you had with Ms. Schaffer, did it?
A I have no pecuniary relationships with Ms. Schaffer.
Q Okay. The next statement, Ms. Hoffer says to her aunt, Ms. Schaffer, "James does everything he can to make me miserable, and he pretends that it's so he can spend extra time with J."
You think that was defamatory?
A Yes. Yeah.
Q So what about --
A Yes, to talk through the logic. So this is something Stephanie does a lot, where she imputes

motives on, like -- she imputes motives on other people. And a big refrain in our relationship was we would get in fights because she would tell me what I was thinking when I was doing something or when I did something or when I said something, and I would disagree. And then we would have a fight about it.

And she would often project motives onto me or, like, onto third parties or something, right, if she were talking about them, on to me, just, like, you know -- like, just in her own projection. And she would tell me what I was thinking and feeling because she knew better.

So the two things, right, James does everything he can to make me miserable. That's not true. And I pretend so I can spend extra time with J, or no, pretend that it's because I can spend extra with J, right, which means I don't actually care about J, I'm just using J, once again, as a means to harm Stephanie, which also thereby harms J.

So it's not only like the last thing, but it's, you know, like an added layer where I'm not only using J as a means to talk to Stephanie, but I'm also harming J as a means to harm Stephanie.

And harming Stephanie being, like, a purpose that I look for in my life or try and make her miserable.
And like, I would never pretend or use my -- like, I would never use a fake story about me wanting to spend time with my son, like spending time with him is -- like, I love doing it. He's my favorite person on the planet. Say that I pretend or use that as a pretext, like, that's, yeah, just really untrue.
Q Okay. And so in the next comment, "In the meantime, he leaves J hanging at bedtime with no one to read him a story and tuck him in."
So she's complaining about you as a co-parent. Do you think that any time a co-parent complains about, you know, and attributes sort of wrongful motives about the other co-parent that that rises to the level of defamation?
A In a normal relationship or, like, post relationship period or post separation period, no. But in the context of this relationship specifically, yeah. Like, Ms. Hoffer's specific conduct does rise to the level because it's so outside the bounds of what one would expect, right. Like, you know, I've been broken up with and broke up with people before, and I see, you know, friends

and family and et cetera who have similar stories, but this is on a level unto itself with -- you know, just given, like, how much and the number of false and horrible things she has said.

Q Okay. So put this outside the context of your relationship with Ms. Hoffer. Two totally strangers, a woman says to her aunt, Jimmy does everything he can to make me miserable and he pretends it so he can spend extra time with Johnny. In the meantime, he leaves Johnny hanging at bedtime with no one to read him a story and tuck him in. You think that's defamation?

A I don't think you could answer some of those things, like, stripped of context, right, because isn't it, like, in the law, right, even though it's a factual dispute, like a false allegation of rape, like that is per se, you know, defamation.

But at the same time, there's a lot of things that, you know, like, given the context of everything, is defamation when in the abstract like we talked about earlier, like, it seems like an innocuous comment if you strip it of everything. But given what Stephanie has already said and had said, you know, in a context similar to our experience, then yeah.

Like, if the same thing happened between another couple after they broke up, like, yeah, it would be defamation. But stripped of context, like, I don't know how you could judge that. Because that -- because it's kind of like a weird characterization because, you know, no -- you know, but like if Stephanie went up to a complete stranger and said, Oh, man, my co-parent, he always does everything he can to hurt me and the stranger at the bus stop is like, Okay, like, I don't know if that's defamation. That seems like -- I mean, it would be a false thing.

But stripped of context, like, I'm not sure what it means. But with Stephanie, it very clearly means like a whole category of things just based on what she's said and alleged and all the problem -- you know, like, the effects to her health and, you know, the abuse allegations and all that kind of stuff. Like, in that context, it means significantly more than if you just said it to a stranger at a bus stop.

Does that make sense?

Q But you would agree -- you would agree that in co-parent relationships and divorce relationships, if one co-parent says about the other co-parent,

they just want me to be miserable, that is not defamation?
A I don't know. Like, I don't know. That doesn't seem like a fair question because it's stripped of context. Like, you take people for whom they are. So I would think, like, how would you -- you know, like, so let's take, you know, like what we talked about earlier, right, like, you know, if you call someone a terrible narcissistic monster or something, in the context of a relationship, saying that, you know, to one another could be, you know, bad or horrible, but it could also be in another context, you know, like par for the course or normal or invited because it's a joke or something, right.
So to strip it of context kind of defeats the purpose of the inquiry in the first place. So I don't know. I don't know how to answer that, like, contextless statements, if that makes sense. I'm trying to think, you know, through it, right, like both as, you know, me, but also to just, like -- like, just trying to think of it objectively, right, like, I don't think it's possible to judge a statement without its context.
Q And this was in the context of Stephanie speaking

with her aunt; correct?
A Yes. Yeah, yeah, yeah.
Q April 6, 2024, "Ms. Hoffer stated the following to Denise Petolino." And those are -- actually, there are three statements attributed to comments made to Denise Petolino. Were those in a text message or an e-mail?
A Text messages.
Q And you identified those in discovery?
A Yes.
Q In either the protective order proceeding or the custodial dispute?
A Correct.
Q And who is Denise Petolino?
A Our next door neighbor.
Q And so Ms. Hoffer write to Denise, "James has J. I am having trouble getting him to bring J back. He won't tell anyone where they are going. J called me yesterday several times weeping because he had wanted to meet me in Columbus."
A Those things are just factually untrue.
Q Did you have your son as of April 6, 2024, in -- was he with you?
A It should be -- the answer should be yes. I don't remember off the top of my head the days in which I

had him, but it was the days leading up to the solar eclipse. I'd have to look, you know, at my notes and everything to get the exact day, but yeah. It sounds right. And it sounds right in the context of reading it here that I would have J in Cleveland.
Q Did Ms. Hoffer share comments with you about, you know, having her son returned to her?
A She didn't communicate to me, which was like -- she would send messages sometimes through Greta, the au pair. But yeah, I like -- I was going to bring J back as we agreed. Like, I was talking with the au pair and giving her all the information throughout that whole thing. And Stephanie's story was just insane, and it turned out to be a pretext to keep J and I apart. But yeah, like, what she's saying here is just not accurate.
Q Did you keep your son longer than had originally been anticipated when you picked him up?
A No. 100 percent, no.
Q Did you tell her exactly where you would be with him during the time that you had your son?
A I told Greta, and I specifically said, so -- and let me back up just to kind of give you some context.

So the eclipse -- you know, the eclipse was happening; super cool, exciting moment. And we had agreed prior to, you know, like, you know, Greta and I had talked about J and because this is what J wanted. Like, he wanted to go to the place that the eclipse was going to be best. So I kept watching and looking at -- I think it was the New York Times kept sharing, like, here's the best place for the cloud cover, here's the best place for this. You know, in this area is, like, the ultimate place to see the eclipse.

So in the days leading up to it, I was tracking and sharing with Greta, like, Hey, you know, it looks like we're going to be -- you know, it looks like the best place to look at it is going to be in Defiance, Ohio, which is like, you know, partway between. And then on the day it happened, you know -- but, like, I couldn't say for sure because weather changes. And it changed a couple times.

So on the day it happened, it was still like looking at the New York Times page about here's where the best place it's going to be, and J still wanted to go to where it was best to be able to see it. So then it turned out, you know, because as we

were driving and, you know, the weather changed and then it turned out to be -- I forget the city, but it was somewhere else in Ohio that we drove to. And it was great because, you know, the weather was perfect.

But that's why, you know, it was up in the air, but I fully disclosed and communicated everything going on about where we were going and when we were going to drop him off and everything there. I never hid that information. Like, I never, you know, tried to, you know, just keep him to keep him, right. Like, it was just, here's what's going on, here's what we agreed to.

And meanwhile, Stephanie prior to, like, we all agreed, we'll go to where J wants to see the eclipse and where it's going to be the best. But then like halfway through his stay in Cleveland -- and I have this all kind of outlined in one of the custody motions where I even, like, share the text messages so it's a pretty good distillation.

But, like, at some point Stephanie just says, Well, I got a hotel in Columbus the day before. Tell James to bring J to Columbus, you know, like a day prior, which was just, like, never agreed to. It was just Stephanie saying, This is what I want

to happen. And then she later said we were supposed to bring him to Columbus and James refused, but that was just never going into the plan whatsoever. Like, we always agreed to going to the place that it was going to be -- you know, like that J wanted to go to, and J wanted to go to the place that the eclipse was going to be the best.

I talk super fast. I'll try to slow down a little bit, Debbi, apologies, but that's what happened.

Q So did you experience any pecuniary harm from Ms. Hoffer sharing these statements with her neighbor, Denise Petolino?

A It became -- this is the same thing, right. So it's part of the neighborhood. It's part of the community, right. I'm a harmful, bad parent. I guess you could say from the totality of, you know, like, Denise and I didn't have a pecuniary relationship, if that's what you're asking.

Q I guess a better question is, did you experience any economic harm as it pertains between you and Denise as a result of Ms. Hoffer making those statements to Denise?

A I guess I'd say from economic harm, it was just

not -- like I said earlier, like, not seeking out jobs, not wanting to go back to Zionsville, like, not, like, feeling as though no matter what I did, Stephanie would make sure that, like, to pollute the water, so to speak, and to make me unwelcome, right. So, like, it's limited me in that way.

Yeah. I think I had some notes on this, but, like, on the top of my head, I can't point to like a bill or like, you know, like, a contract and say, like, this is what caused this, right. Like, I don't have -- you don't have a contract dispute that the contract didn't get executed because of this comment.

Q Sure. So you would agree that there -- you did not suffer any economic harm from Ms. Hoffer making these statements to Denise Petolino?

A I don't know if I'd say that, right, like economic harm. This kind of goes back to, you know, part of the theory of the case, right. It's like the defamatory nature of the stuff, like, prevents a person from, you know, doing things in the first place. And it affects their ability to, like, really join the workforce and be a member of the community.

Like, there's economic harm there. But in

terms of, like, direct economic damages with respect to contracts or, you know, Denise telling the potential employer, like I have no, you know, grounds to say that Denise specifically influenced my not getting hired by somewhere, right. Like, I don't -- you know, I can't point to communications between Denise and, like, an unknown third party.

But to say that there's no economic damages is I think not entirely accurate depending on how you look at -- or what's appropriate to count as economic damages or not. So I guess that's more of a legal question.

Q Did you seek any employment in Indiana after you stopped living in Indiana?

A No.

Q And do you have any evidence to suggest that Ms. Hoffer's statements to Denise had any impact on any other, like, job applications that you have submitted in Ohio?

A No direct evidence of any application I've put in, no.

Q Okay.

A In terms -- sorry, other than my own testimony, I guess, like, in terms of, like you said, preventing myself or something. I don't have any evidence of,

like, her directly affecting, like, specific job things that I was looking for through her communications or stuff like that.

Does that make sense?

I'm trying to be as specific as possible because there's a gray area here. So in terms of Denise going out there and doing stuff, I'm not sure. You know, like, I don't have any anything to claim that Denise herself is specifically going out and doing things affecting my employment. But I can't say that I don't have any evidence that it's affected my employment, right, like, or my economic future.

Q So I'm going to continue plowing through this. I'm going to ask, if we can, you know, I'm going to do my best to ask good questions, and we'll sort of hopefully kind of getting a rhythm with some of these because we've got quite a few and we don't have, you know, forever to get through all these.

A Yeah.

Q So the next two statements are April 2024. There's not a date associated with them. Is there a reason why you don't have a date?

A I think in those text messages they were just screenshots of April or -- no, no, or they were

screenshots without any context and because she was talking about the eclipse I knew it was going to be in April, but I couldn't put it in there. It was like something along those lines or I didn't put in the day.

But it was a screenshot of a text message and Cre is a -- I think she's a law processor at OSU. But, you know, she's in -- yeah, like, she is from Stephanie's friends circle and professional circle in Columbus, Ohio, so that's who she is.

Q Okay. So these are text messages between Ms. Hoffer and someone named Cre that were produced to you in discovery in the custodial dispute or protective order dispute?

A Yes. Yeah, yeah.

Q And "Ms. Hoffer stated the following: His dad refused to bring him back. He was supposed to be back yesterday at 1:00."

A That's factually not true.

Q "I had to request a protection order. The Court granted it, but J's dad requested a hearing. He's straight crazy."

A Yeah. Me being crazy is untrue, right.

Q So what economic harm did either of those comments have on you directly?

A Yeah, so that gets back to the same reason with, like, Carrie Hagan, right. Like, Cre's even closer to Ohio because she works and teaches or practices in Ohio and stuff. And, like, Columbus is so -- Ms. Hoffer knows so many people in Columbus, you know, professionally and everything, like, I'd be doomed if I ever, like, you know, sought employment there. Or like, got off the ground, you know, professionally and kind of in a notable way. Like, you have all these people that are -- yeah, have just been fed wildly inaccurate things.
Q Yeah. So, but what I'm asking is, like, I understand your testimony about Ms. Hagan.
A Yeah.
Q But ultimately where we landed after that conversation is you have no direct knowledge of that having any impact, you know, Ms. -- her comment to Ms. Hagan having any impact on your ability to get a job or your ability to earn a living. You suspect that that might have an impact and you're concerned about it, but you've never -- no one's every said to you, Hey, I didn't hire you for a job because of a comment that Ms. Hoffer made to Ms. Hagan, have they?
A I wouldn't say that that's an accurate

characterization. And this gets kind of back to the nuance, right, where do I have any evidence that Carrie Hagan went to somebody and said, Don't hire this person, or Cre went to somebody and said, Don't hire this person. No, I don't have -- and I didn't have a fiduciary or pecuniary relationship with either Carrie or Cre.

But in terms of evidence that, right, it would be -- you know, because I'm my own lawyer, it would be the plaintiff's testimony that it has economically harmed him because it's prevented him from, you know, even going out in the first place. It's where his reputation is so damaged within these professional circles that, like, him having knowledge of that has prevented me from -- you know, so that would be an economic harm.

But in terms of, you know, direct evidence of Carrie or Cre talking to anyone, third parties, like, no, I don't have any, you know, direct evidence of them talking to someone who, like, I applied for a job of and didn't get it, right.

Q June 7, 2024, Hoffer states to Aunt Schaffer, quote, They are getting along so much better. J especially is really coming out of his shell and being a lot more kind to his brothers and the kids

at school. Removing James and adding Greta made a huge difference for all of us.

A Yeah. I mean, that's untrue, and that's -- once again, paints me as, like, a bad, harmful parent and stuff. Sorry, my brain is going at like half speed, and I know I'm rambling more. But yeah, that's kind of the same in line with what we've already talked about.

Q But -- so Ms. Hoffer is sharing her view to her aunt that sort of getting you out of the picture has been better for your son.

A That's fair.

Q And again --

A We can stipulate.

Q That that's not defamatory?

A Correct. Because it's her -- it's Ms. Hoffer's own perceptions on what's happening. It's not a factual statement about, you know, J doing something objectively. It's just her impression.

Q Ms. Hoffer, August 12, 2024, "Ms. Hoffer states the following to Shannon Hall." Quote -- and who is Shannon Hall?

A She's another employee at the school. She's J's teacher or his -- his newer teacher. And like the prior comment, like it shows the context and the

tenor is part of a pattern, but this statement in and of itself, because it's Ms. Hoffer's mental impression, isn't -- yeah, couldn't be classified as defamation because it's just her own opinion on -- or her impression on what's happening. That's what I meant to say.
Q Well, and this comment, you would stipulate, is not defamation, correct, because it's true?
A Yeah, that's correct, yeah. Yeah. Because of the protection order thing, I forgot about that.
Q So we're -- I'm crossing that one off the statement from August 12th to Ms. Hoffer.
A Yeah.
Q And is that also true for the next statement, quote, On the advice of my lawyer, who feared that his father would enroll him in school in Cleveland, I said no?
A That's -- like, it's untrue that there was any risk of me -- like, enrolling him in Cleveland. Like, this is part of a bigger conversation alleging that I would commit criminal conduct and kidnap J. So I guess that attached to the conversation in general would be defamation, in the context of the e-mail, right.
Q But what she's sharing is that the lawyer advised

her based upon the lawyer's concern that you would enroll him in school in Cleveland. And based upon that, she said no. Is that defamation?
A It is in the context of the bigger conversation because that -- like, but at the same -- you know, I wish I could have included it in the bigger conversation. That statement in and of itself stripped of context is not. But in the bigger conversation where she's saying that, like, there's a risk that I would commit -- you know, there's like an acute risk that I would commit criminal conduct, like, and kidnap my son, that's defamation.
Q So can we stipulate to cross this one off or not?
A I would prefer to keep it in, just -- and I could add like -- include the -- like, the e-mail itself. I shouldn't have broken it down into separate statements.
Q Did you experience any economic harm from this statement by Ms. Hoffer to Shannon?
A It's the same thing I said, but, you know, the last time about, you know, the direct versus subjective versus, you know, experience in plaintiff's testimony, right. Like, that's going to be the same answer throughout. I can't say that there's

no economic harm, but I also can't point to, like, specific contracts that were necessarily affected or like -- yeah, I didn't have a pecuniary relationship with Mrs. Hall.
Q So no direct pecuniary or economic harm?
A I don't think --
Q The harm you would be referring to would be sort of your subjective concern that if you did try to go get a job in Indiana that somehow this would have an impact on you?
A No. Because it's not only a fear, but it's the reality that happened and continues to happen, right. Like, it hasn't -- like, it has an active and ongoing effect. But right, so like I can't point to things made -- you know, statements from Mrs. Hall to other people, but to say and to try to categorize it, no active harm and it's only speculative, like, that's not fair either or accurate either because it continues to harm and affect, you know, the way I approach kind of everything, right, like yeah.
Like, I'm kind of shocked that, like, I haven't been formally investigated by the bar because Stephanie's threatened to contact the Ohio Bar Association, right. Like, that's -- that fear

is constant. And, I mean, can I point to a contract that it affected? Like, no, but at the same time, I can't say that it does no harm. But how -- but how to measure that is kind of an open question.

So I have to say, like, it does do an economic harm. Like, all these statements add up to doing economic harm. I just can't point to, like, specific contracts that -- like, their statements to other people, you know, cause like me to not get certain specific jobs, right. Like, but economic harm certainly has happened. It's just how to measure it and how to properly articulate it. That's what I'm trying to say.

Q There are now comments made to Mr. Perry who I understand is Ms. Hoffer's co-parent on behalf of her other two sons; is that correct?

A Yeah. Yeah, yeah.

Q She -- these are text messages or e-mails between her and David Perry?

A Text message, screenshots.

Q And you became aware of them through discovery in other litigation?

A That's correct.

Q What economic harm have you suffered as a result of

Ms. Hoffer sharing these comments with, you know, a co-parent?
A Yeah. So that alleges basically, like, child abuse, right, where, you know, I'm nasty to my son and I'm gaslighting him, which is a form of abuse, which is bad in and of itself. And it's the same kind of economic stuff. And generally, you know, like, David, he's a lawyer. He worked in Columbus for a number of years. He works in Indiana right now as a lawyer. Same arguments as to, like, all the other professional folks.
So economic harm happened, it's just how to measure it and how to articulate it specifically, right. But I don't have, you know, contracts or specific jobs that I could point to that I certainly missed out on because of comments made -- that he made specifically.
Q January 8, 2025, "Ms. Hoffer states the following to Stacy Smith and Jodi Morrow."
Who are they?
A Once again, school personnel.
Q And you became aware of -- this is a text message or an e-mail?
A Yeah. We could stipulate because it goes to the not being able to pick him up which would be

accurate because of -- oh, no, actually, no. I take that back. The protection order had already been lifted by that point so I was allowed to come to the school. Yeah, yeah. Because it got dismissed in December of 2024 because -- so this is in January of 2025. That stuff no longer is in effect.
Q So, but there was a -- was there some sort of a custodial order in place?
A There was a provisional parenting time order that said I was allowed to have J for spring break. But at the same time, it said nothing about me not being able to go to his school. So that can -- you know, so because it's absent the protective order and it's after that, you know, continues to, like -- even after she let the school know that it got dismissed, not her words, she still continued to paint me as a dangerous person with respect to my son.
Q Okay. But the statement that she makes here, "The order says that James will have J for spring break."
That's true; correct?
A Yes.
Q And you did not otherwise have parenting time?

A I think I did have parenting time in the provisional order. I would have to look at it. And she also let me have parenting time outside of the order too. Like, that happened. But I don't remember what the order says.
Q Okay. But then she says "I would appreciate it if someone would let me know as soon as possible if James comes to pick up J. He's not supposed to."
A That I was not supposed to is the false part because it's after the protection order was dismissed.
Q Well, she's not saying that you're not allowed to go to the school. She says you're not supposed to pick him up from the school.
A Isn't she saying that I'm -- like, he's not supposed to is consistent with all her messages about he's not allowed to per the protection order that protecting us. It's our safety -- you know, like, saying he's not supposed to means, like, he's still not allowed to come to the school. That's the way I read it.
Q No, but what it actually says is I would appreciate if someone would let me know if James comes to pick up J from the school. So she's not saying I would appreciate it if someone let me know if James shows

up at the school. She's saying that she's asking to someone let her know ASAP if you actually come to pick up J from the school. That -- you weren't supposed to just show up and pick him up from the school, were you?

A I don't see why I wasn't allowed, right, because he's my son and if I picked him up after school, like, and we got ice cream or something, right, like, I don't see the problem with that, right. Like, I don't know why I -- absent but for the protective order, I could have picked him up, right. Like, I did pick him up. I mean, you know, before I moved out. But I'm in the records as his father, right. Like, I don't see why I wouldn't be able to pick him up absent the -- absent the ex parte order of protection.

Q Okay. Did you experience any direct economic harm from Ms. Hoffer making this statement to Stacy Smith and Jodi Morrow?

A I would just say the same answer as before. And this also -- the way I read it is it's a continuation of the James is "not supposed to," but like I said, in the context of he's still unsafe and dangerous so he's not allowed to pick up J, right. Like, that's what it is so it alleges, you

know, like, potential criminality. And it's, you know, the same kind of answer as before with respect to school personnel.

Q But it didn't affect any contract that you had, it didn't affect you in any job application, didn't affect your ability to earn a living?

A No, I wouldn't say that, right, because that's a pretty broad sweeping statement. All of these things, right, like, have affected me. And how to measure the economic harm, like -- like I said, it goes back to how -- you know, how do you specifically define it.

In some ways, you can say it's caused, you know, direct economic harm. But at the same time, I don't have an e-mail from the school to a person I applied for a job and said, Hey, don't hire this person because they're dangerous, right. Like, there's nuance there or there's an area where economic harm did occur and continues to occur. But that smoking gun of an e-mail between school personnel and like a specific employer, I don't have that.

Q We now have comments from Ms. Hoffer to David Perry.

A Oh, yeah, that's, you know, portraying me as a

potential criminal, right. Like, it is in line with her statements about me going to kidnap her -- or not kidnap her, like, harass her or harm her or kill her or something.
Q Where are you -- where are you reading that?
A Oh, try not to make noise so that he doesn't come after me, saying that -- meaning that she's -- like, that I'm going to come after her. You know, and that whole, you know, text message. So the January 12th text in and of itself, we can stipulate that that's not defamation because it's her impression that I'm not well and her, you know, stated purpose about something, right, so that's different. But the February 2 stuff is just, yeah, that combined together, you know, expresses the potential for criminality and child abuse and all that stuff.
Q Okay. So I'm crossing off the January 12, 2025. I appreciate that stipulation.
A Yeah.
Q So let's turn to the Groundhog's Day, February 2, 2025.
A Okay.
Q Ms. Hoffer states the following to David Perry: "What if this unleashes another torrent of abusive

filings? I really feel like I'm always crouched in a corner trying not to make noise so he doesn't come after me."

So she's expressing her feeling about sort of the sort of number of filings that have been made in the context of the litigation between the two of you; correct?

A She -- yeah, she seems to be talking about the custody case.

Q And there was quite a bit of filings in that case, weren't there?

A Yeah. Like, most of them in response to her misconduct or, like, alleged misconduct. But reading those three things together in the context of everything else she said, this is just more the way I read it. And I think the way, like, a reasonable person would see it is just, like, James is unstable. He's going to come after her. He's potential -- you know, he's a potentially violent criminal person.

And he so horribly affected J, right, like he harmed J a lot. Even though she doesn't say those specific words, I think the subtext is pretty clear in what she's actually saying. Right, like, if I tell someone over and over again, like, Oh, this

person's going to kill me, I'm afraid, I'm hunkering down, like, you know, blah, blah, blah, they made me -- like, I -- you know, and of all the other, like, false statements about abuse or yelling or swearing, like, how do you not repeat that as just like more of the same?

Q Well, there's not -- what the comment here, February 2nd is about -- is made in the context of her view of the torrent of abusive filings which, you know, the comment about probably the volume of the filings in that case. And there's no -- she's not saying that she believes or she doesn't comment on that you're going to kill her, does she?

A Not in that statement, but if you read everything else that she's written and, you know, those -- like, that statement. And I should have put it in more paragraphs, so, you know, I'm sorry about how I formatted this. But those three statements together, like I said, it's just more of the -- you know, more of the same.

THE WITNESS: Could we take a break in a second too? Like I am kind of all over the place right now.

MR. ZIMMERLY: You're fine? Let's take a

break now. Do you want to take a ten-minute break or how long do you need.

MR. KENNEY-PRENTISS: Yeah, we can come back at 4:45, if that works.

(Recess taken.)

BY MR. ZIMMERLY:

Q So the next set of communications that it looks like there's ones from September 2, 2025, with Mr. Perry, April 8th Mr. Perry. And with regard to these comments, we've talked about economic harm as relates to David Perry, an attorney here in Indianapolis; your sort of feelings that if you tried to come get a job here in Indiana, these comments might have an impact on your ability to get a job here.

But a couple things are true. One, you've not sought a job, a legal job in Indiana; correct?

A I'm pretty sure that's true.

Q And you also are not aware of Mr. Perry making any comments to your -- to an employer or prospective employer about you; correct?

A That's correct.

Q And as it relates to the relationship that you have with Mr. Perry, you don't have any economic relationship with him; is that true?

A Correct.
Q Let's go to the statement that begins on a screenshot message.
A Oh, okay, yeah, on page 16?
Q Yes.
A Okay.
Q "On a screenshot message, Ms. Hoffer stated the following to Amanda."
A Uh-huh.
Q Who is Amanda?
A I don't know. It just had a screenshot, first name Amanda. I have no context to any of it.
Q He writes "James' father request for protective order asking the Court to remove G[redacted] from the house."
Is that true?
A No.
Q You didn't file a protective order?
A I did, but I asked -- so I asked for very specific things. I asked that G[redacted] not stay overnight with J until the custody evaluator made an assessment. I did not want him banned from the house. So yeah. But, like, to say that -- to remove G[redacted] from the house is not an accurate statement.

Q Well, if you were asking for him not to be able to spend the night overnight in the same space as your son, one of them would have to be removed from the house; correct?

A No. They would -- you know, so G[redacted] would stay. So, you know, so long as J was staying with Stephanie, G[redacted] would be staying with David overnight. If J was staying with me, G[redacted] could stay at either residence. I was just asking for a temporary thing to ensure that G[redacted] and J not be in the same residence together until an assessment was done.

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

MR. ZIMMERLY: I'm going to ask the court reporter to designate that question and answer as confidential given that we're talking about minors and a sensitive topic. And we'll seek to maintain that as confidential given that we're talking about children.

A No objection.

Q Really I think my question was -- at this point I don't remember what my question was.

A Oh, yeah.

Q But you did request a protective order which whether or not there was an express request for G[redacted] to be removed from the house, the practical impact is that as it relates to overnight, either G[redacted] or J would have to be removed from the house; correct?

A I don't know if removed is the right word. They just couldn't sleep in the same house. Like, they could not cohabitate in the same house. And it would only have been for a couple of months, which I thought was, like, a fair thing to ask, right. I was asking for it in, what, December or November. And we had the evaluator scheduled and, you know, in like late 2024, early 2025. Like, it was not going to be a permanent thing, like, unless something, like, horrible was found out, right. But, like, yeah. I tried to be reasonable about it. Like, I don't know what else I could have asked.

[redacted]

CONFIDENTIAL

[redacted]

Q And so then Ms. Hoffer shares with whoever Amanda is, her view that your request for a protective order was a ploy to get the judge to order that J be moved to Cleveland with you. That was how she perceived what you were doing in that filing; correct?
A That was her summation on -- or her conjecture on why she thinks I was doing it. But it wasn't to remove G[redacted] from the house, and I didn't ask that J be moved to Cleveland because of it. Like, it -- you know, it paints me as, like, you know, just a horrible monster.
That screenshot -- sorry it's taking me a second to kind of come back. I'm pretty sure this is a ploy. Yeah, so that's her stating an opinion as to why I was doing something, which standing by itself is not defamation, but the whole statement about removing G[redacted] is false.
Q But we've already discussed that someone was going to have to not be in the house overnight. It was either going to be G[redacted] or J; correct?
A Correct.
Q So can we stipulate to this not being defamation?

CONFIDENTIAL

A I don't know, because she has said things about this situation that are not fair, and it's painting it as a permanent -- I think there's nuance here. And the way she frames it just seems, like, really not factually correct and the subtext being just, like -- yeah, like, just not accurate or -- sorry, I'm trailing off.

Let me think about it, but it seems like that that's a pretty bad mischaracterization of what was happening.

Q Well, I'd ask you to think about it. I mean, I'd prefer if we could just not have that be a part of this case because dealing with minors and all that. So if in this federal litigation we don't have to deal with that particular comment, then I think it will be better for everyone. So I'd just ask you to think about that one.

MR. ZIMMERLY: And for the court reporter, I'd just ask that the continued question and answer pertaining to that be marked as confidential.

Q The next statement -- well, just with regard to that last question about that, any economic harm that you're aware of as relates to Ms. Hoffer sharing that opinion with Amanda?

A I would have to cite my same answers from before.

Like, if you take my -- if you assume the reading, just for argument's sake, that Stephanie communicates me as a, you know, horrible monster who's mean to G[redacted] it has the same potential economic effect and actual economic effect, not for, like, specific contracts, but how it affected plaintiff and how it affected him and continues to, just like the way she characterizes that happening.

And so I think there is economic harm there, but not, like you said, with the pecuniary relationship with Amanda or specific e-mails to certain employers.

Q Okay. The next bullet point says "On the dates and to the recipients identified above, Ms. Hoffer made or repeated statements portraying Plaintiff as abusive, dangerous, mentally unstable, or harmful to Child or other children in the household, including the specific statements listed in this response."

A Yeah, that's, like, I think I, like, wrote that or summed it up and then bulleted it and, like, just -- yeah, just forgot to take it out. So we can get rid of -- because it's not specific.

Q Okay.

A But that sums up what she did, like, in general.

So if you want to keep it as part of the answer because that's the general claim. But it doesn't cite to a specific communication.
Q Okay. Well, I'm going to take your stipulation and cross it out.
A Okay, yeah, yeah.
Q Because if it makes sense that we can streamline some of this, I'm going to take every opportunity I get.
A Sure.
Q Okay. So next statement, "On an unknown date, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff raped her."
A Yes.
Q What -- Ophi Bornemann is one of the au pairs; right?
A Yeah.
Q And what -- was this -- it was a text, it was a e-mail, it was a verbal statement?
A It must have been a verbal statement because Ophi said in her -- this is what Ophi admitted during her deposition that Mrs. Hoffer told her. So I can't point to any specific communication. I don't see it appearing in their texts, so it must have been verbal.

Q And so your knowledge of that is based upon Ophi Bornemann's deposition testimony in the custodial dispute?
A Correct.
Q And was it your understanding -- was she sharing that in the context of that August 29, 2022, incident, or 20- -- I'm sorry?
A Yeah, the August 2022 incident, I assume that that's what she was referring to. However, I would have to look at the deposition transcript. I don't -- you know, who -- I mean, Ms. Hoffer could have made multiple allegations to various people for various days, right, but that's -- it would be an assumption to think that she's talking about the same thing. But at the same time, I don't know for certain. I would have to look at the deposition transcript.
Q "On an unknown date, Ms. Hoffer stated the following to Carrie Hagan: Plaintiff forced her to have non-consensual sex."
A Yes, that comes from a discovery response in either the protection order case or the custody case where it was asked to whom she communicated about the incident of nonconsensual sex. I think it was the protective order case to which she answered her

therapist and Carrie Hagan. I think that -- and that's why it's, you know, different between rape and nonconsent, like, why I changed the words. But it came from a discovery response.

Q And your understanding of that reference to nonconsensual sex was that whatever she said to Carrie Hagan was in relation to that incident that we talked about in her bedroom?

A I would assume so, yes.

Q "On an unknown date, Ms. Hoffer stated the following to Carrie Hagan: Plaintiff had a days-long 'spiraling' episode, and Ms. Hoffer feared Plaintiff would harm himself or her."

A I think that comes from a text message screenshot without context, but I would have to verify it.

Q And do you -- okay. Do you know what days-long spiraling episode she was referring to and --

A Because it was a -- yeah, because it was a -- I think this was a screenshot without context. So I can't point to anything. I'll have to look at the text messages. I don't know. I can't from -- I can't remember off the top of my head.

Q Okay. Is it fair to say that following the incident on August 29th of 2022 that you were in a days-long spiraling episode?

A I was.
Q That you were, you know, kind of, as you put it, sort of in a dormant state for five straight days in bed?
A I don't know if spiraling would be an accurate characterization. And I don't know why she said that I would potentially harm her. But then again, it could be in relation to that incident, but it could be in relation to, you know, not two weeks ago, but it could have been two weeks ago, right, like, I -- that lacks context that I would like to know.
Q Okay. And it is -- you wouldn't doubt that during the time that you were in the dad wing and didn't leave for five days, other than to go to the restroom, and you retrieved the gun from the shelf of the walk-in closet and placed it in your room, that Ms. Hoffer legitimately had concern that you would harm yourself?
A You know, I think that calls for speculation based on her motive, but I could see -- which is one of the many reasons why that we talked about that I kind of retrieved, you know, the case with the firearm in it, to prevent her from potentially stealing it.

In retrospect, I'm, like, what did she say, like, she said that -- or did she say she tried to get it or look for it? I don't know. But yeah, I -- if the context was this August, September time frame, like, I don't know what she feared at that point. So I can't say one way or the other. But if it's another context, then I have no idea what she's talking about because I would have to know what context she's communicating that with.
Q Next, "On an unknown date, Ms. Hoffer stated the following to Dr. Bart Ferraro."
A Sorry. Maybe it was in the discovery response she said that and that's why I included it. I'm just -- I don't remember off the top of my head where that comes from, so apologies.
Q The comment about Carrie Hagan?
A Yeah.
Q With regard to the comment alleged to be made to Dr. Bart Ferraro, "The plaintiff forced her to have nonconsensual sex."
A Yes.
Q Was that in the context of Ms. Hoffer having a psychological assessment as a part of the custodial dispute?
A That was, yeah, part of their communications with

the custody evaluation report thing.
Q And that was a part of the judicial process that both of you meet with Dr. Ferraro to have that assessment done on each of you?
A Yes.
Q "Ms. Hoffer stated the following to her therapist: Plaintiff forced her to have non-consensual sex."
A Yes, that and the one with Kenworthy who's another law professor at Illinois, those answers come from a discovery response as well, if I remember correctly. Because a later -- it was either in a deposition or her discovery response that she said she also told Kenworthy. I'm pretty sure it was her deposition. Ms. Hoffer's deposition.
Q Okay. So do you know who the therapist is that she shared that with?
A No. I know the name of several of her therapists because she provided that in a prior discovery response, but I don't know which therapist she specifically shared it with.
Q And do you know when she shared that with the therapist?
A No.
Q What about the comment to Kenworthy Bilz, the law professor at Illinois?

A I don't know when. I know that Stephanie said -- or I think the source of these things are Stephanie's deposition when asked about this. But I could be mistaken as to the source of her admitting that she told these people.
Q "On an unknown date Ms. Hoffer stated the following to Greta Lima De la Llave."
That's one of the au pairs?
A Yes.
Q And "Plaintiff raped her." What -- is that also from someone's deposition?
A I think it's from Stephanie's deposition or it's from Greta's deposition.
Q Do you know when Ms. Hoffer said that to Greta?
A I do not.
Q Do you know the specific words that she used?
A No.
Q Did you -- the same with regard to the comment made to Kenworthy Bilz, do you know the specific words that Ms. Hoffer shared with Kenworthy Bilz?
A No.
Q On an unknown date, Miss Hoffer stated the following to Greta: Plaintiff threw a lamp toward Ms. Hoffer's head, leaving a hole in the wall near her head.

A I think that was from Greta's deposition.
Q Did you ever throw a lamp?
A No. That's another incident that it was just not accurately portrayed in Ms. Hoffer's court filings and protection order filing.
Q So there's never been anything with regard to a lamp?
A There was what we have described as the lamp incident, but I did not throw the lamp. I did not throw it at Ms. Hoffer. Yeah, like there was no intent to ever do harm to Ms. Hoffer. It didn't land close to her head. That's just like a gross, you know, mischaracterization.
Q Well, what is the lamp incident?
A Yeah, so I wrote a letter. I wrote, like -- you know, Stephanie and I exchanged letters about this incident and texted about it. That would be a better account.
From what I remember now, this is back in 2020 after we had, you know, moved in. J spent the night with me, I believe. Could I bring up that letter just to get the -- you know, get the details accurately?
Q Just in the interest of time, why don't you just summarize what you remember because today we're

going off your best memory. So just tell me what happened with the lamp.

A Sure. So I came over in the morning with J. We had slept in a little bit. So J would sleep in my, you know, room with me. You know, this was prekindergarten because this is back in 2020. And I came over with J in the morning, and this is during COVID. So came over, and I don't remember what happened, but Stephanie put us in a sour mood and said something or, like, something accusatory towards me maybe or -- I don't know, something, right, like, there was something she said that caused -- you know, that, like, as an immature reaction in the kitchen. I like through my sweatshirt on the ground, and then I went back to, you know, the daddy wing, right.

So went to my room, and she texted me and the texts are more accurate, but she said something like don't -- you know, don't show off that boorish behavior in front of kids, it's abusive or something.

And I replied cheekily, Well, don't be a fucking bitch, then. Not my finest moment.

And then she said, Call me a fucking bitch again, and you're kicked out.

So I called her a fucking bitch again, via text.

So then she came over to my room, and she was livid. And like, you know, the letter says it better because it's, you know, obviously closer in time and stuff. But she's there in the doorway. She's, like, blocking the doorway and going on and on about, like, how it's abusive and how this is just, you know, a step towards physical abuse or pretty soon.

You know, like, so she alleges her first husband, you know, held her hostage at gunpoint where he held, like, a shotgun outside the bathroom when they were married together, and he was going to murder her. And she compared me to that. And Stephanie said, If you call me a fucking bitch again, you're out. And I only have, like, one way into my bedroom, right, so she's blocking it.

So like an immature child, I said over and over again, Fucking bitch, fucking bitch, fucking bitch, like with that -- not yelling, not just being a petulant child about it, because she told me I couldn't do a thing, so I kept doing that thing like a petulant child.

And then she started really raising her voice

and yelling. And this is, you know, blah, blah, blah, blah, blah. And, you know, just really like -- and, you know, when I get upset about things, right, like, I try to isolate myself and take some time and come -- and come down. And obviously I was upset in the kitchen, which caused me to throw down the sweatshirt onto the ground, just like, you know, both hands and in front of my chest and just threw it straight down to the floor, like not, you know, aggressively, but just like, you know, throw something, just in frustration.

So then she, like, starts -- yeah, so she's in my room. She's blocking the door. She's yelling at me. And I'm just like so pent up with anger that, like -- like, I'm on the far side of the room. And I just get angry, and I just like punch the lamp. I had a lamp by my side thing, like, across the room from her. Punched the lamp, and it kind of, like, lands. I don't know, I want to say, like, in the middle of the room, like, because if I had a diagram, I could show you better. But punch it, it goes to, like, the middle of the room.

Then she starts really yelling. And this is, you know, you're going to -- this is just like my ex -- like, you know, you're going to -- you know,

this is a small step away from you're going to murder me and blah, blah, blah, you're going to start hitting me and this is how physical abuse starts. And in just a moment of pique, P-I-Q-U-E -- and I think I write this in the letter, like, I would never hurt her. I would never, like -- like, I just don't have that instinct.

But, you know, so in a moment of pique, I pick up the lamp and I just, like, slam it against the wall and be, like, you know -- in my mind, I'm thinking, like, of course I would never hit you, but, you know, like, why is this happening? But I'm so angry, like, let me destroy this object and, like, this is what I'm doing, right. And I smash it into the wall several times.

Then I cause a hole -- it's not, like, by Stephanie at all because she's at the door, and I'm, like, by the wall on the other side of my bed. And it has this, like, kind of down half wall thing because it's, you know, in the roof of the garage. And I smash a hole in the wall with the lamp. And then she screams, and then she, like, runs out. And that's what happened.

I didn't scream. I'm not a screamer. But

yeah, just I punched the lamp. It broke. I slammed it against the wall. You know, like, she wasn't anywhere near it, but -- but yeah, that's, like, what happened. And that's what I wrote about. Like I said, the letter would be a better indicator of what happened.

But yeah, like, you know, then transform years later, right, like, what, there's been so many different accounts of her saying it. Like, I threw a lamp at her. I tried to hit her head. It hit the wall right next to her head. I yelled at her. I threatened. You know, like all of these things that are just patently not true, right, like -- like, that's what she later recounted it as and that's not like an accurate statement of what happened. Like, was I childish? Yes. Was I immature? Yes. Did I do a bad thing? Yeah. You know, like, I let my anger get the better of me, and I smashed the lamp against the wall.

But yeah, never, you know -- like, never harmed her. Never threatened to harm her. Never came close to harming her. Never yelled, right, like. That's what happened.

Q The next statement, On an unknown date, Ms. Hoffer stated the following to Greta: Plaintiff slept

with a gun next to his head, which frightened Ms. Hoffer.
That's from --
A That's the thing from August, September of '22.
Q That was from Greta's deposition or Ms. Hoffer's deposition?
A I believe so, yeah. I think this one and the next one are from Greta's deposition, if I remember correctly.
Q On an unknown date Ms. Hoffer stated the following to Greta: Plaintiff was stalking and harassing her.
A Yeah.
Q Is that what she specifically said?
A I believe those were the words from the deposition, but once again, I would have to go back and look at it.
Q Whose deposition?
A Greta's deposition.
Q On an unknown date, Ms. Hoffer stated the following to Ophi: Plaintiff had been 'spiraling' and when he's spiraling he does not get out of bed for days.
A Yeah.
Q Where did that come from?
A I believe that was from her deposition. Or via

text.
Q Ms. Hoffer's?
A No, Ophi's deposition. I'm pretty sure that the unknown dates, I got them from the deposition of Ophi. Because I have their text messages from like between certain time periods and stuff. But I think the unknown ones are from the deposition.
Q Okay. Plaintiff drinks. Is that true? Do you drink?
A I do drink alcohol, yes.
Q And there -- we've already talked about you do sleep all today. That's true; correct?
A No. That, like, if you're referring to the incident in August -- or, I mean, in September of 2022, then that was an abhorrent thing, right, like it's not every day your partner seems to have, you know, accused you of doing something horrible. So that was a time that I just didn't get out of bed for days. But it wasn't a regular thing.
Like, you know, and that's where the falsehood comes in, right, where Stephanie uses that to make it seem like it's a regular occurrence when, in fact, it is not because, you know, it happened that once.
Q And then has sex with an acquaintance at night to

cope with major depressive episodes when he is spiraling.
Was that specifically what Ms. Hoffer said to Ophi?
A I think so. I think that was from the deposition. But then again, I'm -- I don't remember for sure.
Q Have you had sex with acquaintances at night?
A That's a weird question. I guess, because, I mean, I was acquainted with Ms. Hoffer and we had sex at night. So that would be accurate.
Q Have you had sex with other acquaintances at night?
A With other people -- have I had sex with people that I'm acquainted with at night, yes.
Q Have you ever done that to cope with major depressive episodes?
A Not that I remember. Not that I know. Like, I don't know if that's ever been a reason. I don't remember ever stating that as a reason. It's just so -- such a weird thing to say.
Q Has that --
A You know, when I'm, like, you know -- like, you don't -- you don't want to have sex when you're going through a major depressive episode, right. Like, why -- it's just a weird thing.
Q Has that comment about drinking or sleeping all

day, having sex with acquaintances at night when you're depressed, those comments ever had any impact on your looking for a job, ability to earn a living, anything of that sort?

A Yeah. It goes back to what we talked about, you know, before and the prior conversations about economic harm. So the same stuff applies. I don't want to keep kind of repeating the same thing. So I think it's fair to say that the same statements I made before are consistent throughout unless I otherwise specify and can point to, you know, specific incidences.

But this is just, you know, like, Ophi and me kind of fell out and Stephanie was saying this stuff to me or about me. And, like, she -- yeah, I -- and it's just, I mean, she's alleged like horrible criminal behavior. So I guess there is economic harm, but it's just how to measure it, et cetera, et cetera. So it's kind of the same thing I said before.

Q You and Ophi --

A I feel like a broken record.

Q You and Ophi had a falling-out?

A Yeah. Like, over time she, like -- after I moved out and she got closer to Stephanie and, you know,

like Ophi talked to me less and less. And then by the time I deposed her, she just cut off all communication with me from that point on. I think that's kind of clear from the text messages between myself and Ophi that I gave Ms. Hoffer that I also gave you, that that pattern emerging. But yeah, that's what happened.

Q On an unknown date, Ms. Hoffer stated the following to Ophi: Plaintiff was affecting J, J did not want to go to Cleveland, and Ms. Hoffer had no choice but to sue for formalized rights.

A I think that's a typo. I had no choice. But yeah, like, J likes coming to Cleveland. Yeah, let's stipulate that that's not defamation. I think that was just poorly worded and a typo. My apologies.

Q So I'm striking out the statement "Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff was affecting J, J did not want to go to Cleveland, and Ms. Hoffer had no choice but to sue for formalized rights"?

A Yeah, yeah, please get rid of it. Sorry about that.

Q Okay. The next five have to do with comments to Ophi and Yana on November 13, 2023.

A Yeah.

Q We already talked --
A Yeah, my mistake. I said it multiple times. You know, like, as I was answering this just because, like, there's so much in the case, like, I would write sections and go to things, and like, I think I just missed it in terms of redundancy.
Q Okay. So those are -- we've already talked about those.
A Yeah.
Q Those are duplicates of what we talked about earlier?
A Yeah.
Q And that was the -- that was the call that's described in the Our Family Wizard with also the comments about Noodle, the ferret?
A Yeah. So that's with respect to Yana, with respect to Ophi. Like I said, it could be that conversation or it could be either text messages or her deposition. I don't remember where it comes from, but either Ophi reported it or Ophi was confirmedly there hearing it, right. Like, those -- either one of those two things are true. But they all have to do with the same, you know, general incident from my understanding.
Q Okay. There are then some comments from May 18,

2018.
A Yeah.
Q That's correct, those are from 2018; correct?
A Yeah. Those are -- I think that's a message from Stephanie to Caroline from -- dated in 2018.
Q So I'm not going to ask you about those because in my view those are outside the statute of limitations.
A Yeah.
Q On an unknown date, stated -- Ms. Hoffer stated the following to Amber, Yana, Caroline, and Nancy, or attempted to state the following to them: Ms. Hoffer wanted to tell them the truth about Plaintiff.
A Yeah. So the truth is supposed to be in parentheses, and it was more of a threat. So this is based on a text message between myself and Ms. Hoffer back in -- back before what you perceive as the statute of limitations period where Ms. Hoffer and I were talking back and forth and she threatened in telling all the bad things about me -- telling me all the bad things about me; that she was going to contact these people or try to contact these people, quote/unquote, the truth, which sums up these, like, you know, very negative

comments about me.
So that's what it refers to. But I didn't spell it out, but it does refer to a text message. And the truth is supposed to be in quotation marks.
Q And that is -- so this unknown date is sometime prior to October of 2023?
A That's correct.
Q And do you have any personal knowledge of her reaching out to Amber, Yana, Caroline, and Nancy to, quote/unquote, tell them the truth?
A She turned over messages or, like, messages to them. And then admitted I think in a discovery response that she tried to reach out to them or tried to locate them or reached out to some of them. I don't remember the specifics. And Caroline did tell me that Stephanie did reach out, if I remember that from our text messages.
Q And that was sometime prior to October 2023?
A I don't remember when I learned of that. I would have to look at mine and Caroline's messages to one another.
Q "On an unknown date, Ms. Hoffer stated, threatened, or attempted to state to Plaintiff's Marine Corps command that Plaintiff presented safety concerns and was the subject of allegations requiring

intervention."
A Yeah.
Q What is the basis of your knowledge as it relates to that alleged statement?
A Yeah, so there's a couple things. Number one, it was -- what was it? It was in her messages. It was, like, something in discovery that I found out that she was trying to locate or talk to my command about me. I think it was maybe in her messages to her aunt or Jason or somebody, that she was trying to talk to my command.
I also remember before I left that my security clearance -- because at the time I had a top secret security clearance, which, you know, is expensive, and it's kind of a big deal. And that our security manager let me know that, like, an investigation was being -- you know, like, I wasn't a part of the investigation, obviously, but I was being investigated as part of my security clearance thing. This was in 2024, like I said, before I left.
So part of this discovery process is, you know, are the messages, if they exist, about Stephanie actually reaching out to or talking to people in my command. And, you know, contacting my

Marine Corps unit and stuff. So that's where that comes from and that's why, you know, I'll supplement it as it goes forward. But right now, like, there's smoke. I just don't know if there's fire necessarily there.

Q So you have no personal knowledge of Ms. Hoffer having any conversations with anybody at Marine Corps command?

A Correct.

Q And as you were seeking a security clearance, the investigation into that, that is something that happens when somebody is seeking a security clearance; correct?

A I already had the security clearance. I had already been granted the security clearance. So, you know, us in the Marine Corps, we get -- you know, like, officers get secret security clearances, but I was able to obtain a top secret security clearance back in 2022, I want to say, while I was going to Quantico. It might have been in 2020, through the investigation. It took a while just because those investigations are pretty onerous and they take time.

So I had the top secret security clearance, but then in 2024, that's when an investigation

opened up into the security clearance that I had at the time and that, you know, I obviously lost.
Q You lost the security clearance?
A Well, because I left the Marine Corps.
Q Oh, okay.
A Right. And then because they're time limited. Like, if I would have stayed in, I would have maintained it, but since I left the Marine Corps.
Q Oh, okay. "On an unknown date, Ms. Hoffer threatened or attempted to state to the Ohio State Bar Association or related professional legal authorities that Plaintiff had engaged in conduct that should harm his legal career."
Do you have any personal knowledge about Ms. Hoffer reaching out to the --
A Like, the thing about the Marine Corps, she has talked about reaching out to the bar association I think on multiple occasions and people, you know -- so that's -- she's threatened it. I don't have actual knowledge that she, in fact, did do it. But that's why the discovery is such that, if she did, it would be good to know.
Q So we're through the list, there we go.
A Yeah, yeah.
Q Any other statements -- now that we've gone through

this, any other statements that you haven't included on this list that you believe to be defamatory?
A My brain is complete mush. I can't think of anything right now. And like I said, I'll -- you know, I'll think about some of these and supplement or clarify as needed. And obviously as the discovery goes, like, there might be more that comes out so -- but off the top of my head, this is, I think, fairly comprehensive given the materials I have and I'm aware of.
Q So we're on to Count II, Invasion of Privacy. Complaint page 49. This is Exhibit 7, the complaint, page 49, Count II.
A Yeah.
Q This is paragraph 5.7.
A Yeah.
Q Related to Ms. Hoffer invaded your privacy via intrusion. "Ms. Hoffer, without Mr. Kenney-Prentiss' knowledge or consent, intruded through several unlawful and highly offensive intrusions upon the property of Mr. Kenney-Prentiss, to include going through his electronic communications with others, searching his personal files and property, and

surreptitiously taking photographs of his belongings for later use in court proceedings."

So I just want you to identify each instance that Ms. Hoffer intruded upon your property as alleged here.

A Yeah. So she had on a previous occasion gone through my text messages. This occurred when we were in Vienna, so back in 2018, went through my text messages. She while we lived together talked about taking photos of my prescription pills in case I would ever sue her in case things go to court.

But more to the point, she went through my belongings after I moved out, took several things or took pictures of several things. Yeah. Went through my things before they put -- got put in the storage center, you know, to, like, basically look for dirt on me, some of which were given to the custody evaluator and which she admitted to in her deposition.

Q Okay. So I'm going to go through each of these items.

The going through electronic communications with others, that is reference to going through your text messages in Vienna circa 2018?

A Yes. Unless I'm forgetting something, I think that's it.
Q Okay. And searching his personal files and property, that is a reference to your allegation that after you left your property at her home, she went through it in the process of it being taken to the storage facility?
A Not in the process of it being taken to the storage facility. I don't know this exact context because I don't think we talk about it in the deposition, but she does -- like I said, if I remember correctly, talk about going through my things and finding certain things or looking for certain things. And then they end up, like I said, in the evaluator's files. But she does admit going through my stuff.
Like, I don't know, you know, the context, right. Like, I don't know if it was as she's carrying a box to the storage facility or she was just going there on like a random day looking for stuff. But the effect is the same, right, she was going through my stuff, looking for things that she could use.
Q And what specifically did she find that she used?
A What was it, like several -- what was it, like a

journal entry or something, like some handwritten notes. I mean, I had a lot of files. I had a lot of papers. So to find the things, she obviously had to go through it a bit. I don't remember exactly off the top of my head everything, but I know, you know, there was a number of things that she went through and found.
Q And those were things that you left behind when you moved back to Cleveland?
A Well, not that I left them behind. You know, I was going to get them and move them out because they were still mine, but just, you know, because of the thing with the bugs and all that, like, I didn't move them back when I was, like, scheduled to move them back. So they were there, you know, after I drove to Cleveland in September.
Q Okay. But you don't recall specifically which handwritten notes or files?
A Not off the top of my head, but I know I can identify them and she talks about them. So I could get -- you know, she -- she could certainly tell you, you know, the documents that she retrieved. And I could look through the responses and what she's said in the past, and I could identify those documents.

Q The surreptitiously taking photographs of his belongings for later use in court proceedings, is that a reference to taking pictures of your prescriptions?
A Yes.
Q And when was that? When and where?
A I don't remember -- yeah, so if you're asking about the statute of limitations and if you say two years, like, all of this obviously occurred when we lived together, and I moved out in September 2023. But since then, she's also, like, taken pictures of me, like, during child, like, exchanges and stuff.
Like, I remember a weird, creepy incident where she was, like, snapping photos of me when I picked J up from Put-in-Bay which was weird. And she's, like, recorded FaceTime conversations between J and I. So I don't know how many more photos she has of that, but those are the ones that I'm aware of, and that stuff happened after I moved out.
Q Right, so I think we're talking about two -- I think you mentioned two different things.
With regard to the pictures of your prescriptions, it was sometime before September of 2023; correct?

A Yeah, but she also took photos because that's I think how she got the document excerpts from going through my stuff because how else could she have transmitted the information, right. So she had to have taken a picture. I don't think they're scanned copies. So she took photographs of the stuff as she was going through it.
Q Okay. And with regard to you also say that she took photos of you during child handoffs.
A Yeah.
Q But those weren't pictures of your property, that was sort of out in the public as you were exchanging the child; correct?
A Yeah. Yeah, yeah, yeah.
Q Any other instances that you allege to be an intrusion upon your person or property that we've not talked about?
A Not that I can think of. Like I said, if I remember something, I'll let you know, but right now my brain is kind of on fumes. But nothing else comes to mind right now.
Q Okay. Interrogatory No. 3. This is Deposition Exhibit 10.
THE WITNESS: Could we take, like, another five-minute break?

MR. ZIMMERLY: Sure. We'll be back at 6.
MR. KENNEY-PRENTISS: Okay, cool.
(Recess taken.)
BY MR. ZIMMERLY:
Q So James --
A Back on the record?
Q Yeah.
MR. ZIMMERLY: I think we're back on the record, right, Debbi?
THE REPORTER: Yes.
A And I wanted to point out something as I was getting another water with respect to defamation. Something that I forgot to say that I should have included that I will include is so as part of, like, you know, the custody and all that stuff, like, I reached out to both Stephanie's ex-husband and ex-fiance, and her ex-fiance, Travis McDade, told me. And I don't remember the exact words, but Stephanie said that, like, I'm saying the same thing about me as I did Paul, her first husband, and that I'm going to kill her. So that would be another thing about defamation.
Q This was a conversation that you had with, would you spell -- state and spell the name.
A Yeah. Travis McDade, T-R-A-V-I-S, space

M-C-D-A-D-E. He is a law professor person for Illinois law school or something like that.
Q And when did you have this conversation with him?
A Back in 2014 at some point, via e-mail. I don't know when, but it's, you know, in a, like -- in the discovery thing that I sent you.
Q Okay. So that conversation that you had with Travis McDade was in 2014?
A Yes. No, no, no, 2024. My mistake, sorry, 2024. The thing with the 4, yeah, 2024.
Q Okay. And did he say when this alleged statement by Ms. Hoffer was made?
A I don't remember. I would have to look at the exact e-mail.
Q Okay. We're on Exhibit 10.
A Okay.
Q Interrogatory No. 3 which asked that you identify all instances where Ms. Hoffer publicly disclosed private facts concerning you or presented you in a false light, including: The private facts that were disclosed or instances you were presented in a false light; the individuals who received the disclosure; when and where the disclosure occurred, and all documents reflecting or relating to the contents of the disclosure.

Okay, so scrolling through that, if you'll go to page 22, we have a first one post, October of 2023. "On January 8, 2025, Ms. Hoffer stated the following to Stacy Smith and Jodi Morrow: 'Here is the first of three emails that I will send about the custody case for James. This is the court's order releasing the protective order against James's father and ordering him to limit his communications with me. The communication restrictions should not affect the school."

So --

A Yes.

Q -- what about that is an invasion of your privacy or presenting you in a false light?

A Yes. So a lot of these, in fact, maybe all of them or most of them, mirrored the defamation stuff. This paints as a false light because, like what we talked about, the judge's order dismissing Stephanie's protection order thing.

Like, the peacekeeping language didn't have the force of law, right, like, there's no -- and, I mean, she knows this. She's a tax lawyer, right. Like, every action by the government needs some sort of statutory or administrative or something policy backing it, like, they just can't say, Oh,

I'm going to order you that you're not allowed to do X. Like, there needs to be a basis.

Like, her saying that I'm still, like, ordered to limit communications with her and that it's releasing and not dismissing, right, it's just, like, that's the false light where it still indicates that I'm a dangerous person and that this order exists, right, that doesn't exist.

Q Okay. Well, I guess we can agree to disagree about that.

But so in the e-mail, she is providing a copy of the order to Stacy Smith and Jodi Morrow; correct?

A Uh-huh. Yeah.

Q And whether we use the word dismissing or releasing, ultimately the protective order was lifted against J's father; correct?

A Yeah. Her petition for an ex parte order of petition -- or her petition for an order of protection was denied and the case was dismissed. It's also, like, a private case, right, like -- or not public, you know, knowledge or information, right. Like, they're all confidential filings.

Q And in Exhibit 2, we looked at that language from Judge Kincaid where he expressly uses the word

order when he's talking about limiting
communications; correct?
A Oh, right, yeah. We discussed that. And I think, yeah, I -- you know, that was the conversation earlier about peacekeeping stuff, et cetera.
Oh, shit. Printed Exhibit 10, okay, good. Going back and forth between Adobe things, yeah. Exhibit 2, page 2.
Q And it was also a true statement, the last comment, the communications restrictions should not affect the school. That was also accurate?
A It -- I mean, no, because she had previously told them that, like, I wasn't allowed to, you know, pick up J, and she made it seem like I'm unsafe. So that's, like, saying the status quo was still in effect, even though the protective -- like, in her account, she had already made the school -- or informed the school that I was, like, this unsafe person that J needed protection from, like. And then her saying this shouldn't affect how the school deals with James, me, it's just not accurate to say.
Q Well, what she's actually saying, though, is that the order pertained to limitation of communications with me, being Ms. Hoffer, and that that

communication restriction should not affect the school. That was accurate, wasn't it?
A I guess. I guess I just didn't read it like that, right, I just read the totality of the thing. It just implied that, you know, like, things between Plaintiff James and the school shouldn't be affected, right. And she's referring to the order, which then means, because it's the last sentence -- or the sentence that precedes it, the order with the communication restrictions, which is the same order releasing the protective order should not affect the school, which is a factually untrue statement.
So if she's referring to the communication restrictions themselves, it's true that it shouldn't affect the school. But if she's referring to the communication restrictions order which is implied by the preceding sentence, it means that it is an untrue statement because the denial of her petition would affect the school because I would be able to see J and visit school grounds and pick him up and be involved in his life again.
Q Okay. But she ultimately doesn't say -- she's not saying here that in some way -- in fact, what she's

saying here is that there's no restriction on them communicating with you and vice versa?
A I don't -- so I think you're doing the thing that you're -- that you've correctly said I've been doing is, like, reading more into it, where she doesn't talk about the communications between me and the school.
But it seems to be implied just based on, you know, the two sentences together is that she could be referring to the order itself not affecting the school, which the status quo before that order was that she told them that, you know, I was unable to come there and I shouldn't pick J up and I'm on a list, right. Like, and the order not affecting the school denying her petition would affect how I interact with the school or how they interact with me with respect to, you know, being on school grounds and seeing J.
Q Okay. Moving on to the next one, October 24, 2023, there's a writing or statement from Ms. Hoffer to Carrie Hagan.
Is that where we were talking about before in the context of definition?
A Yeah, yeah, yeah. So that's about the meltdown thing and weird meltdown, et cetera.

Q So would your answers if I asked you questions about, you know, the basis of where that came from and economic harm and the background, that would -- your answers to those questions -- like, I don't want to reask all of that.
A Yeah. They'd be the same. Right, you know, like, the truth or veracity of the statement or why it's untrue, it's the same answers, right, like -- so all of that stuff would be the same.
Q The next one.
A The one, October 30th, '23, that's new and not included in the defamation thing.
Q "Lately, he has been upset with his dad, who is starting to be a bit more unavailable for FaceTime calls. Many times, he is not available because he is with someone else-friends, or a woman friend."
A Yeah, that last part is just not true. But I didn't include it in the defamation thing because it doesn't give rise to the same level of, like, harm, like, child harm or abuse or, like, that kind of thing. But at the same time, it is false, right. Like, what, I was in New York and couldn't talk to J because I was with Yana or something. Or like there was a time that I couldn't talk to J right then and there, but we still had FaceTime

every day, right.

But, like, her saying this many times he's not available, it's like I'm suddenly an absent father, which depending on the day, Stephanie either says James and J talk way too much and J needs an independent life and he's -- you know, J's forced to talk to James. Or it's James doesn't want to talk to J, he doesn't care about him, he's using him as a means, he's always with other people. Right, like, she claims both of them in extremeness, and it's absurd.

Q We've talked about the next comment, October 30, 2023, the everyone's brain is different.

A Yeah.

Q Same with the spirited away to Cleveland?

A Yep.

Q We've talked about the statement by Ms. Hoffer on November 13th to Ophi Bornemann about HPV.

A Yeah.

Q We haven't talked about November 2023 I don't think, statement to Carrie Hagan about a family gathering.

A Yeah, I -- like, I don't know why -- I don't remember ever threatening not to bring J back. Yeah, it's just -- from what I remember, it's just

not true, and I would have to consult, you know, the Our Family Wizard messages and what was going on at the time to tell you more specifically. But yeah, it's just a mischaracterization. It's the same thing with the next thing, just lying about what happened to paint me, like I said, in a false light.
Q We agreed to strike out the defamation related to this proposal that -- we can make that stipulation here too with regard to the --
A You know, it's a private thing, right, like, I don't know why she's sharing this information with an employee. It just seems unnecessary.
Q You still think that that was an invasion of your privacy for her to share her views about that conversation?
A Yeah, we can strike it, yeah. Let's stipulate it's late.
Q You think that this comment in December 2023 from Ms. Hoffer to Carrie Hagan was somehow an invasion of your privacy?
A Yeah, she just liked sharing facts that -- well, I don't know, I can't think straight right now. To just seem to be like -- here, let me think about it. Yeah, I mean, it's mischaracterizing it, but

at the same -- yeah, let's strike that conversation.
Q December 2023, it looks like she is sharing about the marriage proposal.
A Yeah, let's just strike that, that stuff.
Q What about the next statement pertaining to Gone Girl?
A Yeah, all of the Carrie Hagan stuff you can get rid of in this section, strike there. Through it is.
Q Now we're striking those going to Ophi Bornemann?
A Yeah.
Q "On or about December 2023, James is really adamant about stopping conversations when he gets overwhelmed. Once he says he needs a break, he calls even a single word extra an abuse."
A That's just patently false. So she's lying about me to an employee that also watches our kids. Like, that's just wrong.
Q Well, how is that an invasion of your privacy?
A Well, it's painting me in a false light. It's saying incorrect things about me to someone who's, you know, supposed to be watching our son, right, so she's -- it just seems inappropriate.
Q Okay. What about December 19, 2023, "Poor J must be so damn unsettled right now. I am really

kicking myself. This is my fault. I knew James would react badly, and I didn't prevent it."
A Yeah. I remember why I included this, but I can't remember the context so I would have to look back at exactly why. So apologies that it's not included. But there was something going on and I just remember this is just, like, such a -- yeah, it was just a weird -- if I remember correctly, it was just a weird mischaracterization and like an incorrect one, but I can't remember off the top of my head what it was about.
Q I may not have time to go through all of these comments, but with regard to every -- have you listed here in response to Interrogatory No. 3 all the instances that you've been able to identify where Ms. Hoffer publicly disclosed private facts concerning you or presented you in a false light?
A Yes, with the addition of what I told you about communications with her ex. I forgot to add that. But with that, with the defamation list plus this list I think is -- should be everything that I'm currently aware of.
Q And each of these is an instance where there is -- you've identified the speaker, Ms. Hoffer, and the recipient, you know, one or two people at a time?

A Yeah.
Q And your knowledge of each of those is based upon, you know, a text message or an e-mail or some deposition testimony as it relates to all of these?
A That's correct.
Q You weren't a party to any of these conversations except perhaps if in the list the call that involved Yana and Ophi is included in this list. Other than that, these are all communications that you're not a party to; correct?
A Correct.
Q And do you have any knowledge of the recipients of these communications, telling anybody else about them?
A No.
Q And do you have any knowledge of any economic harm experienced by you as a result of these comments, other than -- I mean, sort of the caveat that you always make that, you know, there's these --
A Yeah, we've talked about this, yeah, before. But like with the defamation stuff, I can't point to a specific contract where there's a smoking gun e-mail, right, like, that I'm not in a pecuniary relationship with David or Stephanie Schaffer, et cetera. So the same answer applies.

Q Okay. I'm going to switch topics in the interest of time, reserving the right perhaps to come back and finish off this list, but I'm going to try to get through some other topics with the time we have remaining today.
A Okay. How much time have we been going for? Just kind of curious.
Q I think my calendar invite gives us till 7:30. So if Debbi -- I think Deb's available till then I think.
So Count III, malicious prosecution.
A Okay.
Q It's on page 50 of the complaint.
A Exhibit 7. Yep, I see it.
Q And paragraph 5.14 alleges that Ms. Hoffer instituted an action against Mr. Kenney-Prentiss, namely, her protection order case against him.
So I'm clear, the malicious prosecution you alleged in this case pertains to Ms. Hoffer's petitions for protective order against you; is that correct?
A That's correct.
Q Are there any other proceedings that you allege were a malicious prosecution by her against you?
A Okay, I don't remember what the legal definition of

malicious prosecution is at the top of my head, so I don't know if it is inclusive of bad faith or bad things that she's done in the custody case. But I'm fairly certain it just includes the protection order case, but I don't -- yeah. I don't remember how inclusive malicious prosecution is, but it does refer to the protection order case.

Q Okay. That was my understanding, but I wanted to confirm.

A Yeah, yeah.

(Deposition Exhibit 11 marked for identification.)

Q Exhibit 11, if you'd open that.

A Yep.

Q This is a copy of the petition for an order for protection and request for a hearing that she filed on February 27th of 2024; is that correct?

A Yeah. And like you said, if this is going to be public, the stuff about, you know, kid -- like, kids are in here, I think, so you might want to have this be confidential or parts of it confidential. I don't remember it off the top of my head, everything.

Q That makes sense. And I agree with that. And so, you know, I think it makes sense for us to talk

about particularly things that we want perhaps to seal. We certainly would be redacting, you know, minors' names and dates of birth and things of that sort.
A Yeah.
Q So I have no objection to that.
You understood that Ms. Hoffer filed for a protective order based on communications from you or actions by you that she believed to be stalking and harassing; correct?
A She filed it based on things that she alleged were tantamount to stalking and harassing.
Q Is it true that a reasonable person could also have felt that way?
A No, not in the context of the relationship.
Q And what do you mean by that?
A So I don't know if you had a chance to look at it when I filed the motion for summary judgment in the protection order case. It was a fairly comprehensive, like, analysis, but -- and in it, I claim rightly that no reasonable person would feel afraid, terrorized, frightened, threatened, given everything in the relationship, given the parties' past, given the consistent behavior. Yeah, like, there's no reasonable person would have filed this,

right. Like, she did this to preempt the custody suit, right. Like, she did not have a legitimate basis to file this.
Q What specific evidence are you pointing to that some -- well, do you allege that she was malicious in seeking the protective order?
A Yes.
Q And what specific evidence do you point to to support that it was malicious?
A Oh, a ton. I mean, this could take the entire year, right. I mean, the entire last hour. If you want, I could bring up the motion for summary judgment or I could summarize things. But I know if I start explaining why it will not be comprehensive because there's just overwhelming evidence that this was malicious. So I don't know how -- how you want me to answer this, but it would -- if I was comprehensive, it would take hours to explain or to go through.
So like I said, I think the summary judgment motion is a fairly good distillation of why or how it can be shown to be malicious. So yeah. I don't know how you want to take it.
Q Well, why don't you give me the CliffsNotes.
A Because it's late, would you mind if I bring up

that motion? And if you don't have it in front of you, I could e-mail it to you?
Q That's fine.
A Okay.
MR. ZIMMERLY: Okay. Go ahead and mark it as Exhibit 20.
Deb, we can go off the record.
(Recess taken.)
(Deposition Exhibit 20 and Exhibit 21 marked for identification.)
BY MR. ZIMMERLY:
Q We're going to mark a document that was sent to me by Mr. Kenney-Prentiss as Exhibit 20. This is respondent's motion for summary judgment in the protective order proceeding. It's a 202-page document. And we'll mark that as Exhibit 20.
We'll mark as Exhibit 21 a document that's entitled "Stephanie-Comments-Threats." That is a 20-page document.
And so with regard to Exhibit 20, I think you provided that in the context of evidence that the motion for protective order was filed maliciously and you were going to use this as sort of a guidepost for you to give me the CliffsNotes.
A Yeah --

Q Why don't you, you know, go ahead and in the interest of time let me know what those CliffsNotes are.
A Sure. So I think the case that Stephanie's protection order being malicious is fairly outlined, not completely, but in -- you know, in a lot of ways in this motion for summary judgment. And what I do in this thing is I go through the parties' history with a narrative of facts, and then I break down a lot of the very big allegations that she makes in her protection order thing and points out how -- how completely they're untrue or mischaracterized and how she really just outlines why or I outline and demonstrate why all the things that she said and alleged, you know, sometimes were not even false but demonstratively false based on her own statements, right.
So let's take, you know, the parties' history as an example. So she has long made threats, and this is more with Exhibit 21, made threats in relation to me, the plaintiff, James, not being with her. And she has made lots of threatening gestures about it in seemingly ultimatum or malicious ways.
She also has a history of stating that, you

A Okay. So more quickly, she made a lot of false and misleading statements in her protection order petition. Her protection order petition or the motion for summary judgment also outlines that she -- with the behavior that she alleges, she not only did it as well but did it more significantly to me, and there was a huge double standard to what she expected and what she did.

The behavior that she cites that I was, you know, doing to warrant a protection order was not anything new in the relationship and, in fact, her past comments kind of illuminate the fact that, yeah, she didn't like have a legitimate ground, you know, to bring it when she did.

So, for instance, on page 65 of Exhibit 20, right, this is kind of the inciting incident to have her file the protection order in February. Our co-parent relationship had broken down to the point, you know, where, like, I didn't know what to do and her keeping J from me so I sent her a letter to preserve records for an upcoming case.

She writes, and you see the blue text messages excerpt, those are between Stephanie and Mr. Perry that she said, you know, she needed to get this in -- you know, I have to get this PO in before he

files a custody case, right.

And she also said she was going to wait until April, which is not something that someone in threat of imminent bodily harm, right, says, Well, I could have waited a few months. You know, it's not serious now, I was going to wait a few months. But since he filed -- since he said this thing about a lawsuit now, I have to file it, right. Like, that kind of illustrates her motive for filing it in the first place, right.

She cites several -- so she cites the sushi incident, which is when I threw sushi against the garage. She cites the lamp incident there from 2020. She cites the incident of nonconsensual sex, as how she says it. But weirdly enough, it was in December of 2022, so after all these incidents occurred, she writes to her aunt, Stephanie Schaffer, that she doesn't have enough for a restraining order. Let me find that.

Okay, and so if you go to page 173, so this is a section that's in the section about attorneys' fees kind of demonstrating the fact that, you know, it was malicious and frivolous, et cetera, where Stephanie has a long history of preparing for custody, threatening custody. She has threatened

custody fights with Mr. Perry, you know, on several occasions. So if you look at the bottom of that page, you know, she has already familiarized herself with custody litigation.

And then the next page, in the middle of it, right, so this is in December '22, after the most I guess you would call it eye-catching incident of her protection order, she writes to her aunt, there isn't enough for a restraining order. So that's I think kind of indicative, right.

So, you know, I also point out at the bottom of the page that, you know, she lied about not knowing what a protective order was called despite having researched it.

So then later, yeah, I talk about how she started a journal as soon as I moved out, seemingly in preparation for this, you know, protection order thing. But, you know, as soon as I kind of file it -- and she had a hard cover diary on her bedside table. And she did have a journal on her phone that she kept. She didn't include those things pre-2023 in her, you know, thing as evidence. It was only the journal that she started only after I moved out where she seems to be, you know, generating a record for later use, which is

something that she had been long preparing.

There was all -- you know, so one incident in particular kind of highlights -- here, let me find it. Okay, so if you -- okay. Where was this? Sorry, I'm looking for something.

Okay. So if you go to page 81 of Exhibit 20, part of Stephanie's protection order is the night that I called an excessive amount of times, more than 150 times to try to reach J. This was the one incident cited in Judge Kincaid's order that could give rise to her allegations. But me not having the opportunity to present evidence, I would have presented this evidence here to show that even the night of calling so many times was a fabrication to allow her to, you know, further support her protection order when she files it.

So she called the night that I called so many times, terrifying and talking about how she locked the doors and, you know, the same -- the same, you know, greatest hits she said with respect to a lot of incidents that she cited in her protection order, right.

But the thing that she left out, she had actual knowledge on what I was trying to do. So I was calling, I think it was a Tuesday because --

but it could have been a Wednesday, but so I had always FaceTimed J once a day, as we discussed. And J called me during a conference call that I was having for, you know, the Marine Corps, and he called me mid-conference call. I answered the phone and said, Hey, J, I'll call you back as soon as this is done and hung up.

So then I, you know, after, you know, like after the call was over, as soon as the call was over, I start trying to call, you know, the iPad. And sometimes it's off or it's on vibrate or, like, it's on vibrate or it's in another room. And it was late, so to catch him kind of before bed I called, called, called, because sometimes it takes him a while -- you know, them a while to hear it and stuff like that. So I just kept kind of calling because he was expecting me to call. We had always talked at least once a day, and I didn't want to let my son down and let him think that I, you know, said I was going to do something and didn't do it.

So as it turns out, with what I get from her contemporaneous messages with, like, Ophi and also through Ophi's deposition, Stephanie and J were both awake. Stephanie and J even came downstairs.

Stephanie turned off the iPad and put it in a cupboard or just like put it on silent and put it in a cupboard. Not -- you know, not answering. It could have been really easy to say, Hey, J just say a quick goodnight to your dad. Something, right.

So it also outlines in chronological order, so like on the bottom of page, you know, 81, you know, it starts, right. She had actual knowledge on why I was calling. I started calling well before the child was in bed, well before he was asleep, well before she came downstairs.

And I then, you know, e-mailed her because I tried to call her phone as well so I could reach J. Because I said he was excited about wanting to tell me a few things. So she cites that e-mail in the protection order but leaves out the part where it was clear that I was only calling to call J.

She then writes to Ophi, and you could see a snapshot of that, you know, Hey, did you write to J, blah, blah, blah. And then she kept feigning ignorance even though she had my e-mails and read them and responded to them. You know, do you have any idea on why, you know, he's called nearly 30 times.

So this is Stephanie's text messages in the

blue on page 82, and Ophi's text messages are in the gray. Stephanie is saying, Is that it? He's called me nearly 30 times. I'm wondering what would cause him to do that. It's so bizarre.

Ophi affirmatively says, he wanted to say good night to J. And she, as in Stephanie, seems to not even acknowledge that fact and said, Oh, this is unusual even for him.

And then later on in the conversation, she says, you know, James, as in me, Stephanie says, He's not leaving any voicemails so I assume there's no emergency. Also he would have told you or had his mom call, right.

So not only does it prove that she knew why I was calling, but it also shows her state of mind at the time where she has a lot of messages with Ophi that she, you know, cites fear or cites something, I don't know. Like, she's not private when it comes to talking to Ophi about Stephanie's feelings. Stephanie's not private about talking to Ophi about her feelings.

So Stephanie's text messages to Ophi do not indicate any amount of fear, any amount of trepidation, any amount of anything negative whatsoever, just confusion over why I was calling,

even though Stephanie was affirmatively told why I was calling, both by me, but also by Ophi.

And then, you know, I replied to her e-mail that she sent me, and I asked, you know, like, so while you were both awake, you refused to let me speak to J via FaceTime to say goodnight. And, you know, and like, I called yesterday and both you and J were awake.

You know, because, like, before on multiple occasions, even if it was late and J was up, like, he has these blue light glasses that he puts over his eyes to stop, you know, kind of blue light from, you know, getting in to not disrupt his circadian rhythm. And it would sometimes just be a quick, like, Hey, say goodnight to your dad. Hey, it's late, J needs to go to bed, blah, blah, blah, or he's in bed. It's just like a quick goodnight.

But instead of doing any of that, she lets the phone ring, doesn't block my grandmother's phone number, right. Like, she just lets it ring continuously because I was calling from my grandma's land line because she had blocked my phone number. So just trying to reach J. She could have blocked it any time. She didn't.

It was like she was trying to make a record

for the protection order case. She knew exactly why I was calling. Chose not to answer it. Didn't indicate any amount of fear whatsoever with Ophi. And then later would cite this incident that she made sure to lock the doors and became very hyperbolic about it.

And she even -- she shared in discovery with one of the state court cases, I don't know if she's shown you yet, but I left a voice mail where I'm just, like, brokenhearted asking to just talk to J and making sure he's okay. And, like, I was just obviously, like, really, really upset and hurt. And it -- you know, it was terrible because this was the first time ever in years that, like, J and I had missed a day.

And, like, in the wake of me leaving, this is September 2023, this is the month that I left, like, it was so important to be consistent, and he was excited to tell me something. And, like, she actively prevented it from happening.

So that's -- that is a great microcosm of why it was complete BS that she cited this incident, the way she characterized it, the way she later used it as one incidence of many, right. And other than being malicious, why else -- what other

possible explanation in all of reality could
explain her actions this night.
Q Is it true that you called 150 times?
A I don't remember the exact amount, but it probably was more than 150 times.
Q Let's go to abuse of process.
A Okay.
Q And Count IV.
A I could say a lot more, but I know we're kind of running short on time so I just want to highlight that that's just the tip of the iceberg in terms of proof for, you know, maliciousness in bringing this thing. But at the same time, I think that was a good microcosm to kind of illustrate a broader point.
Do you have any questions?
Q I do. Count IV, page 51 --
A Yeah.
Q -- of the complaint. This is Exhibit 7. 5.18, alleges Ms. Hoffer brought her petition for an order of protection against Mr. Kenney-Prentiss with ulterior purposes and motives.
A Yes.
Q Just so I'm clear, the abuse of process that you alleged in this case pertains to Ms. Hoffer's

petition for a protective order against you; is that correct?
A And her actions in the custody case as well.
Q Okay. What actions in the custody case are you alleging are abuse of process?
A Yeah, so we talked about the protection order thing, but if you look at 5.19 and 5.20, it also connects with her campaign of what we allege, or I allege, the parental interference and alienation to prevent me and my son, like, to be together and to talk and stuff like that.
So the protective order was the main point on how she abused, you know, the process. But she also used it basically as a sword I think as what the case law says, like, uses a sword to deprive someone of their kind of parental rights. And then through her bad faith in the custody order proceedings, it was just further evidence of the same.
Q Okay. So, but the -- I'm trying to understand what process or proceeding you're pointing to as the alleged abuse of process.
So I understand that you allege that the malicious prosecution -- I mean, as with the malicious prosecution claim, your allegation that

her initiation of the protective order proceeding, I understand your allegation that that is the process or the proceeding. With regard -- I don't understand, what other process or proceeding are you saying is an abuse of process?

A Yeah, so, you know, for instance, right, in 5.19, plaintiff alleges that Ms. Hoffer spoliated evidence, and that was in connection to both the protection order case and the custody case, which, you know, is not procedurally correct. She used, for instance, the Court's provisional parenting time order that gave, like, a minimum of forced FaceTime calls a week to then flatly deny any other FaceTime calls if it wasn't on Tuesday, Thursday, Saturday, and Sunday between 5 and 5:15, right. Like, that also is, you know, abusing the process.

But most of it, the main thrust of it is the protection order proceeding. Now, you know, like I said to deprive myself of my parental rights and to gain an advantage in the impending custody litigation.

Q Okay. So we've looked at Exhibit 11 -- no, maybe we haven't. Exhibit 11 is the petition for protective order.

A Yes, we briefly brought it up, but we didn't go to

any particular page.
Q Yeah, so if you would pull that up and go to page 3.
A Yes.
Q Section 9 asks for the following relief and check all that apply. And then she has these boxes checked.
So these were the -- these were the various forms of relief that Ms. Hoffer was seeking in her petition for a protective order?
A That's correct. And I would like to highlight the locations in which she's requesting relief from. So I would just say, again, that the protection order protected only her. The allegations that I was abusive towards the kids came later, right, during the custody case, right. Like, that's when she started alleging that.
But if the protection order was protecting only her, and if both kids got bus rides to and from the school or all -- you know, not both kids, as in both kids, G[redacted] and L[redacted] and J separately, but anyway, because the kids got bus rides to and from school, why would she request that I stay away from J's elementary school and G[redacted] and Lev[redacted], you know, middle school if not for preventing me,

you know, like, a medium or a venue to maybe see him, right.

Like, if it was protecting only her and she was actually looking for protection for only her, she would say her place of work, you know, her place of residence and her as just a person, right. Just, like, don't be around me. So why the schools. That's a great question.

Q Well, there's a box there that says the order of the respondent to stay away from the following locations frequented by my family or household members, which may include a residence, school, or place of employment; correct?

A That's correct.

(Deposition Exhibit 12 marked for identification.)

Q And if you pull up Exhibit 12.

A Yes.

Q This is a form that I pulled up yesterday from the Indiana judicial branch website.

A Yeah.

Q An official website of the Indiana state government. You'll notice that there's an OJA, like, number on it relating to the form. This is a more recent form because it's dated July 20th of

2026.
A Yeah.
Q The one in Exhibit 11 is dated earlier to that. Let me see here.
A 2019 it looks like.
Q Right, so an older form. But if you'll scroll down in Exhibit 12 to page -- let's see here. Pages 4 and 5, there is a Section 9 that says "I'm asking the Court to order the following relief (check all which apply)." And you'll see that that last box, "Order the Respondent to stay away from the following locations frequented by my family or household members, which may include a residence, school, or place of employment," that option is available on the form; correct?
A Yes.
Q So the relief that she was seeking, in terms of checking those boxes and listing schools, was within the bounds of what was proper and regular in this type of proceeding?
A I don't know how you make that connection. I mean, she is filling out an old form. Like, to use something in the future as a reason to do something doesn't make sense to me.
In Exhibit 11, the one that we cited that

Ms. Hoffer filled out, right, like, there's no explanation as to what could be included, right. Like, she's not given the 2025 guidance in 2024. So when I just read the plain reading, right, ordering the respondent to stay away from locations frequented by my family or household, which may include residence, school, or place of employment, like, I read that as residence, school, place of employment, you know, like, college that you attend or something, right. You know, a lot of people who go to higher education, like, apply for a protection order, so that's kind of inclusive of the person itself.

But there's also protection orders that protect not just the person but everyone in the family. But in Stephanie's situation, it only protected her, so it just seemed a bit outside the bounds to ask for the two schools of the kids.

Q But the point that I'm making is that the form itself, when she checks that box, the form itself says order the respondent to stay away from the following locations frequented by my family or household members, which may include a residence, school, or place of employment.

So that is an option that's available to

someone seeking a protective order, to check that box and to list schools that are frequented by members of their family or household members.

A I guess I don't understand what you're asking, right. So like if you ask the question, does this place allow you to put other locations other than your home, right, because the one before it is home.

So the second question is where else should this person stay away from. And it says "Which may include a residence, school, or place of employment," which is not inclusive of that whole thing. So it could be, you know, a restaurant, a bar, a field, a public park, right. And if Stephanie, you know -- like, if she would have written, like, I don't know, like, Ohio State University or, you know, every university in the country, or, like, then -- it would still ask the same question. Just because it's a school doesn't mean it's automatically permissible to go and be included in this list.

Like, she's -- if she's asking for protection only for her, why would she include locations that she doesn't attend school at or even frequent all that much, right. Like, she's not going to the

school all the time. The only people going there all the time is J and G[redacted] and Le[redacted]

So I guess, like, it's open-ended for a reason because first she says home and then literally anywhere else, like residence, school, place of employment, but it doesn't necessarily mean, please put all these schools and place of employment and residences of everyone in your household. Because if that were the case and Stephanie were to do that, she would have included David's residence in that list because G[redacted] and L[redacted] are also household members.

David's a household member because it's one of the statutory things that kind of reads him into being a household member. Because if she was just writing all possible locations of everyone else in her household member, for all their residences or schools or places of employment, she would have written down David's house. You know, she would have written down his current place of employment, wherever that was at the time. But she didn't.

Q You're saying that Mr. Perry was a family or household member of Ms. Hoffer?

A Yes. Yeah, yeah, yeah. Yeah, because of the -- you know, I looked this up years ago, but according

lied a whole bunch in her protection order thing. She -- yeah, like, all of the everything, I guess I would say. Like, there's just so much overwhelming stuff here that indicate that her purposes were not in good faith when she brought the protection order petition.
Q Okay. Let's turn to the Crime Victims Relief Act conversion claims, Counts V and VI. They're on pages 52 and 53 of the complaint.
A Yeah.
Q Is your crime under the Crime Victims Relief Act tied to the conversion claim? Is that -- am I understanding that correctly?
A Not necessarily, no. That's part of it.
So there's two conversions in the State of Indiana. There's the civil conversion claim, and then there's the criminal conversion claim. The CVRA thing is with respect to violations of the criminal code to recoup that way. So the two criminal code violations that I allege would be the criminal conversion, which is very similar to the civil conversion, and also the parental interference section of the code, which is a separate relief under the CVRA, which is also separate from the tortious interference with

parental rights that was dismissed in this case.
Q Talking about property conversion, but whether it's civil conversion or criminal conversion, the conversion theories, are they the same? You're just -- one's common law and one's criminal?
A I don't know. I would have to look at it to see how similar they are. I assume they overlap. It's based on the same basic incidences, right. Like, she had my stuff. She didn't give it back. Or respond after I asked about it because I wanted to try to get it back. I couldn't afford getting it. She went through it, right, like they're both -- that forms the basis of both the civil and criminal conversion claims. Whether or not they're identical and how they work as an operation of law, I can't think about it right now. I don't know.
Q Okay. But we're talking about personal property. You're talking about the property that was -- you left behind at her home when you moved back to Cleveland, both civil conversion and criminal conversion, they are based upon that property; is that correct?
A It includes most of my household goods that remained at her residence even after I attempted to get them back. Yeah. Yeah, that makes -- yeah.

Q And we're talking about household goods, then?
A Yeah. Yeah, the -- yeah, the stuff that, you know, like I said, she exercised unauthorized control over it, the stuff that's still in storage right now because I can't afford to bring it back.
Q Is the stuff still in storage?
A Yes.
Q And that's at a storage facility in Whitestown?
A Yes.
Q And who's paying the storage costs for that?
A I am.
Q And so that property is within your custody or control?
A Right now it is, but I can't afford to bring it back, right. Like, if she would have communicated to me about getting the stuff back and I had more discretionary income at that time to actually get it back, you know, I still had savings and I hadn't blown it all on lawyers, right. Like, I could have got it back then. But since I was unable to and I went through all my money, I haven't been able to get it back.
So it's there. It's in my name. Stephanie was the one to initially contract with them and move my stuff out. And yeah, I could afford to

keep it there because otherwise I lose my stuff, but I can't afford to bring it back because that's way too expensive.

(Deposition Exhibit 13 marked for identification.)

Q Okay. So pull up Exhibit 13 if you would.
A Yeah.
Q This is a document that you produced in discovery, Bates stamp 36451, Our Family Wizard, message 35 of 872. She writes to you on November 10, 2023, "A new au pair, Greta, will arrive in January. She will stay in the guest house. Would you please remove your things in the week following Thanksgiving?

"If you do not respond by the end of this weekend, I will make arrangements to have your belongings moved to storage in Whitestown."

That's what she told you at that time?
A I don't remember this message. She obviously sent it. I know that I asked her about the storage stuff a couple times after that, maybe even before that, I don't remember. She always ignored me. I don't remember this message.
Q But do you deny that she sent it to you?
A No.

Q Okay. So she let you know -- well, she asked you to come pick up the things, and if not she let you know that she was going to have them moved to a storage in Whitestown; correct?
A She said would you please remove your things in the week following Thanksgiving. If you don't respond by the end of the weekend, I will make arrangements to have your belongings moved to storage in Whitestown.
Yeah, so, To: First viewed: Never. So I never actually saw that, it looks like.
Q But you had access to it? I mean, you've produced this document; correct?
A No. So this is a document that Stephanie produced to me that I'm reproducing back to you. So this is something that Stephanie had sent me in the protection order case and/or the custody case. So these were produced by Stephanie.
Q Now, but are you denying that she sent this to you or --
A No, but I -- I never saw this message.
Q You just never opened it?
A I guess. I don't -- like, I know that I asked her about the storage stuff and she never responded. But yeah, I never saw this. And apparently

Stephanie knew that I never saw it because it has like this read function on it too. But yeah, she was the one to produce this document.
Q Okay. So in any event --
A Yeah, sorry. But elsewhere in the messages, you'll see me asking her about this exact thing and she ignores me several times.
Q In any event, she had your property and put it into a storage locker; correct?
A Correct.
Q And you have access to that storage locker?
A Yes.
Q And have you accessed the storage locker at any time?
A Yes. Like a year or two ago. I don't remember when. But I can access it.
Q And have you taken anything from it?
A I needed a few small things, but in my little Prius, like, there's like my bed and my dresser. There's a whole bunch of huge stuff in there that would require a mover, tons of books. Like, I didn't take like a handful of things back.
Q Okay. Did Ms. Hoffer pay the movers to take your property to that storage locker?
A I don't know how she got it there.

Q But you've never been billed for that?
A Correct.
Q Okay. So I guess this is just sort of a practical question. She's asked you in this e-mail to come and get the property. She's let you know, even though you didn't see this, that if you didn't come get it she was going to put it in a storage locker. What should she have done other than, you know, to -- given that you had this property here, other than to put it in the storage locker? She was just supposed to keep it in her home until you decided to come get it or --
A She could have responded to me asking questions about it in, what was it, September and October. I don't know if I kept asking about it in December. I think I did, but she could have responded to any one of my multiple questions about it to have a dialogue about it to figure out exactly how to move the stuff back. That's what she could have done. She could have actually responded in good faith to me specifically asking about getting my stuff out, and she never did.
Q But she's never prevented from you coming to get that property from the storage locker, has she?
A Not from the storage locker, no. She told me about

it months later, where she said she put it. I don't remember what month. Maybe it was like April or something, right, when she actually gave me the address. But until that, like, she hadn't responded to my messages about the storage locker -- or, I mean, not the storage locker, my property, and then the protection order hit. So yeah.
Q Did --
A I think the first time I heard about it actually was when she gave over discovery in the protection order thing. What, was that in August? Because that included the messages from Our Family Wizard. So it wasn't until then that I actually knew about it maybe, but I don't remember. Maybe I read about it in April or May or whenever she sent me that. You would have to look at the read receipts on when she told me it was in secure care.
But, yeah, like, I don't know if that answers your question. But there was a period of time where I had no idea where my stuff was.
Q You also mentioned some other element of the CVRA that you're alleging having to do with custody. Can you explain that theory to me?
A I would have to look at the statute. My theory of

the case is she violated the criminal statute by, like, keeping J from me, which then forms the basis for relief under the CVRA. I would have to look at the statute. I can't talk specifics right now.
Q Okay. Is there a specific date or incident that you're pointing to where you say that she violated the crime victims -- she committed a crime as it relates to custody?
A Yeah. That means she kept J from me for like 190 days straight, right. Like, she cancelled planned parenting time. She did her best to keep me and J apart. If that's a crime under that specific criminal code, then that should give the basis for relief, or that should serve as the basis for relief because she didn't have good cause or, you know, any justification other than, you know, a malicious purpose to keep us apart.
Q Did you know that he was with Ms. Hoffer? Did you understand that?
A That J was with Ms. Hoffer?
Q Yes.
A Like physically? Sometimes she would send him to David's house, like I said, for overnights and weekends and stuff like that. But yeah, he resided with Stephanie in Zionsville.

Q Okay. So you knew where he was?
A Yes and no. There were periods of time, in fact, there was a definite time when she encouraged the au pairs to lie about where J was because he was at David's and Stephanie didn't want me finding out.
They went on vacations, to trips. I didn't know anything about it. Like, the only information I would ever get -- you know, like, Stephanie was never prevented from communicating anything with me, right. Like, she could send -- and the protection order is clear about this. Like, even if someone initiates contact, it doesn't give the other person authority or right to contact back, right.
So she could have very easily as a good faith parent said, Hey, just so you know, we have an upcoming vacation to the Grand Canyon and we're going to be this day and this day, and this is where we're going to go. Or J's going to David's house from this time to this time. He's going to spend the night over at this person's place.
She never said any of that. And, in fact, actively encouraged, like I said, the au pair to lie about his whereabouts. So there was definitely some concealing going on and just, you know, like a

refusal to do, like, the basic human co-parent decency thing and just, like, let me know where he's going to be. So yeah. I guess he was hidden from me or concealed or, you know, whatever the words are.

(Deposition Exhibit 14 marked for identification.)

Q Okay. Exhibit 14 is a document that you've produced with Bates stamp 1422. This is a copy of the order from earlier this year that allowed Dr. Ferraro's child custody evaluation report to be shared to -- with me and the Southern District of Indiana; is that correct?

A That's correct. I would note that this case is currently up on appeal. The decision is due by the Court of Appeals basically any day that could retroactively vacate this order. So I just want to note that as a possibility. In case it does, I would ask that, you know, the order and the report itself be removed and marked as confidential, if that happens.

(Deposition Exhibit 15 marked for identification.)

Q Well, preemptively let's go ahead, the next exhibit I'm going to show to you is Exhibit 15, which is a

CONFIDENTIAL

copy of that custody evaluation. And we can mark this and the -- and the testimony about it as confidential pursuant to this order.

A [redacted] s

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

CONFIDENTIAL

[redacted]

Q So let's hit my last three pages of my outline here
with the time that we've got remaining.
A Yeah.
Q I was trying to -- Count VII of the complaint is a
claim for intentional infliction of emotional
distress.
A Yeah.

Q "Ms. Hoffer intentionally inflicted emotional distress on Mr. Kenney-Prentiss." This is from the paragraph 5.31 of the complaint. "Ms. Hoffer's conduct toward Mr. Kenney-Prentiss was both extreme and outrageous."
What specific conduct do you allege by Ms. Hoffer was extreme and outrageous?
A This is going to take a long time to answer. There's a ton, right. Like, I don't even know where to start. You know, like keeping me and J apart for 190 days. Doing the ex parte order protection maliciously. Saying horrible things about me to all these third parties. You know, preventing me from having a relationship with my son's school. Years of abuse, right. Like, this goes back years.
I know we disagree with the statute of limitations thing, but I think legally it can be incorporated. Like, our entire history can be incorporated, right, so I think things like threatening suicide because I wouldn't be with her and threatening to keep J away from me forever and, you know, like, preventing me from engaging with family. You know, like we had a vacation planned that got kind of, you know, messed up because of

Stephanie's suicide threats, right.

Like, just a pattern of -- in retrospect, right, like, you'll see in my medical record -- or my therapy records that my therapist identified me as a victim of abuse even before I recognized it myself.

But yeah, it was just years of lying, dishonesty, intentional pain being inflicted, the whole nine yards, right, like, there's just so much.

You know, like it continues even to today, you know, right, where Stephanie's restricting mine and J's FaceTime communications to 30 minutes. Which, like, sometimes we talk for that long, but sometimes we want to talk for an hour or two, and, like, Stephanie, you know, doesn't have the force of law to do it. It was something that she just wanted to do, that she recommended it being included in the final order, right.

But, like, J hates the restriction. I hate the restriction. And it's, like, gotten rid of something -- you know, so J and I would do these things called movies where we'd be on FaceTime and he would say he has this character named Ajax, and there's a whole story behind that. But we do this

role playing thing where he is -- you know, Ajax is the captain of the enterprise and also the head of Ajaxion. And I voice all the other characters, and we have all these awesome like imagination games on FaceTime.

And at the same time, so this is back in, what, October, November, September, August of like 2025, so last year, where we were also reading the Percy Jackson books. So, like, we would read Percy Jackson, and then we would have a movie afterwards. Or we'd do the movie first and then read Percy Jackson. And J loved me reading Percy Jackson. And sometimes we'd be on the phone for, like, five, ten minutes because he wanted to do other things or swim, but sometimes we'd be on the phone for like two hours.

And when Stephanie put the 30-minute restriction on, like, the calls got so fraught with emotion in that, like, J felt pressure because he still wanted to read the Percy Jackson books. And because she limited it to 30 minutes, like, he would get angry with me for, like, not starting it immediately when I would call and because he wanted to keep reading the book, and he had like a limited amount of time. Like, he chose he wanted to read

the book, and we -- we stopped doing movies. We stopped having that -- sorry, I'm crying.

That, like, imagination game that was, like, one of our things. It was the thing that we did. And, like, she knew she was taking that away. Like, if you give her power over me, she's going to use it to inflict pain, and that's just a consistent thing that exists. And especially like having me move out, like, it has just been her modus operandi. And it's been hell.

Q This -- the limitation of the FaceTime calls to 30 minutes, is that pursuant to the custody order?

A That's what the custody order says, but the custody order is not in effect because it's been fully stayed since, what was it, November, right. Like, it was only in effect for, like, what, a couple days. But it's not in effect. And it's Stephanie's own restriction that she asked for, right, in her own proposed order. But the final order is not in effect at all right now. And it hasn't been.

Q But that was what the court ordered in paragraph 238, is that -- that you have FaceTime communications with JKP on Tuesday, Thursday, Saturday, and Sunday at 5 p.m. and the calls should

be limited to 30 minutes in duration?
A That's what Stephanie asked for and got.
Q That's what the Court entered?
A That's what Stephanie asked for and got. It's horrible.
Q But that is what the -- that is in the Court's order; correct?
A What paragraph is it?
Q 238.
A Yeah, that's what Stephanie requested and got. That's what I'll say about it.
Q And so you assert that her limitation of your FaceTime calls to 30 minutes in duration is an intentional infliction of emotional distress?
A Yeah.
Q Even though that's what the Court here ordered?
A Based on what she specifically asked for. That's what she's imposing despite the stay. And it's not being in effect at all.
Q Paragraph 5.32 of the complaint, you allege that your mental state deteriorated to the point of considering suicide and a myriad of harmful psychological effects; is that true?
A Yeah. Yes.
Q And is it true that you had suicidal ideations and

attempts before you met Ms. Hoffer?
A In middle school I attempted it. Not since then. And yeah, this was in late 2024, right, it was the first time that it was going to be a thing, right. It was going to be -- I was going to do it if I lost that thing.
Q And Dr. Ferraro's report provides more context with regard to past suicidal ideations and attempts?
A I don't know. I don't remember. Like, I got diagnosed with major depressive disorder as, you know, a young kid, right. Like, so, you know, and my dad killed himself, so it's been a part of, you know, the zeitgeist my whole life. And because it's like so, you know, a part of family stuff. Like, you think about it or you talk about it or you joke about it. But it really wasn't a serious thing, you know, until like where it was, you know, going to maybe happen was, like, with the protection order stuff. It was really bad.
Q Is it true that you had nightmares before you met Ms. Hoffer?
A I don't know how to answer that. I mean, everyone has nightmares. I remember nightmares as a kid, right, where, like, a shark was going to eat me or I had one a couple times where, like, dinosaurs

were coming into my grandma's house. But nothing like the nightmares, you know, because they've been consistent and just not great. They've been just bad. They become acute during periods of, like, her withholding J or preventing me from talking to him or like stuff like that. And I -- I've had some pretty bad ones about him. And it is -- you know, it's just -- it's not a fun experience.

Q Is it true that you had experienced insomnia before you met Ms. Hoffer?

A I don't know how to answer that. You know, because one thing to say, is it true that you've experienced sadness or anxiety or depression or, you know, name any emotion ever before meeting somebody when you were -- I don't know how to tell this, 27 or something. Yeah, of course I felt and had all of those things. Nightmares, because who doesn't have insomnia or, you know, nightmares and stuff.

But it's markedly different to say that since a certain event happens, like, there's been a marked change, right. It's the same thing that you asked earlier about in relationships and in breakups, isn't it true that people say bad things about each other. And yes, it's true. And it's

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES MICHAEL KENNEY-PRENTISS )
)
Plaintiff, )
)
-v- ) CASE NO.
) 1:25-cv-02018-MPB-MJD
STEPHANIE RENEE HOFFER, )
)
Defendant. )

Job No. 209186

I, JAMES MICHAEL KENNEY-PRENTISS, state that I have read the foregoing transcript of the testimony given by me at my deposition on July 31, 2026, and that said transcript constitutes a true and correct record of the testimony given by me at said deposition except as I have so indicated on the errata sheets provided herein.

______________________________
JAMES MICHAEL KENNEY-PRENTISS

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(800)869-0873

STATE OF INDIANA
COUNTY OF HENDRICKS

I, Debbi S. Austin, a Notary Public in and for said county and state, do hereby certify that the deponent herein was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Defendant; that said deposition was taken at the time and place heretofore mentioned between 12:01 p.m. and 8:27 p.m.;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction; and that the typewritten transcript is a true record of the testimony given by said deponent;

And thereafter presented to said witness for signature; that this certificate does not purport to acknowledge or verify the signature hereto of the deponent.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative of the attorneys for any of the parties.

IN WITNESS WHEREOF, I have hereunto set my

hand and affixed my notarial seal this 14th day of August, 2026.




My Commission Expires:
July 13, 2031

Job No. 209186