**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JAMES MICHAEL KENNEY-PRENTISS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-02018-MPB-MJD |
| v. | ) | |
| | ) | |
| STEPHANIE RENEE HOFFER, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

In this action, James Kenney-Prentiss asserts tort claims against Stephanie Hoffer relating to their failed romantic relationship, Hoffer's subsequent efforts to secure a protective order against Kenney-Prentiss, and their ongoing child custody dispute. The complaint includes eight remaining claims: (1) defamation, (2) invasion of privacy, (3) malicious prosecution, (4) abuse of process, (5) claims under the Indiana Crime Victims Relief Act ("CVRA"), (6) conversion, (7) intentional infliction of emotional distress, and (8) civil conspiracy.[1] Discovery has confirmed that the evidence fails to support any of his claims. Accordingly, Hoffer respectfully requests that summary judgment be granted in her favor.

## I. Statement of Material Facts Not in Dispute[2]

Kenney-Prentiss and Hoffer were in a romantic relationship which resulted in the birth of a child in 2017. (Dkt. 1, p.2.) They lived together in Zionsville, Indiana, from July 2020 until September 2023, when Kenney-Prentiss moved to Cleveland, Ohio. (*Id.* ¶¶ 10, 13.)

[1] Kenney-Prentiss also asserted a claim for "tortious interference with parenting rights," which the Court rightly dismissed in response to a partial motion to dismiss filed by Hoffer. (Dkt. 29 at 3.)

[2] Hoffer sets forth these facts as undisputed solely for purposes of summary judgment.

On August 29, 2022, Kenney-Prentiss and Hoffer had a sexual encounter, but dispute whether Hoffer gave consent. According to Kenney-Prentiss, he went to Hoffer's bedroom uninvited, told her that he was there "to use [her]," received no verbal response from Hoffer, had sex with her, and then left. (Dkt. 65-1 at 41-45 (Kenney-Prentiss Dep. at 57:4-61:17).) In their text communications immediately following the incident, Hoffer noted her lack of consent. (*Id.* and Dkt. 65-5 at 4 (Dep. Ex. 8 ("This was not even close to consent.")).) Hoffer has confided in a few women close to her and two therapists that she did not give consent. (*See* Dkt. 65-6 at 10-17 (Kenney-Prentiss Dep. Ex. 10, Interrogatory No. 2).)

On November 10, 2023, after they had separated and Kenney-Prentiss moved to Cleveland, Hoffer messaged Kenney-Prentiss to let him know that a new au pair would be arriving in early 2024 and asking that he remove his personal property in the week following Thanksgiving 2023. (Dkt. 65-1 at 224-228 (Kenney-Prentiss Dep. at 245:6-249:21); Dkt. 65-9 (Dep. Ex. 13).) Hoffer advised Kenney-Prentiss that if he did not respond by the end of the weekend, she would make arrangements to have his belongings moved to storage. (*Id.*) When Kenney-Prentiss failed to retrieve the personal property, Hoffer paid movers to take it to a storage facility and also paid the first four months' storage fees to keep it there. (Dkt. 65-10, Declaration of Stephanie Hoffer ("Hoffer Decl.") ¶ 2.) Kenney-Prentiss alone has access to the storage facility and can remove the property whenever he wants. (Dkt. 65-1 at 226 (Kenney-Prentiss Dep. at 247:8-247:22).) In fact, he has taken a "few small things," but cannot fit the larger items like his bed, dresser, and books into his Prius. (*Id.*)

On November 13, 2023, Hoffer and Kenney-Prentiss had a FaceTime call in which Hoffer warned Kenney-Prentiss in the presence of his current romantic partner (Yana Yakutilovi) and her children's au pair (Ophie Bornemann) that Kenney-Prentiss was at risk

for being a carrier for HPV ("human papilloma virus"), as he had been intimate with Hoffer, who was also a carrier of the virus. (Dkt. 65-1 at 25-36 (Kenney-Prentiss Dep. at 41:4-52:2); Dkt. 65-4 (Dep. Ex. 6).) Hoffer told Kenney-Prentiss that Yana needed to "know the truth, and that if [he] didn't tell her everything, it wasn't consent." (Dkt. 65-1 at 33-34 (Kenney-Prentiss Dep. at 49:21-50:19).) Hoffer did so based out of a feeling of moral obligation, as she believed that Kenney-Prentiss' future partner should be aware of the potential risks to adequately provide consent. (Dkt. 65-10 (Hoffer Decl. ¶ 3).) Kenney-Prentiss also disclosed to Yana that he was at risk for being a carrier of HPV. (Dkt. 65-1 at 28 (Kenney-Prentiss Dep. 44:3-44:20).) He has never been tested for the virus. (*Id.* at 29 (45:5-45:7).) Following the call, Kenney-Prentiss sent Hoffer an email, calling her a "monster" and "vile, immature, self-centered, despicable, wrong, immoral, narcissistic, disgusting, evil, childish, [and] unfit to be a parent." (*Id.* at 45:8-45:20.)

On February 27, 2024, Hoffer filed a petition for a protective order against Kenney-Prentiss, citing past communications and actions that she alleged to be stalking and harassing, including some of their interactions described herein. (Dkt. 65-1 at 198-199 (Kenney-Prentiss Dep. 215:11-216:12); Dkt. 65-7 at 6-43 (Dep. Ex. 11).) Among other things, on September 21, 2023, Kenney-Prentiss called Hoffer more than 150 times over the course of one night. (Dkt. 65-1 at 206-212 (Kenney-Prentiss Dep. 225:6-231:5).) In completing the petition for protective order (on a form provided by the Indiana Judicial Branch website), Hoffer checked the boxes requesting the various means of relief offered on the form. (*See* Dkt. 65-1 at 214-217 (Kenney-Prentiss Dep. at 233:22-236:16); Dkts. 65-7 and 65-8 (Dep. Exs. 11, 12.)

The Indiana Court of Appeals has summarized the order of events that followed as it pertains to the protective order:

> After their volatile romantic relationship ended and their co-parenting became equally problematic, [Hoffer] petitioned for a protective order against [Kenney-Prentiss], alleging he stalked her and engaged in a pattern of harassment against her. The trial court granted an ex parte order for protection, and [Kenney-Prentiss] later moved for summary judgment on [Hoffer's] protective order petition. [Kenney-Prentiss'] motion also sought an award of attorney fees based on his view that [Hoffer's] petition was frivolous and filed in bad faith. The trial court denied [Kenney-Prentiss'] motion as well as the motion to reconsider that [Kenney-Prentiss] filed afterward.
>
> The trial court then conducted an evidentiary hearing on [Hoffer's] petition for protective order at which [Hoffer] presented hundreds of written communications that the parties had exchanged during the six months before the issuance of the ex parte order for protection. In these communications, [Kenney-Prentiss] was often profane as he repeatedly accused [Hoffer] of bad parenting, poor character, and undiagnosed mental illness. [Kenney-Prentiss] also repeatedly told [Hoffer] that he and Child would be better off without [Hoffer] in their lives. And he repeatedly turned discussions to his and [Hoffer's] prior romantic relationship despite [Hoffer's] requests in the communications that she and [Kenney-Prentiss] only discuss matters involving Child.

(Dkt. 65-1 at 7-8 (Kenney-Prentiss Dep. at 20:14-21:3); Dkt. 65-2 at 3 (Dep. Ex. 1).) Kenney-Prentiss acknowledges that the Court of Appeals' summary was generally an accurate description of his past relationship with Hoffer, although he took issue with how "repeatedly" he may have done certain things. (Dkt. 65-1 at 8-15 (Kenney-Prentiss Dep. at 21:6-28:23).)

On December 18, 2024, after holding a hearing on the petition for a protective order, the state court trial judge denied Hoffer's request for a protective order, but, at the same time, imposed limits on Kenney-Prentiss' communications with Hoffer:

> It is further ordered that the same, this Order, does not constitute an unfettered license to communicate directly with [Hoffer] – for though [Kenney-Prentiss] may offer communication to [Hoffer], whether it is responded to or even accepted is up to her.

> Communication should be limited to that necessary for the parties to complete their legal affairs and said communication with [Hoffer], on her election, may be by and through her counsel, Mr. Drew Kirages, or other such attorney as the case may be.

(Dkt. 65-1 at 16-18 (Kenney-Prentiss Dep. 29:1-31:23); Dkt. 65-3 at 2 (Dep. Ex. 2).)

In the interim, on September 22, 2024, Kenney-Prentiss filed a paternity action in Boone County Circuit Court, styled as *In the Matter of the Paternity of James M. Kenney-Prentiss, II*, Case No. 06C01-2407-JP-245 (Boone County Circuit Court). In that action, the parties have been involved in a custodial dispute over their minor son.

On July 10, 2025, the Boone County Circuit Court held a final hearing in the custodial matter. On October 6, 2025, the court entered Findings of Fact and Conclusions of Law, granting sole legal custody and primary physical custody of the child to Hoffer. (Dkt. 50-9.)

In its order, the Boone County Circuit Court issued fees and expenses against Kenney-Prentiss for his litigation conduct and the significant economic impact it had on Hoffer and her family, finding * that Hoffer had spent $160,000 in attorneys' fees in the custodial dispute alone and had also paid $28,881.00 to the court-appointed custody evaluator (with no contribution from Kenney-Prentiss for the custodial evaluation), * that Kenney-Prentiss had provided the custodial evaluator "with more documentation to review than any other party to a custodial evaluation that he can recall," * that Kenney-Prentiss's "unusual and aggressive manner of litigating th[e] case was neither customary nor necessary, and it resulted in fees to [Hoffer] that could have otherwise gone to support [the minor child] and the family," * that Hoffer had taken "out a second mortgage on her home to have representation against [Kenney-Prentiss's] many motions and discovery requests," * that the Court had "advised [Kenney-Prentiss] that his manner of litigation was bordering on abuse of process … yet he

continued litigating in a similar manner for the next 9 months," and * that Kenney-Prentiss's "unwarranted conduct in th[e] case cost [Hoffer] substantially more in attorney's fees than was reasonable and typical for a case of this kind, and it was not in [the minor child's] best interest." (*See* Dkt. 50-9 at 36- 37 (Oct. 6, 2025 Findings of Fact and Conclusions of Law).)

As a result, the court ordered Kenney-Prentiss pay to Hoffer $45,000 toward Hoffer's attorney's fees and $8,000 toward reimbursement of the custodial evaluator. (*Id.*) That order is currently stayed while an appeal by Kenney-Prentiss is pending. Kenney-Prentiss has not paid the amounts awarded to Hoffer in the order.

## II. Legal Standard

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). "Once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). If the nonmoving party fails to proffer such evidence, summary judgment must be granted. *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 662 (7th Cir. 2011). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

## III. Legal Argument

### A. Numerous accusations by Kenney-Prentiss against Hoffer are time-barred by Indiana's two-year statute of limitations.

Indiana's two-year statute of limitations applies to tort claims for injury to person or character or personal property. *See* Ind. Code § 34-11-2-4(a) ("An action for: (1) injury to

person or character; [or] (2) injury to personal property . . . must be commenced within two (2) years after the cause of action accrues.”).

Kenney-Prentiss filed this lawsuit on October 2, 2025. Kenney-Prentiss asserts that Hoffer made numerous defamatory statements, invaded his privacy, and engaged in intentional infliction of emotional distress with regard to statements and actions that predate the two-year lookback period of the statute of limitations. (*See, e.g.*, Dkt. 65-6 (Dep. Ex. 10).) However, any statement or action by Hoffer alleged to be unlawful but that occurred more than two years prior to the filing of the complaint should be time-barred.

Even if the Court were to find that alleged statements made prior to October 2, 2023 (and which go as far back as 2018, *see* Dkt. 65-6 at 10-13, 17 (Dep. Ex. 10, Interrogatory 2)), are not time-barred, the statements otherwise fail as a matter of law for the same reasons discussed at length below. Specifically, they do not carry a defamatory imputation, are entitled to a qualified privilege, and there is no evidence that they have caused Kenney-Prentiss any pecuniary harm.

**B. The defamation claims fail based upon the undisputed evidence. (Count 1)**

“The general elements of defamation are: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages.” *Mourning v. Allison Transmission, Inc.*, 72 N.E.3d 482, 489 (Ind. Ct. App. 2017). “Whether a communication is defamatory or not is a question of law for the court, unless the communication is susceptible to either a defamatory or nondefamatory interpretation—in which case the matter may be submitted to the jury.” *Kelley v. Tanoos*, 865 N.E.2d 593, 596-97 (Ind. 2007). “A defamatory communication is said to either be ‘defamatory per se’ or ‘defamatory per quod.’ A communication is defamatory per se if it imputes: (1) criminal conduct; (2) a loathsome

disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." *Id.* "All other defamatory communications are defamatory per quod." *Id.* "In an action for defamation per quod, the plaintiff must demonstrate special damages." *Kelley*, 865 N.E.2d at 596-97. "[S]pecial damages are pecuniary loss." *N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 306 (Ind. Ct. App. 1999) (Robb, J., concurring).

There are several key defenses and privileges as it relates to defamation.

First: Truth. "In order to impose liability for defamation, the United States Constitution requires a false statement of fact." *J.-Gazette Co. v. Bandido's, Inc.*, 712 N.E.2d 446, 457 (Ind. 1999). "'A statement is not defamatory unless it conveys a defamatory imputation *of fact* ....'" *DeOreo v. Dudzinski*, 253 N.E.3d 577 (Ind. Ct. App. 2025) (quoting *Brewington v. State*, 7 N.E.3d 946, 960 (Ind. 2014) (emphasis in original)). "Whether a statement conveys a defamatory imputation of fact is determined under a 'reasonable-person inquiry' and presents a question of law for the court." *Id.*

Second, "[a] qualified privilege protects 'communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty.'" *Kelley*, 865 N.E.2d at 597 (citation omitted). Such a privilege can exist between social organizations, church members, business partners, and employers and employees. *See Cortez v. Jo-Ann Stores, Inc.*, 827 N.E.2d 1223, 1232-1234 (Ind. Ct. App. 2005). "In the absence of a factual dispute, the applicability of the privilege is a question of law to be determined by the court." *Kelley*, 865 N.E.2d at 597. "Once [a] communication is established as qualifiedly privileged, the plaintiff then has the burden of

overcoming that privilege by showing that it has been abused." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992)

Finally, "Indiana law has long recognized an absolute privilege that protects all relevant statements made in the course of a judicial proceeding, regardless of the truth or motive behind the statements." *Hartman v. Keri*, 883 N.E.2d 774, 777 (Ind. 2008).

In discovery, Hoffer asked Kenney-Prentiss to identify with specificity alleged defamatory statements by Hoffer. In response, Kenney-Prentiss identified over one hundred statements, many of which occurred outside the time frame allowed by the statute of limitations (i.e., prior to October 2, 2023). (*See* Dkt. 65-1 at 55-57 (Kenney-Prentiss Dep. 71:2-73:20); Dkt. 65-6 at 10-17 (Dep. Ex. 10, Interrogatory No. 2).) Hoffer is entitled to judgment on all such statements that occurred prior to October 2, 2023. *See* Part III.A *supra*.

Of those statements made within the limitations period, the undisputed evidence demonstrates that they are not actionable for various reasons, including because they do not have a defamatory imputation or are otherwise privileged. Each statement is addressed in turn, utilizing the legal framework set forth above:

- <u>[1] On October 24, 2023, Ms. Hoffer stated the following to Carrie Hagan: "I panic wrote to the school because James was having that weird meltdown about bugs."</u>

This statement was not defamatory, is entitled to privilege, and caused Kenney-Prentiss no damage. First, the statement was true. In or about September 2023, Kenney-Prentiss was preparing to move out and utilizing old cardboard boxes. In doing so, he experienced what he believed was a mite bite. In his deposition, Kenney-Prentiss stated that he called Hoffer about it and they both began "freaking out" and "spiraling" about it, including the possibility that he might transport mites to his grandmother's house. (Dkt. 65-1 at 61-69 (Kenney-Prentiss Dep. 77:13-85:13).) Kenney-Prentiss takes issue with Hoffer

describing his reaction as a "meltdown about bugs," arguing that he did not "meltdown" and his concerns were much more complex than just the bugs. (*See id.*) But those sorts of characterizations do not make Hoffer's account untrue, nor do they have a defamatory imputation. And Kenney-Prentiss has no evidence of any special damages resulting from it. (Dkt. 65-1 at 69-71 (Kenney-Prentiss Dep. at 85:14-87:25).)

- [2] On October 30, 2023, Ms. Hoffer stated the following to Jen Hilton and Tammy Mazelin: "I told him that his dad hadn't been happy here because everyone's brain is different, and his dad's brain needs lots and lots of contact with family and friends to stay happy."

This statement was also not defamatory, is entitled to privilege, and caused Kenney-Prentiss no damage. Ms. Hilton is the teacher of the Hoffer's and Kenney-Prentiss's child, and Ms. Mazelin is also school personnel. (Dkt. 65-1 at 72-77 (Kenney-Prentiss Dep. at 88:1-93:22).) Hoffer's explanation to them about how she tried to explain to her minor son about why his father left is not defamatory and is entitled to a qualified privilege. *Garson v. Hendlin*, 141 A.D. 55, 62 (N.Y. App. Div. 1988) (providing information to aid probation department's investigation was entitled to "qualified privilege arising by virtue of the defendant's significant familial interest in furthering the welfare of the Garson children"). As to alleged damages, Kenney-Prentiss only learned of the comment through discovery in the state cases, suffered no pecuniary harm from the comment, and has never even tried to contact these school personnel. (Dkt. 65-1 at 77--81 (Kenney-Prentiss Dep. at 93:23-97:2).)

- [3] On October 30, 2023, Ms. Hoffer stated the following to Jen Hilton and Tammy Mazelin: "James's dad refuses to communicate with me at all ever since I asked him to use the Our Family Wizard app."

This statement was also not defamatory and caused Kenney-Prentiss no damage. Telling the teachers that Kenney-Prentiss refused to communicate with Hoffer after she

insisted on the use of a particular application does not carry a defamatory imputation. Moreover, Kenney-Prentiss has no evidence of pecuniary harm to support such a claim, as he contends it relates solely to his relationship with the school, which he has not tried to contact. (Dkt. 65-1 at 77-81, 83 (Kenney-Prentiss Dep. at 99:11-99:20, 93:23-97:2).)

- [4] On October 30, 2023, Ms. Hoffer stated the following to Jen Hilton and Tammy Mazelin: "I've heard him say to J on FaceTime a couple of times recently that he is going to take J out of school on Friday and take him to Cleveland."; [5] On October 30, 2023, Ms. Hoffer stated the following to Jen Hilton and Tammy Mazelin: "I think it will be super upsetting for J to be spirited out of school for a long car trip to a place he doesn't want to go."

These statements are not defamatory, are entitled to a qualified privilege, and caused Kenney-Prentiss no economic harm. Kenney-Prentiss seeks to characterize these statements as implying that he would kidnap his son and take him across state lines, (Dkt. 65-1 at 83-86 (Kenney-Prentiss Dep. at 99:21-101:8, 101:16-102:20)), but he reads too much into them. As a mother, Hoffer is entitled to provide her opinion as to how the removal of her child from school by his father might emotionally affect the child. Moreover, Kenney-Prentiss has no evidence of pecuniary harm. While he contends that the statements impute criminal conduct to him, (Dkt. 65-1 at 85 (Kenney-Prentiss Dep. 101:9-101:15)), they simply do not.

- [6] On November 13, 2023, Ms. Hoffer stated the following to Yana: "He is carrying high-risk HPV for which there is no vaccine coverage."; [7] On November 13, 2023, Ms. Hoffer stated the following to Ophi Bornemann: "He is carrying high-risk HPV for which there is no vaccine coverage." [8] On November 13, 2023, Ms. Hoffer stated the following to Ophi Bornemann: "He doesn't tell people."

As noted above, "[a] qualified privilege protects 'communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty.'" *Kelley*, 865 N.E.2d at 597. Here, Hoffer

has been diagnosed with high-risk HPV for which there is no vaccine coverage and had been sexually intimate with Kenney-Prentiss. (Dkt. 65-10 (Hoffer Decl. ¶ 3).) To the extent that she shared information with Kenney-Prentiss's next presumed sexual partner (Yana) in the presence of another woman (Ophi) that Kenney-Prentiss was the potential carrier of that virus, Hoffer did so within the qualified privilege. Indeed, Hoffer acted in good faith under a moral obligation to another woman to assure that the woman was aware of the potential risks associated given his contact with the virus through Hoffer. (*Id.*)

- [9] On November 17, 2023, Ms. Hoffer stated the following to Stephanie [Shaffer]: "He started to swear at me, telling me to fuck off because I am a fucking evil narcissist. The kids were all sitting there."

This was true, is not defamatory, and is entitled to a qualified privilege. Kenney-Prentiss also suffered no special damages from it. Ms. Shaffer is Hoffer's aunt. (Dkt. 65-1 at 92 (Kenney-Prentiss Dep. 108:7-108:10).) Kenney-Prentiss acknowledges that he has sworn at Hoffer, told her to fuck off, and accused her of being a fucking evil narcissist (or words to that effect). (*Id.* at 93-96 (109:2-112:7).) He denies saying those particular words in front of the children but admits that he swore around them. (*Id.*) Finally, Kenney-Prentiss has no economic harm from the statement, as he admits that he has met Hoffer's aunt on only one occasion and that he has no personal or financial interactions with her. (*Id.* at 97-99 (113:7-115:24).)

- [10] On November 17, 2023, Ms. Hoffer stated the following to Stephanie [Shaffer]: "James asked again and again to talk to J after dinner, and J finally looked at me and sort of desperately asked if he could talk to dad after dinner. It was screamingly obvious that he didn't want to."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 96-97 (Kenney-Prentiss Dep. at 112:8-113:6).)

- [11] On December 19, 2023, Ms. Hoffer stated the following to Ophi Bornemann: "The James thing is a long story. He sent me a message in the app last night that made me worry that he was having a mental health crisis. He asked me to please call him, and because I was concerned for his safety, I did. Then he proposed marriage. But not in a good way."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 99-100 (Kenney-Prentiss Dep. 115:25-116:9).)

- [12] On March 4, 2024, Ms. Hoffer stated the following to Maggie Ioannacci, Jen Hilton and Tammy Mazelin: "Without getting into the details, I thought, and a court agreed, that it was necessary for our safety at the moment."

This statement was not defamatory, was entitled to a qualified privilege, and caused Kenney-Prentiss no damages. Hoffer sought and obtained an ex parte order of protection in February 2024. (*See* Dkt. 65-3 (Dep. Ex. 2).) Explaining to school staff her thoughts about seeking such relief—and that it had been agreed upon by the court—is entitled to the qualified privilege, particularly given that Hoffer did not abuse the privilege by "getting into the details." Kenney-Prentiss contends that Hoffer should have said that a court agree that it was necessary "for *her* safety at the moment," (Dkt. 65-1 at 101 (Kenney-Prentiss Dep. 117:2-117:24)), but that distinction does not make her statement defamatory. And Kenney-Prentiss has suffered no pecuniary harm from it. (*See* Dkt. 65-1 at 101-103 (Kenney-Prentiss Dep. 117:25-119:6).)

- [13] On March 4, 2024, Ms. Hoffer stated the following to Maggie Ioannacci, Jen Hilton and Tammy Mazelin: "For the time being, and for the next two years if the order remains in place, James's dad should not pick him up from the school."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 103-105 (Kenney-Prentiss Dep. at 119:7-121:1).)

- [14] On March 5, 2024, Ms. Hoffer stated the following to Maggie Ioannacci: "It makes sense to enter the protective-order information for G[] and L[]too, though I

would be shocked if there were a problem with James trying to pick them up. Better to be safe."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 105-106 (Kenney-Prentiss Dep. at 121:2-122:7).)

- [15] On April 5, 2024, Ms. Hoffer stated the following to Stephanie [Shaffer] [Hoffer's aunt]: "Mostly he's been funneling information through poor J."

This statement was not defamatory because it was true. While he denies using his son as a means of getting information to Hoffer, Kenney-Prentiss acknowledges that he *did* seek to learn information through his son. (*See* Dkt. 65-1 at 106-109 (Kenny-Prentiss Dep. at 122:17-125:6).) Additionally, the statement did not have any defamatory imputation, nor did it cause Kenney-Prentiss any damages. Kenney-Prentiss acknowledges that he has no pecuniary relationship with Ms. Shaffer and suffered no monetary harm from the alleged statement. (Dkt. 65-1 at 109-110 (Kenney-Prentiss Dep. at 125:7-126:16).)

- [16] On April 5, 2024, Ms. Hoffer stated the following to Stephanie [Shaffer]: "James does everything he can to make me miserable, and he pretends that it's so he can spend extra time with J."

This statement from Hoffer to her aunt, expressing her views about Kenney-Prentiss's actions and motivations toward her are not defamatory and are otherwise entitled to the qualified privilege. They also caused Kenney-Prentiss no damages.

- [17] On April 5, 2024, Ms. Hoffer stated the following to Stephanie [Shaffer]: "In the meantime, he leaves J hanging at bedtime with no one to read him a story and tuck him in."

This statement should receive short shrift. Hoffer's statement to her aunt that Kenney-Prentiss left their child "hanging at bedtime with no one to read him a story and tuck him in," is not defamation. It does not have a defamatory imputation, was entitled to a qualified privilege, and caused Kenney-Prentiss no damage.

- [18] On April 6, 2024, Ms. Hoffer stated the following to Denise Petolino: "James has J. I am having trouble getting him to bring J back."; [19] On April 8, 2024, Ms. Hoffer stated the following to Denise Petolino: "He won't tell anyone where they are going."; [20] On April 8, 2024, Ms. Hoffer stated the following to Denise Petolino: "J called me yesterday several times weeping because he had wanted to meet me in Columbus."

Ms. Petolino is Hoffer's next-door neighbor. (Dkt. 65-1 at 116 (Kenney-Prentiss Dep. at 132:14-132:15).) Kenney-Prentiss concedes that he had their child-in-common during this time frame and that Hoffer raised challenges to when and where to meet to exchange the child, but contends that the statements that Hoffer was having trouble getting the child back, that he would not tell anyone where they were going, or that the child cried because he wanted to meet Hoffer in Columbus, are false. (Dkt. 65-1 at 116-120 (Kenney-Prentiss Dep. at 132:16-136:11).) Yet, the statements do not carry a defamatory imputation and are entitled to a qualified privilege (as neighbors can have the sort of close relationship akin to family or close friends). Most importantly, Kenney-Prentiss has no evidence of any pecuniary harm from the statement, as he has no evidence that it has affected his employability in either Indiana or Ohio. (Dkt. 65-1 at 120-123 (Kenney-Prentiss Dep. at 136:12-139:13).)

- [21] On April 2024, Ms. Hoffer stated the following to Cre: "His dad refused to bring him back. He was supposed to be back yesterday at 1:00."; [22] On April 2024, Ms. Hoffer stated the following to Cre: "I had to request a protection order. The court granted it, but J's dad requested a hearing. He's straight crazy."

"Cre" is a law professor and part of Hoffer's "friends circle and professional circle." (Dkt. 65-1 at 123-124 (Kenney-Prentiss Dep. at 139:21-140:10).) Kenney-Prentiss contends that the statements are untrue. But, in fact, Hoffer did request a protection order, which was granted, and Kenney-Prentiss did request a hearing. Her comments about a dispute over the timing of the return of the child are not defamatory. And, most importantly, Kenney-Prentiss has no proof of any special damages from the alleged statements. (Dkt. 65-1 at 124-126

(Kenney-Prentiss Dep. 140:24-142:21).) *See Lovings v. Thomas*, 805 N.E.2d 442, 447-448 (Ind. Ct. App. 2004) (collecting cases with various obnoxious remarks that did not amount to defamation per se and granting summary judgment because plaintiff failed to present any evidence of pecuniary harm).

- [23] On June 7, 2024, Ms. Hoffer stated the following to Stephanie [Shaffer]: "They are getting along so much better. J especially is really coming out of his shell and being a lot more kind to his brothers and the kids at school. Removing James and adding Greta made a huge difference for all of us."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 126-127 (Kenney-Prentiss Dep. at 142:22-143:19).)

- [24] On August 12, 2024, Ms. Hoffer stated the following to Shannon Hall: "James's father, who lives in Cleveland, is the subject of a protection order. He is not permitted to come to the school and should not be allowed to pick James up."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 127-128 (Kenney-Prentiss Dep. at 143:20-144:13).)

- [25] On August 12, 2024, Ms. Hoffer stated the following to Shannon Hall: "On the advice of my lawyer, who feared that his father would enroll him in school in Cleveland, I said no."

Ms. Hall is the teacher of the child-in-common. (Dkt. 65-1 at 127 (Kenney-Prentiss Dep. at 143:20-143:24).) There is nothing defamatory about the statement. Kenney-Prentiss tries to wrap it into the "bigger conversation" that there was "an acute risk that [he] would commit criminal conduct, like, and kidnap my son…." (*Id.* at 128-129 (144:25-145:13).) But that is not a reasonable implication of the actual statement. Moreover, while Kenney-Prentiss contends that the comment has made him hesitant to put himself out in the marketplace, he has identified no actual economic damages from the statement. (*Id.* at 129-131 (145:19-147:14).)

- [26] On September 29, 2024, Ms. Hoffer stated the following to David Perry: "I can't believe how nasty he was to J about it."; [27] On September 29, 2024, Ms. Hoffer stated the following to David Perry: "I hate that James gaslighted him like that, telling him that they had not talked at all today. J looked really confused."; [28] On November 23, 2024, Ms. Hoffer stated the following to David Perry: "If James finds out that he is at your place, he is going to make a ton of filings about everything under the sun that will put me even further behind." [29] On November 23, 2024, Ms. Hoffer stated the following to David Perry: "J having a sleepover with you guys always ends up with me getting punished."

These statements were not defamatory. Hoffer's comments to Mr. Perry, the co-parent of her other children, regarding her beliefs about how "nasty" Kenney-Prentiss was, that she hated that Kenney-Prentiss had "gaslighted him like that", that Kenney-Prentiss would "make a ton of filings … that will put me even further behind," and that her son "having a sleepover with you guys always ends up with me getting punished" are the sorts of opinions entitled to the qualified privilege between co-parents navigating a difficult co-parent. Indeed, Hoffer's comments were prescient, as she has had to deal with Kenney-Prentiss' myriad filings, costing her hundreds of thousands of dollars, and as the child-in-common's sleepovers with his brothers at Mr. Perry's house have been weaponized by Kenney-Prentiss in this lawsuit to allege criminal concealment. (*See* Part III.F *infra*.) Moreover, Kenney-Prentiss has no evidence of any special damages from the comments, as he has no pecuniary relationship with Mr. Perry, has never sought a job in Indiana, and has no knowledge of Mr. Perry ever sharing the comment with any employer or prospective employer. (Dkt. 65-1 at 131-132 (Kenney-Prentiss Dep. at 147:25-148:17).) Hoffer is entitled to judgment in her favor.

- [30] On January 8, 2025, Ms. Hoffer stated the following to Stacy Smith and Jodi Morrow: "The order says that James will have J for spring break. He otherwise does not have any parenting time. I would appreciate it if someone would let me know ASAP if James comes to pick up J. He is not supposed to."

This comment to school personnel was not defamatory, is entitled to the qualified privilege, and caused Kenney-Prentiss no economic harm. Hoffer's true statement that Kenney-Prentiss did not have parenting time beyond the order that directed that he have the child for spring break was not defamatory, nor was her reasonable request to a limited set of school staff to let her know if he came to pick up the child. (Dkt. 65-1 at 132-135 (Kenney-Prentiss Dep. at 148:18-151:16).) Kenney-Prentiss also has no evidence of any economic harm resulting from the statement. (*Id.* at 135-136 (151:17-152:22).)

- [31] On January 12, 2025, Ms. Hoffer stated the following to David Perry: "James is not well, I don't think, and I don't want to push him back into filing tons of stuff."

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 136-137 (Kenney-Prentiss Dep. at 152:23-153:20).)

- [32] On February 2, 2025, Ms. Hoffer stated the following to David Perry: "What if this unleashes another torrent of abusive filings? I really feel like I'm always crouched in a corner trying not to make noise so that he doesn't come after me." [33] On February 2, 2025, Ms. Hoffer stated the following to David Perry: "To say that he is all over the place in this last six weeks would be an understatement. J can't grow up in that environment. It's just not stable." [34] On February 2, 2025, Ms. Hoffer stated the following to David Perry: "There is a significant risk that they will see him as quirky and a bit intense and not understand or be able to see the profound effect that it has had on J when he moved. It's like having a completely different, stabilized child."

These statements were not defamatory and are entitled to a qualified privilege. As noted by the state court, Kenney-Prentiss *has* filed a torrent of filings, for which the state court awarded Hoffer a portion of her fees. And Hoffer's expression of her feelings (in addition to being reasonable) are not defamatory. Mr. Perry is the co-parent of her other children and someone who she considers to be one of her closest friends and a family member. (Dkt. 65-10 (Hoffer Decl. ¶ 9).) Moreover, Kenney-Prentiss has no evidence of any special damages from the comments, as he has no pecuniary relationship with Mr. Perry, has never sought a

job in Indiana, and has no knowledge of Mr. Perry ever sharing the comment with any employer or prospective employer. (Dkt. 65-1 at 140-141 (Kenney-Prentiss Dep. at 156:7-157:1).) Hoffer is entitled to judgment in her favor.

- [35] On April 8, 2025, Ms. Hoffer stated the following to David Perry: "The principal and vice principal and half the faculty of the school were standing there, as if everyone didn't already think that I'm some kind of monster because of James's DCS complaint."; [36] On April 8, 2025, Ms. Hoffer stated the following to David Perry: "There's worse coming from James. He just does everything he can to let me know that he is never going to let me live a normal peaceful life."; [37] On April 8, 2025, Ms. Hoffer stated the following to David Perry: "He obviously didn't sleep or eat right. His schedule is totally off, and he came back sick again."; [38] On April 8, 2025, Ms. Hoffer stated the following to David Perry: "James is an absolute wave of destruction, and I don't know why he thinks what he is doing is okay or good for J."

As discussed above, these statements of opinion regarding how Hoffer was perceived by school staff after Kenney-Prentiss filed a DCS complaint, her belief that he was "never going to let [her] live a normal peaceful life," her observation that her child did not sleep or eat right, was off-schedule and sick, and her feeling that Kenney-Prentiss is "an absolute wave of destruction" are entitled to a qualified privilege. And Kenney-Prentiss has no evidence of any special damages from the comments, as he has no pecuniary relationship with Mr. Perry, has never sought a job in Indiana, and has no knowledge of Mr. Perry ever sharing these comment with any employer or prospective employer. (Dkt. 65-1 at 140-141 (Kenney-Prentiss Dep. 156:7-157:1).)

- [39] On a screenshot message, Ms. Hoffer stated the following to Amanda: "James filed a request for a protective order asking the court to remove G[] from the house. He's accusing G[] of [REDACTED]. I'm pretty sure this is a ploy to get the judge to order that J be moved to Cleveland with James. It's so weirdly awful."

These comments by Hoffer to "Amanda" are not defamatory because they are true and because they are entitled to a qualified privilege. In fact, Kenney-Prentiss had filed a

request for a protective order, which, if granted, would have resulted in either "G" (Hoffer's oldest son) or "J" (the child-in-common) not being allowed to stay overnight in the same house. (Dkt. 65-1 at 141-142,150 (Kenney-Prentiss Dep. 157:7-158:12, 167:4-167:22).) Kenney-Prentiss also experienced no specific economic damage from the statement, dooming this claim. (*Id.* at 152-153 (169:21-170:12).)

- [40] On the dates and to the recipients identified above, Ms. Hoffer made or repeated statements portraying Plaintiff as abusive, dangerous, mentally unstable, or harmful to Child or other children in the household, including the specific statements listed in this response.

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 153 (Kenney-Prentiss Dep. at 170:13-170:23).)

- [41] On an unknown date, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff raped her.

Kenney-Prentiss has acknowledged that this statement is taken from Ms. Bornemann's deposition testimony, in which she acknowledged Hoffer telling her about the August 29, 2022 sexual encounter between Kenney-Prentiss and Hoffer, for which Hoffer has consistently denied giving Kenney-Prentiss consent. Even crediting Kenney-Prentiss' account, he went to Hoffer's bedroom uninvited, told her that he was there "to use [her]," did not receive verbal consent from Hoffer, had sex with her, and Hoffer immediately noted her lack of consent. (Dkt. 65-1 at 41-45 (Kenney-Prentiss Dep. at 57:4-61:17); Dkt. 65-5 at 4 (Dep. Ex. 8) ("This was not even close to consent.")).)

While the parties may have different views of the incident, that does not make Hoffer's experience or perception of what happened untrue, invalid, or defamatory. The Court should "not lightly apply a framework commonly applied to public statements about third parties in this most personal of contexts: a conversation with intimates about your own possible sexual

assault." *Doe v. University of Dayton*, 766 F. App'x 275, 289-90 (6th Cir. 2019) (unpublished). Nor should the Court "disregard the risk that victims of sexual assault could be dissuaded from sharing their experiences—and so from seeking support, justice, and treatment—by looming defamation suits." *Id.*

Hoffer's description of her experience with the au pair, who lived with the family for over a year, was the equivalent of a close family member, is entitled to a qualified privilege. *See Doe*, 766 F. App'x at 289-90 (noting that "[p]rivate statements to friends are not the type of utterances commonly thought of as giving rise to defamation claims," and finding that woman's "alleged statements to six friends and roommates that [plaintiff] sexually assaulted her"—"an incident that personally involved her to a small number of friends and roommates who shared an interest in her health and well-being"—was entitled to qualified privilege); *Garson*, 141 A.D. at 62 ("[I]t has been 'generally agreed that a qualified privilege attaches to communications relative to family matters, made in good faith to the proper parties, by members of a family, intimate friends, and third persons under a duty to speak.'" (collecting authority)).

- [42] On an unknown date, Ms. Hoffer stated the following to Carrie Hagan: Plaintiff forced her to have non-consensual sex.

This claim fails both because the alleged statement is true and because it is privileged. As noted above, Hoffer did not provide consent to Kenney-Prentiss prior to their sexual encounter on August 29, 2022. Moreover, the statement is entitled to a qualified privilege, because Ms. Hagan is a law professor and a close legal and personal confidant of Hoffer. (Dkt. 65-10 (Hoffer Decl. ¶ 4).) Hoffer shared her account of what happened to her with Ms. Hagan in the context of seeking advice as to whether to include her account in the protection order filing. (*Id.*) As such, she did not abuse the privilege.

- [43] On an unknown date, Ms. Hoffer stated the following to Carrie Hagan: Plaintiff had a days-long "spiraling" episode, and Ms. Hoffer feared Plaintiff would harm himself or her.

Similarly, this claim fails because the alleged statement is true and because it is privileged. Kenney-Prentiss *did* stay in his bed for several days after the August 29, 2022 incident and concedes that he was spiraling (Dkt. 65-1 at 156-157 (Kenney-Prentiss Dep. at 173:10-174:25) (Q. Is it fair to say that following the incident on August 29th of 2022 that you were in a days-long spiraling episode? A. I was.)), and Hoffer *did* fear that he might harm himself or her. (Dkt. 65-10 (Hoffer Decl. ¶ 6).) Moreover, the statement is entitled to a qualified privilege, given Ms. Hagan's role as a close personal and legal confidant of Hoffer. (*Id.* ¶ 4.) Hoffer shared her concerns with Ms. Hagan in that context. (*Id.*) As such, she did not abuse the privilege.

- [44] On an unknown date, Ms. Hoffer stated the following to Dr. Bart Ferraro: Plaintiff forced her to have non-consensual sex.

This claim fails both because the alleged statement is true and because it is privileged. As noted above, Hoffer did not provide consent to Kenney-Prentiss prior to their sexual encounter on August 29, 2022. According to Kenney-Prentiss, he went to Hoffer's room uninvited, told her that he was there "to use [her]," had sex with her, and Hoffer immediately noted that the incident lacked her consent. (Dkt. 65-1 at 41-45 (Kenney-Prentiss Dep. at 57:4-61:17); Dkt. 65-5 at 4 (Dep. Ex. 8) ("This was not even close to consent.").)) Moreover, the statement is entitled to an absolute privilege, as Hoffer shared her account of what happened as a part of a judicially-ordered psychological evaluation in the custodial dispute. (Dkt. 65-10 (Hoffer Decl. ¶ 7).)

- [45] On an unknown date, Ms. Hoffer stated the following to her therapist: Plaintiff forced her to have non-consensual sex.

As with the prior statement, this claim fails both because the alleged statement is true and because it is privileged. Among other things, Hoffer's statements to her therapist are entitled to privilege. Disclosing such information as a part of a confidential therapeutic relationship is not an abuse of that privilege as a matter of law.

- [46] On an unknown date, Ms. Hoffer stated the following to Kenworthey Bilz: Plaintiff raped her; [47] On an unknown date, Ms. Hoffer stated the following to Greta Lima De la Llave: Plaintiff raped her.

These claims fail because Hoffer's statements are true. Even crediting Kenney-Prentiss' version of events, he went to Hoffer's bedroom uninvited, told her he was there "to use [her]", engaged in sex, and never asked or received consent to his actions. (Dkt. 65-1 at 41-45 (Kenney-Prentiss Dep. at 57:4-61:17).) While the parties may have different views of the incident, that does not make Hoffer's experience or perception of what happened invalid or defamatory. Moreover, these statements are entitled to a qualified privilege, since Kenworthy Bilz is a close legal and personal confidant, and Greta Lima De la Llave is an au pair, the equivalent of a close personal family member. (Dkt. 65-10 (Hoffer Decl. ¶ 5).)

- [48] On an unknown date, Ms. Hoffer stated the following to Greta Lima De la Llave: Plaintiff threw a lamp toward Ms. Hoffer's head, leaving a hole in the wall near her head.

This statement is true and is entitled to the qualified privilege. Per Kenney-Prentiss' own account, while he was living with Hoffer sometime in 2020, he threw his sweatshirt on the ground of the kitchen, told Hoffer not to be a "fucking bitch," called Hoffer a "fucking bitch" via text, repeated that Hoffer was a "fucking bitch" multiple times, and their disagreement then escalated in his bedroom:

> So then she, like, starts -- yeah, so she's in my room. She's blocking the door. She's yelling at me. And I'm just like so pent up with anger that, like -- like, I'm on the far side of the room. And I just get angry, and I just like punch the lamp.

> I had a lamp by my side thing, like, across the room from her. Punched the lamp, and it kind of, like, lands. I don't know, I want to say, like, in the middle of the room …. But punch it, it goes to, like, the middle of the room. Then she starts really yelling. And this is, you know, you're going to -- this is just like my ex -- like, you know, you're going to -- you know, this is a small step away from you're going to murder me and blah, blah, blah, you're going to start hitting me and this is how physical abuse starts. And in just a moment of pique, … I pick up the lamp and I just, like, slam it against the wall and be, like, you know -- in my mind, I'm thinking, like, of course I would never hit you, but, you know, like, why is this happening? But I'm so angry, like, let me destroy this object and, like, this is what I'm doing, right. And I smash it into the wall several times. Then I cause a hole – it's not, like, by Stephanie at all because she's at the door, and I'm, like, by the wall on the other side of my bed. And it has this, like, kind of down half wall thing because it's, you know, in the roof of the garage. And I smash a hole in the wall with the lamp. And then she screams, and then she, like, runs out. And that's what happened.

(Dkt. 65-1 at 160-167 (Kenney-Prentiss Dep. at 177:22-184:23).)

- [49] On an unknown date, Ms. Hoffer stated the following to Greta Lima De la Llave: Plaintiff slept with a gun next to his head, which frightened Ms. Hoffer.

This statement is not defamatory because it is true, not defamatory, entitled to a qualified privilege, and caused Kenney-Prentiss no economic harm. In fact, in the aftermath of the August 29, 2022 incident, during the several days in which Kenney-Prentiss stayed in his bed from August 30 to September 5, Kenney-Prentiss retrieved a handgun from the shelf of his walk-in closet and placed it near his side table. (Dkt. 65-1 at 48-54 (Kenney-Prentiss Dep. 64:6-70:24).) Kenney-Prentiss admits that he moved the gun into his proximity because he was concerned that Hoffer would take it "[b]ecause she would have been afraid [Kenney-Prentiss] was going to off [himself] or she would work herself up and be afraid that [he] was going to off [himself]." (*Id.* 53 (69:1-69:10).) This is not defamation.

- [50] On an unknown date, Ms. Hoffer stated the following to Greta Lima De la Llave: Plaintiff was stalking and harassing her.

Kenney-Prentiss contends this statement is from Ms. De la Llave's deposition. (Dkt. 65-1 at 167 (Kenney-Prentiss Dep. at 184:10-184:19).) In fact, when deposed, Ms. De la Llave (another au pair) testified that Hoffer mentioned that "she was receiving some aggressive messages, emails, phone calls sometimes, and that she didn't want to deal with it anymore," and that there was "[s]talking, because of all the messages she was getting, she did mention, but that's it." (Dkt. 65-11 at 6-9, 13 (De La Llave Dep. at 24:7-24:23, 65:1-9).) This was true and entitled to a qualified privilege, as it was an accurate description of the basis of Hoffer's efforts to secure a protective order and which she shared with Ms. De la Llave in the context of the household. Kenney-Prentiss has no evidence of any economic harm resulting from it.

- [51] On an unknown date, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff had been "spiraling," and when he spirals he does not get out of bed for days.

This statement, taken from Ms. Bornemann's deposition, is not defamatory. Ms. Bornmann testified based upon her own observation as to the reason that Kenney-Prentiss would be an unfit father: "Given his – from what I experienced while both he and I were living at Miss Hoffer's place, his emotional absences at times and the ability [sic] to sometimes not get out of bed and do anything. So I don't know if it is depression or whatnot, I am not qualified to say that, but at points it was, like, obviously debilitating, which, as a full-time care provider, it just can't happen." (Dkt. 65-12 at 6 (Bornemann Dep. at 169:15-169:24).) Thus, this was true, not defamatory, and caused Kenney-Prentiss no economic damages.

- [52] On an unknown date, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff drinks, sleeps all day, and then has sex with an acquaintance at night to cope with major depressive episodes when he is spiraling.

This statement—which Kenney-Prentiss was not able to identify with particularity—is entitled to a qualified privilege as between Hoffer and the au pair and is based upon fact. (Dkt. 65-1 at 168-169 (Kenney-Prentiss Dep. at 185:8-186:19).) Dispositively, Kenney-

Prentiss has no evidence of any actual economic harm stemming from it. (*Id.* at 169-170 (86:25-187:20).)

- [53] On an unknown date, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff was affecting J, J did not want to go to Cleveland, and Ms. Hoffer had no choice but to sue for formalized rights.

Kenney-Prentiss has stipulated that this alleged statement was not defamatory. (*See* Dkt. 65-1 at 171 (Kenney-Prentiss Dep. 188:8-188:22).)

- [54] On November 13, 2023, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff was carrying high-risk HPV for which there is no vaccine coverage.; [55] On November 13, 2023, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff does not tell people that he is carrying high-risk HPV.; [56] On November 13, 2023, Ms. Hoffer stated the following to Ophi Bornemann: Plaintiff withholds information that actively affects the other person.; [57] On November 13, 2023, Ms. Hoffer stated the following to Yana: Plaintiff was carrying high-risk HPV for which there is no vaccine coverage. [58] On November 13, 2023, Ms. Hoffer stated the following to Yana: Plaintiff was withholding medical information necessary for Yana to give true consent.

Kenney-Prentiss has acknowledged that the inclusion of these alleged statements was a mistake as they were the same statements as those addressed in numbers 6 through 8 above. (Dkt. 65-1 at 171-172 (Kenney-Prentiss Dep. at 188:23-189:24).)

- [61] On an unknown date, Ms. Hoffer stated the following to Amber, Yana, Caroline, and Nancy, or attempted to state the following to them: Ms. Hoffer wanted to tell them the [“truth”] about Plaintiff.

Kenney-Prentiss has acknowledged that the “unknown date” of this alleged statement was prior to October 2023, and thus outside the statute of limitations. (Dkt. 65-1 at 173-174 (Kenney-Prentiss Dep. at 190:10-191:7).) In any event, telling someone that she wanted to tell them the truth about Kenney-Prentiss was not defamatory.

- [62] On an unknown date, Ms. Hoffer stated, threatened, or attempted to state to Plaintiff's Marine Corps command that Plaintiff presented safety concerns and was the subject of allegations requiring intervention. Plaintiff identifies this item based on

information presently known and will supplement after discovery concerning whether, when, and to whom any publication or republication occurred.

Kenney-Prentiss has acknowledged he has no personal knowledge of Hoffer making any statements to his Marine Corps command. (Dkt. 65-1 at 174-176 (Kenney-Prentiss Dep. at 191:22-193:9).) In fact, she did not. (Dkt. 65-10 (Hoffer Decl. ¶ 8).)

- [63] On an unknown date, Ms. Hoffer threatened or attempted to state to the Ohio State Bar Association or related professional/legal authorities that Plaintiff had engaged in conduct that should harm his legal career. Plaintiff identifies this item based on information presently known and will supplement after discovery concerning whether, when, and to whom any publication or republication occurred.

Kenney-Prentiss has acknowledged he has no personal knowledge of Hoffer making any statements to the Ohio State Bar Association or any related professional/legal authorities. (Dkt. 65-1 at 177 (Kenney-Prentiss Dep. at 194:9-194:22).) In fact, she did not. (Dkt. 65-10 (Hoffer Decl. ¶ 8).) She is entitled to judgment on this claim.

**C. Invasion of privacy (Count 2)**

The Indiana Supreme Court has held that the term "invasion of privacy" is a label used to describe "four distinct injuries: (1) intrusion upon seclusion, (2) appropriation of [name or] likeness, (3) public disclosure of private facts, and (4) false-light publicity." *Lovings v. Thomas*, 805 N.E.2d 442, 445–46 (Ind. Ct. App. 2004) (quoting *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 593 (Ind. 2001)). Kenney-Prentiss accuses Hoffer of an invasion of his privacy under the first, third, and fourth theories, but his claims fail as a matter of law.

First, Kenney-Prentiss alleges that Hoffer intruded upon his seclusion, surreptitiously going through his text messages in 2018 and threatening to go take pictures of his prescription pills while they lived together. (Dkt. 65-1 at 178-183 (Kenney-Prentiss Dep. 195:12-200:21).) But those actions are alleged to have occurred outside the two-year limitations period,

entitling Hoffer to judgment on that basis. Kenney-Prentiss also contends that Hoffer "went through [his] belongings after [he] moved out", "took several things or took pictures of several things" before they were put into storage, and also took photos of Kenney-Prentiss during the exchange of their child. (*Id.*) But Kenney-Prentiss did not have an expectation of privacy with regard to items that he left behind at Hoffer's home, nor in public places. As a result, Hoffer is entitled to summary judgment as to this theory of liability, as there is no evidence that she invaded his privacy.

In his second and third theories, Kenney-Prentiss accuses Hoffer of publicly disclosing private facts and false-light publicity, alleging she placed him in a false light before the public. (Dkt. 65-1 at 185-195 (Kenney-Prentiss Dep. 202:15-212:22); Dkt. 65-6 at 18-28 (Dep. Ex. 10, Interrogatory No. 3).) Given the numbers of statements identified by Kenney-Prentiss, Hoffer did not have sufficient time to address each of the statements individually during the course of his deposition. But the analysis of these statements mirrors those with the defamation claims, as the comments are not inherently unlawful or are otherwise entitled to privilege. *See* Part III.B *supra*.

Additionally, Kenney-Prentiss's claim fails for reasons that do not require getting into the specific details of each alleged statement. As to both theories of liability, a plaintiff must establish that the defendant gave "publicity" to a matter placing the plaintiff in a false light. Restatement (Second) of Torts § 652E (1977). "'Publicity' … means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Id.* § 652D cmt. a; *see also Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 383 (Ind. 2022) (explaining "[a] communication to a small group of persons is generally not actionable"). Thus, summary

judgment is appropriate where there is not a disclosure sure to reach the public or a large number of people. *See McKenzie*, 185 N.E.3d at 383; *Laux v. Baker*, 238 N.E.3d 692, 703-04 (Ind. Ct. App. 2024) (where a grievance was dismissed and did not lead to the preparation of a formal disciplinary complaint, matter was kept confidential and not available to the public).

Here, the evidence is undisputed that the alleged communications did not reach the public (except by Kenney-Prentiss's filing of this federal action). Rather, the recipients of each of the alleged communications were limited to approximately one to two individuals. (Dkt. 65-1 at 195-196 (Kenney-Prentiss Dep. at 212:12-213:15).) Kenney-Prentiss has no evidence that any of those individuals shared those communications publicly. (*Id.*) Indeed, he only learned of them as a result of utilizing discovery in the state court actions. That is not "the public," as a matter of law. Summary judgment is rightly entered on this basis.

**D. Malicious prosecution (Count 3)**

"In a malicious prosecution claim, the plaintiff must establish that "(1) the defendant ... instituted or caused to be instituted an action against the plaintiff ...; (2) the defendant acted with malice in doing so; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor." *City of New Haven v. Reichhart*, 748 N.E.2d 374, 378 (Ind.2001). "Probable cause has been defined as the apparent state of facts found to exist upon reasonable inquiry which would induce a reasonable, intelligent, and prudent man [or woman] to bring an action." *Display Fixtures Co., a Div. of Stein Indus. v. R. L. Hatcher, Inc.*, 438 N.E.2d 26, 30 (Ind. Ct. App. 1982).

Here, Kenney-Prentiss alleges that Hoffer's pursuit of a protective order amounted to a malicious prosecution. However, his claim fails on the third and fourth prongs, as the undisputed evidence fails to establish that Hoffer "had no probable cause to institute the

action," *City of New Haven*, 748 N.E.2d at 378, or that the action terminated entirely in his favor. Rather, as recognized by the Indiana Court of Appeals in its summary of those proceedings, Hoffer petitioned for a protective order after "[a]fter their volatile romantic relationship ended and their co-parenting became equally problematic." (Dkt. 65-2 at 3 (Dep. Ex. 1).) The trial court found sufficient cause to grant an ex parte order for protection and denied Kenney-Prentiss's efforts to dismiss the petition as frivolous or filed in bad faith. (*Id.*) Then, at the evidentiary hearing, Hoffer presented "presented hundreds of written communications that the parties had exchanged during the six months before the issuance of the ex parte order for protection":

> In these communications, [Kenney-Prentiss] was often profane as he repeatedly accused [Hoffer] of bad parenting, poor character, and undiagnosed mental illness. [Kenney-Prentiss] also repeatedly told [Hoffer] that he and Child would be better off without [Hoffer] in their lives. And he repeatedly turned discussions to his and [Hoffer's] prior romantic relationship despite [Hoffer's] requests in the communications that she and [Kenney-Prentiss] only discuss matters involving Child.

(Dkt. 65-1 at 7-8 (Kenney-Prentiss Dep. at 20:14-21:3); Dkt. 65-2 at 3 (Dep. Ex. 1).)

And while the trial court denied Hoffer's request for a protective order, in doing so, it "further ordered that the same, this Order, does not constitute an unfettered license to communicate directly with [Hoffer] – for though [Kenney-Prentiss] may offer communication to [Hoffer], whether it is responded to or even accepted is up to her." (Dkt. 65-3 at 2 (Dep. Ex. 2).) "Communication should be limited to that necessary for the parties to complete their legal affairs and said communication with [Hoffer], on her election, may be by and through her counsel, Mr. Drew Kirages, or other such attorney as the case may be." (*Id.*) In this way, Hoffer did achieve some measure of success by the action, as the court required that Kenney-

Prentiss not engage in the sorts of communications (such as the 150 calls in one night) that had served as the basis of the protective order action.

**E. Abuse of process (Count 4)**

"A plaintiff claiming abuse of process must show a misuse or misapplication of process for an end other than that which it was designed to accomplish. The two elements of abuse of process are: (1) ulterior purpose or motives; and (2) a willful use of process not proper in the regular conduct of the proceedings. If a party's acts are procedurally and substantively proper under the circumstances then his intent is irrelevant. There is no basis for an abuse of process claim if legal process is used to accomplish an outcome that the process was designed to accomplish." *Estate of Mayer v. Lax, Inc.*, 998 N.E.2d 238, 256-57 (Ind. Ct. App. 2013).

Kenney-Prentiss' abuse of process claim fails on the second element, as he does not (and cannot) identify any evidence that the protective order proceeding was used in a way that was improper in the regular conduct of those proceedings. Hoffer filed a petition for a protective order, seeking the available protections offered on the judicial form available to her. (*See* Dkt. 65-1 at 213-216 (Kenney-Prentiss Dep. at 233:22-236:16); Dkts. 65-7 and 65-8 (Dep. Exs. 11, 12).) That is the proper and regular use of a civil action for a protective order—and is not in any way procedurally or substantively improper. *Brown v. Robertson*, 92 N.E.2d 856, 858 (Ind. Ct. App. 1950) (in banc) ("A regular and legitimate use of process, though with an ulterior motive or bad intention is not a malicious abuse of process.").

Put another way, even if Hoffer had an improper motive in seeking a protective order (an accusation she vehemently disputes), she did not use the civil process in a way that is procedurally and substantively improper. Therefore, the abuse of process claim fails, and Hoffer is entitled to judgment on that claim as a matter of law.

### F. Crime Victims Relief Act Claims and Conversion (Counts 5 and 6)

After moving out of Hoffer's home in September 2023, Kenney-Prentiss left behind personal property in her guest suite. On November 10, 2023, Hoffer messaged Kenney-Prentiss asking that he remove his personal property. (Dkt. 65-9 (Dep. Ex. 13).) Kenney-Prentiss did not remove the personal property, so Hoffer had it moved to storage, where Kenney-Prentiss has access to it and could (and can still) remove it at any time. (Dkt. 65-10 (Hoffer Decl. ¶ 2).) Kenney-Prentiss' contention that Hoffer converted this property lacks any merit. Kenney-Prentiss left, failed to take his property with him, and when he failed to come get it, Hoffer had it moved into a storage (and paid the moving and initial storage fees). That is not conversion, nor is it a basis to assess liability or damages against Hoffer under the Crime Victims Relief Act (CVRA).

Kenney-Prentiss also alleges that Hoffer violated the CVRA by "concealing" their child-in-common, thereby criminally interfering with his custody. (Dkt. 65-1 at 228-231 (Kenney-Prentiss Dep. at 249:22-252:5).) It is a Class C misdemeanor for "[a] person who with the intent to deprive another person of custody or parenting time rights" to "(1) knowingly or intentionally take[]; (2) knowingly or intentionally detain[]; or (3) knowingly or intentionally conceal[]; a person who is less than eighteen (18) years of age…." I.C. § 35-42-3-4(b).

Here, Kenney-Prentiss acknowledges that he knew that their child-in-common was physically living with Hoffer in Zionsville. (*See* Dkt. 65-1 at 228-231 (Kenney-Prentiss Dep. at 249:22-252:5).) He takes issue with the fact that Hoffer may not have given him advance notice that she was taking her family on vacation or as to each instance the child stayed

overnight at the parent of Hoffer's other children. (*See id.*) That is not criminal concealment. Hoffer is entitled to judgment on these counts as a matter of law.

**G. Intentional infliction of emotional distress ("IIED") (Count 7)**

An IIED claim exists where "'one who by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to another is subject to liability for such emotional distress.'" *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996). "The elements of [IIED] are that a defendant: (1) engages in extreme and outrageous conduct; (2) which intentionally or recklessly; (3) causes; (4) severe emotional distress to another." *Waldrip v. Waldrip*, 976 N.E.2d 102, 117 (Ind. Ct. App. 2012).

Indiana courts "impose[] strict limits on conduct severe enough to support an IIED claim." *Rowe v. Gary Housing Auth.*, No. 2:06-cv-291, 2008 WL 754254, at *5 (N.D. Ind. Mar. 18, 2008); *Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 127–28 (Ind. Ct. App. 1992) (noting Indiana Supreme Court's "long-standing reluctance to recognize the tort of intentional infliction of emotional distress in this state, and its only recent recognition of this tort . . . in very limited circumstances"). The comments to the Restatement explain:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. . . . **The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.** The rough edges of our society are still in need of a good deal of filing down, and in the meantime **plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt.** There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Gable*, 673 N.E.2d at 810 (quoting Restatement (Second) of Torts § 46 at 72-73) (emphasis supplied). "In the appropriate case, the question can be decided as a matter of law." *Haegert v. McMullan*, 953 N.E.2d 1223, 1235 (Ind. Ct. App. 2011) (citation omitted).

Here, Kenney-Prentiss's claim fails on the first element, as the undisputed evidence fails to show that Hoffer engaged in any conduct that would rise to the level of "extreme and outrageous" necessary to sustain such a claim. Instead, when he was asked to identify what conduct by Hoffer serves as the basis of his IIED claim, Kenney-Prentiss pointed to the "entire history" of his relationship with Hoffer, including the various actions offered in support of his other claims (which fail for the reasons discussed as to them) and claiming that "it was just years of lying, dishonesty, intentional pain being inflicted, the whole nine yards." (Dkt. 65-1 at 238-239 (Kenney-Prentiss Dep. at 265:6-266:10).) For example, he contends that the recent implementation of a 30-minute time limit on FaceTime meetings with their child-in-common has amounted to IIED, as it has prevented Kenney-Prentiss from spending hours reading *Percy Jackson* books with his son or playing the "imagination game" with him. (*Id.* at 239-241 (266:11-268:10).)

But the law does not contemplate that the sort of interpersonal conflicts or parental disputes that Kenney-Prentiss seeks to characterize as IIED are the sort of extreme and outrageous conduct necessary to support such a tortious claim. Indeed, if that were the case, our courts would be overrun with disgruntled boyfriends, fiancées, divorcees, and co-parents suing each other for all the perceived slights of relationships gone sour.

**H. Civil conspiracy (Count 9)**

Finally, Kenney-Prentiss asserts a civil conspiracy claim. "[C]ivil conspiracy is not an independent cause of action," *Newland Resources, LLC v. Branham Corp.*, 918 N.E.2d 763, 776

(Ind. Ct. App. 2009), and must be based upon an underlying tort. Here, Kenney-Prentiss accused Hoffer of engaging in a civil conspiracy with David Perry (the co-parent of her other two children) and her au pairs to "evade service of process, defy court orders, procure a 'frivolous' protective order, and steal [Kenney-Prentiss'] property" (Dkt. 29 at 4.) As set forth above, the undisputed evidence shows that Hoffer did not engage in a malicious prosecution and did not unlawfully convert Kenney-Prentiss' property. Kenney-Prentiss has insufficient evidence of any tort to which his claim could attach. Accordingly, summary judgment is also rightly entered in her favor on the civil conspiracy claim.

## IV. Conclusion

Kenney-Prentiss has alleged that Hoffer engaged in hundreds of unlawful acts over the course of the last decade—throwing the messiness of their failed relationship against the wall and hoping that something sticks. In this brief, Hoffer and her counsel have done their best to winnow through the immense volume of accusations that Kenney-Prentiss has made against her efficiently and with specificity and clarity. To the extent that the Court finds that there are any statements or actions that somehow escaped her analysis or that merit further review, Hoffer asks that she be given an opportunity to address those concerns.

Hoffer respectfully requests that summary judgment be granted in her favor.

Respectfully submitted,

*/s/ Philip R. Zimmerly*

Philip R. Zimmerly (Attorney No. 30217-06)
Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000
(317) 684-5173 (FAX)
PZimmerly@boselaw.com

*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2026, a copy of the foregoing document was filed electronically, that a copy was emailed to *pro se* Plaintiff, and that a copy will follow via United States Mail:

James Michael Kenney-Prentiss
1220 W 6th Street, Suite 303
Cleveland, OH 44113
440-212-6672
JMKP@JusticeInCleveland.com

*/s/ Philip R. Zimmerly*
Philip R. Zimmerly